No. 24-10367

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF
COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW
CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF
AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS,

*Plaintiffs-Appellees*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM;
JEROME POWELL in his official capacity as Chairman of the Board of
Governors of the Federal Reserve System; FEDERAL DEPOSIT INSURANCE
CORPORATION; MARTIN GRUENBERG in his official capacity as Chairman
of the Federal Deposit Insurance Corporation; OFFICE OF THE COMPTROLLER
OF THE CURRENCY; MICHAEL J. HSU in his official capacity as Acting
Comptroller of the Currency,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
No. 2:24-cv-25
(Honorable Matthew J. Kacsmaryk)

---

## BRIEF FOR DEFENDANTS-APPELLANTS

---

*(counsel listed on following page)*

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel
Nicholas Jabbour, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
nick.jabbour@frb.gov
Phone: (202) 815-7450

*Counsel for Defendants-Appellants Board of Governors of the Federal Reserve
System and Jerome Powell, in his Official Capacity*

Theodore J. Dowd II, Acting Chief Counsel
Patricia S. Grady, Deputy Chief Counsel
Peter C. Koch, Director for Litigation
Ashley W. Walker, Special Counsel, Litigation
Office of the Comptroller of the Currency
400 7th Street SW, Mailstop 9E-1
Washington, DC 20219
ashley.walker@occ.treas.gov
Phone: (202) 649-6315

*Counsel for Defendants-Appellants Office of the Comptroller of the Currency and
Michael J. Hsu, in his Official Capacity*

Harrel M. Pettway, General Counsel
B. Amon James, Assistant General Counsel
J. Scott Watson, Senior Counsel
Michelle Ognibene, Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226-3500
mognibene@fdic.gov
Phone: (703) 562-2121

*Counsel for Defendants-Appellants Federal Deposit Insurance Corporation and
Martin Gruenberg, in his Official Capacity*

# CERTIFICATE OF INTERESTED PERSONS

*Texas Bankers Association et al. v. Board of Governors of the Federal Reserve System et al.*, No. 24-10367

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## Plaintiffs-Appellees

Texas Bankers Association

Amarillo Chamber of Commerce

American Bankers Association

Chamber of Commerce of the United States of America

Longview Chamber of Commerce

Independent Community Bankers of America

Independent Bankers Association of Texas

## Defendants-Appellants

Board of Governors of the Federal Reserve System

Jerome Powell, in his official capacity as Chairman of the Board of Governors of the Federal Reserve System

Office of the Comptroller of the Currency

Michael J. Hsu, in his official capacity as Acting Comptroller of the Currency

Federal Deposit Insurance Corporation

Martin Gruenberg, in his official capacity as Chairman of the Federal
Deposit Insurance Corporation

## **Counsel**

For Plaintiffs-Appellees:

> Ryan Thomas Scarborough
> Jesse T. Smallwood
> Sarah M. Harris
> Tyler J. Becker
> Braden G. Currey
> Alexander Cole Gaudio
> Armani Jamal Madison
> William Robert Murray, Jr.
> Richard Alan Olderman
> Williams & Connolly, L.L.P.
> 680 Maine Avenue, S.W.
> Washington, DC 20024
>
> Slater Chalfant Elza
> Underwood Law Firm, P.C.
> 500 S. Taylor Street
> Amarillo, TX 79101
>
> Tyler Stephen Badgley
> Jennifer B. Dickey
> Maria Monaghan
> U.S. Chamber Litigation Center
> 1615 H Street, N.W.
> Washington, DC 20062
>
> Andrew Doersam
> Thomas Pinder
> American Bankers Association
> 1333 New Hampshire Avenue, N.W.
> Washington, DC 20036

For Defendants-Appellants:

Mark Van Der Weide
Richard M. Ashton
Joshua P. Chadwick
Nicholas Jabbour
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551

Theodore J. Dowd II
Patricia S. Grady
Peter C. Koch
Ashley W. Walker
Office of the Comptroller of the Currency
400 7th Street SW, Mailstop 9E-1
Washington, DC 20219

Harrel M. Pettway
B. Amon James
J. Scott Watson
Andrew J. Dober
Michelle Ognibene
Herbert G. Smith II
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226-3500

## **Banks**

Plaintiff-Appellee Texas Bankers Association claims to represent "more than 400 member banks—comprised of community and regional banks, bank holding companies and savings institutions across the state of Texas." ROA.91.

Plaintiff-Appellee American Bankers Association claims to represent "small, regional, and large banks … located in each of the fifty States and the District of Columbia." ROA.92-93.

Plaintiff-Appellee Independent Community Bankers of America claims to

represent "thousands of community banks … located in each of the fifty States and the District of Columbia." ROA.94.

Plaintiff-Appellee Independent Bankers Association of Texas claims to represent "more than 2,000 banks and branches" in Texas. ROA.95.

_/s/ *Nicholas Jabbour*_____
Nicholas Jabbour
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
nick.jabbour@frb.gov
Phone: (202) 815-7450

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellants Board of Governors of the Federal Reserve System and Chairman Jerome Powell ("Federal Reserve Board"), Office of the Comptroller of the Currency and Acting Comptroller of the Currency Michael J. Hsu ("OCC"), and Federal Deposit Insurance Corporation and Chairman Martin Gruenberg ("FDIC")—collectively, the federal banking agencies ("FBAs")—respectfully request oral argument.

The FBAs have for nearly 50 years applied the text of the Community Reinvestment Act requiring them to assess whether each depository institution they supervise is "meeting the credit needs of its entire community." 12 U.S.C. § 2903(a)(1). The FBAs recently issued a Final Rule to ensure that they continue to follow this central command of the statute. However, the district court issued a preliminary injunction to prevent the Final Rule from taking effect, primarily on the ground that it exceeded the FBAs' statutory authority. The FBAs believe oral argument would provide substantial assistance to the Court in understanding the district court's errors, including how the district court misconstrued the text of the statute.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 4

STATEMENT OF THE ISSUES ............................................................ 5

PERTINENT STATUTES ...................................................................... 5

STATEMENT OF THE CASE ................................................................ 5

    A.    Statutory and Regulatory Background ................................... 5

    B.    Procedural History ............................................................... 15

SUMMARY OF ARGUMENT .............................................................. 17

STANDARD OF REVIEW .................................................................... 18

ARGUMENT ......................................................................................... 18

I.    The FBAs Did Not Exceed Their Statutory Authority by Issuing Regulations That Evaluate Retail Lending in a Bank's "Entire Community" ...................................................................................... 18

    A.    The text of the CRA contains no exclusions with respect to a bank's "entire community" ................................................. 19

    B.    The structure, history, and purpose of the CRA confirm that there are no exclusions from a bank's "entire community" ........................ 22

    C.    The district court's analysis of the statute was flawed ...................... 27

1.    The district court erred in its interpretation of a CRA amendment concerning institutions serving military personnel .................................................................. 27

2.    The district court erred in using the "whole-text canon" to rewrite the statute ................................................... 32

3.    The district court erred in using subsequent unenacted legislation as a statutory construction tool.............................. 33

D.    The FBAs adequately justified their decision to evaluate more locations where retail lending is conducted ....................................... 35

E.    The Major Questions Doctrine is inapplicable.................................. 37

II.    The FBAs Did Not Exceed Their Statutory Authority by Including Deposit Products and Digital Delivery Systems in Evaluating Whether "Credit Needs" Are Being Met.................................................................. 41

III.    The District Court Erred in Finding that Plaintiffs Showed Irreparable Harm.................................................................. 45

A.    The district court failed to assess whether the claimed compliance costs were more than *de minimis*......................................................... 45

B.    Plaintiffs' claimed compliance costs lacked the immediacy necessary for preliminary relief........................................................... 47

IV.    The District Court's Assessment of the Balance of Equities and Public Interest Was Flawed.................................................................. 51

CONCLUSION ..................................................................................... 55

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Advocate Health Care Network v. Stapleton*,
    581 U.S. 468 (2017) ..................................................................... 22

*Alabama Association of Realtors v. HHS*,
    594 U.S. 758 (2021) ..................................................................... 39

*Azar v. Allina Health Services*,
    587 U.S. 566 (2019) ..................................................................... 22

*Barnhart v. Peabody Coal Co.*,
    537 U.S. 149 (2003) ..................................................................... 28

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ................................................................ 39

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ..................................................................... 20

*Calogero v. Shows, Cali & Walsh, L.L.P.*,
    970 F.3d 576 (5th Cir. 2020) ...................................................... 32

*Canal Authority of State of Florida v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ...................................................... 55

*Cantero v. Bank of America, N.A.*,
    144 S. Ct. 1290 (2024) ................................................................ 26

*Career Colleges & Schools of Texas v. U.S. Dep't of Education*,
    98 F.4th 220 (5th Cir. 2024) ................................................. 46, 48

*Cascabel Cattle Co., L.L.C. v. United States*,
    955 F.3d 445 (5th Cir. 2020) ...................................................... 33

*Cheapside Minerals, Ltd. v. Devon Energy Production Co., L.P.*,
    94 F.4th 492 (5th Cir. 2024).......................................................... 20

*Coastal Conservation Association v. U.S. Dep't of Commerce*,
    846 F.3d 99 (5th Cir. 2017).................................................... 28, 31

*Dean v. United States*,
    556 U.S. 568 (2009).......................................................................... 31

*Deanda v. Becerra*,
    96 F.4th 750 (5th Cir. 2024).................................................... 34, 35

*Div. 80, LLC v. Garland*,
    2022 WL 3648454 (S.D. Tex. Aug. 23, 2022)............................ 48

*Dolan v. Postal Service*,
    546 U.S. 481 (2006)......................................................................... 32

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)......................................................................... 35

*Harrison v. Young*,
    48 F.4th 331 (5th Cir. 2022)......................................................... 18

*Holland American Insurance Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985)........................................................ 48

*Huntington Ingalls, Inc. v. Director, Office of Workers' Compensation Programs, United States Dep't of Labor*,
    70 F.4th 245 (5th Cir. 2023)............................................. 18, 19, 20

*In re Crocker*,
    941 F.3d 206 (5th Cir. 2019)........................................................ 25

*In re Fort Worth Chamber of Commerce*,
    100 F.4th 528 (5th Cir. 2024)....................................................... 21

*In re Ramirez*,
    204 F.3d 595 (5th Cir. 2000)........................................................ 24

*King v. Burwell*,
    576 U.S. 473 (2015) ....................................................................... 39

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ..................................................... 19, 35, 43

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ....................................................... 46

*Marx v. General Revenue Corp.*,
    568 U.S. 371 (2013) ............................................................... 28, 29

*Medical Center Pharmacy v. Mukasey*,
    536 F.3d 383 (5th Cir. 2008) ....................................................... 34

*Morehouse Enterprises, LLC v. ATF*,
    78 F.4th 1011 (8th Cir. 2023) ....................................................... 47

*Mourning v. Family Publications Service, Inc.*,
    411 U.S. 356 (1973) ....................................................................... 43

*National Federation of Independent Business v. OSHA*,
    595 U.S. 109 (2022) ....................................................................... 39

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................... 18

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ....................................................................... 34

*Restaurant Law Center v. Dep't of Labor*,
    66 F.4th 593 (5th Cir. 2023) ....................................................... 46

*Roberts v. Sea-Land Servs., Inc.*,
    566 U.S. 93 (2012) ......................................................................... 24

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) ........................................................................... 20

v

*Russello v. United States*,
464 U.S. 16 (1983) ........................................................................ 23

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
531 U.S. 159 (2001) ...................................................................... 34

*Spivey v. Chitimacha Tribe of Louisiana*,
79 F.4th 444 (5th Cir. 2023) ......................................................... 21

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) ......................................................... 48

*Texas v. EPA*,
662 F. Supp. 3d 739 (S.D. Tex. 2023) ........................................... 48

*United States v. Vonn*,
535 U.S. 55 (2002) ........................................................................ 30

*Voting for America, Inc. v. Steen*,
732 F.3d 382 (5th Cir. 2013) ......................................................... 51

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......................................................... 37, 38, 39

*Winter v. Natural Resources Defense Council, Inc.,*
555 U.S. 7 (2008) .................................................................. 18, 46

**Statutes**

12 U.S.C. § 24 .............................................................................. 26

12 U.S.C. § 24 (Seventh) ............................................................. 26

12 U.S.C. § 1464 .......................................................................... 26

12 U.S.C. §§ 2901-2908 ................................................................. 5

12 U.S.C. § 2901 .......................................................................... 25

12 U.S.C. § 2901(b) ..................................................................... 25

12 U.S.C. § 2902(3) ............................................................... 6, 23

12 U.S.C. § 2902(4) ...................................................................... 27

12 U.S.C. § 2903(a) ................................................................. 23, 24

12 U.S.C. § 2903(a)(1)................................... 1, 6, 10, 19, 21, 23, 25, 29, 31, 32, 41

12 U.S.C. § 2903(a)(2)............................................................... 6, 23

12 U.S.C. § 2903(b) ............................................................... 3, 31, 42

12 U.S.C. § 2903(d) ...................................................................... 31

12 U.S.C. § 2905 .................................................................. 1, 6, 42

12 U.S.C. § 2906 .......................................................................... 30

12 U.S.C. § 2906(a)(1).................................................................... 24

12 U.S.C. § 2907(a) ............................................................... 3, 31, 42

28 U.S.C. § 1292(a)(1)..................................................................... 5

28 U.S.C. § 1331 ............................................................................ 4

Home Mortgage Disclosure Act of 1975,
    Pub. L. No. 94-200, § 304(a)(1) , 89 Stat. 1124, 1125 (1975) .................... 42

The Community Reinvestment Act of 1977,
    Pub. L. No. 95-128, 91 Stat. 1147 (1977) ............................................. 5, 22
        § 802(b), 91 Stat. at 1147 (codified at 12 U.S.C. § 2901(b)).................. 25
        § 803(3), 91 Stat. at 1147-48 (codified at 12 U.S.C. § 2902(3)) ....... 6, 23
        § 804, 91 Stat. at 1148 (codified at 12 U.S.C. § 2903(a)).................... 23
        § 804(1), 91 Stat. at 1148 (codified at 12 U.S.C. § 2903(a)(1)) ... 5, 6, 21
        § 804(2), 91 Stat. at 1148 (codified at 12 U.S.C. § 2903(a)(2)) ............. 6
        § 806, 91 Stat. at 1148 (codified at 12 U.S.C. § 2905) ........................... 6
    Pub. L. No. 95-630, 92 Stat. 3641 (1978),
        § 1502, 92 Stat. at 3713 (codified at 12 U.S.C. § 2902(4)) ............. 24, 27

Pub. L. No. 101-73, 103 Stat. 183 (1989)
  § 744(q), 103 Stat. at 440 (codified at 12 U.S.C. § 2902(2))................ 24
  § 1212(b), 103 Stat. at 527
  (codified at 12 U.S.C. § 2906(a), (b), (c))......................................24, 30
Pub. L. No. 102-233, 105 Stat. 1761 (1991)
  § 402(b), 105 Stat. at 1774 (codified at 12 U.S.C. § 2907) ............. 24, 31
Pub. L. No. 102–242, 105 Stat. 2236 (1991)................................................ 24
  § 222, 105 Stat. at 2306 (codified at 12 U.S.C. § 2906(b)(1)(B)) ......... 24
Pub. L. No. 102-550, 106 Stat. 3672 (1992)
  § 909, 106 Stat. at 3874 (codified at 12 U.S.C. §§ 2903(b), 2907(a))... 24
  § 909(1), 106 Stat. at 3874 (codified at 12 U.S.C. § 2903(b))............... 31
  § 909(2), 106 Stat. at 3874 (codified at 12 U.S.C. § 2907(a))............... 31
Pub. L. No. 103–328, 108 Stat. 2338 (1994)
  § 110, 108 Stat. at 2364
  (codified at 12 U.S.C. §§ 2906(b), (d), (e)) ....................................24, 30
Pub. L. No. 106–102, 113 Stat 1338 (1999)
  § 103(b), 113 Stat. at 1350 (codified at 12 U.S.C. § 2903(c)) .............. 24
  § 712, 113 Stat. at 1469 (codified at 12 U.S.C. § 2908) ....................... 24
Pub. L. No. 110–315, 122 Stat. 3078 (2008)
  § 1031(a), 122 Stat. at 3488 (codified at 12 U.S.C. § 2903(d))....... 24, 31
Pub. L. No. 111–203, 124 Stat. 1376 (2010)
  § 358, 124 Stat. at 1548 (codified at 12 U.S.C. §§ 2902(1), 2905) ....... 24

Tex. Fin. Code § 32.001 ............................................................................... 26

**Rules**

Fed. R. App. P. 4(a)(1)(B) ............................................................................. 5

**Regulations**

12 C.F.R. Part 25, app. G ............................................................................. 2
  § 25.12(n)......................................................................................................7
  § 25.22 ..........................................................................................................8
  § 25.23 ..........................................................................................................8
  § 25.24 ..........................................................................................................8
  § 25.25(b) ......................................................................................................7
  § 25.26 ..........................................................................................................8
  § 25.26(c) ....................................................................................................15
  § 25.27 ..........................................................................................................7

§ 25.41(c)(2) ................................................................ 2, 7

## Regulatory Materials

43 Fed. Reg. 47144 (Oct. 12, 1978)............................................ 6, 25, 38

60 Fed. Reg. 22156 (May 4, 1995) ................................................... 6

61 Fed. Reg. 54647 (Oct. 21, 1996).................................................. .38

81 Fed. Reg. 48506 (July 25, 2016)............................................. 7, 8, 38

87 Fed. Reg. 33884 (June 3, 2022) ............................................ 9, 35, 36

88 Fed. Reg. 87895 (Dec. 20, 2023) ............................................. 7, 14

89 Fed. Reg. 6574 (Feb. 1, 2024) (Final Rule)............................... *passim*

## Other Authorities

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1
    (3d ed. Apr. 2021 update) ............................................... 48

A. Scalia & B. Garner, *Reading Law: The Interpretation of*
    *Legal Texts* (2012) ............................................. 20, 25, 34

*Black's Law Dictionary* (5th ed. 1979) ................................................. 25

Comment Letter of American Bankers Association (Aug. 5, 2022),
    https://www.regulations.gov/comment/OCC-2022-0002-0484 .................. 54

Comment Letter of Independent Community Bankers of America (Aug. 5, 2022),
    https://www.regulations.gov/comment/OCC-2022-0002-0315 ............. 52, 54

Comment Letter of Independent Bankers Association of Texas (July 27, 2022),
    https://www.regulations.gov/comment/OCC-2022-0002-0055 .................. 54

Comment Letter of U.S. Chamber of Commerce (Aug. 5, 2022),
    https://www.regulations.gov/comment/OCC-2022-0002-0448 .................. 54

Community Reinvestment Act Examination Procedures (1978),
https://fraser.stlouisfed.org/title/district-notices-federal-
reserve-bank-dallas-5569/regulation-bb--community-reinvestment-act-
542590 .................................................................................................. 25

Federal Reserve Board, Consumer Compliance and Community Reinvestment
Act (CRA) Examination Mandates (last accessed July 17, 2024),
https://www.federalreserve.gov/supervisionreg/caletters/Attachment_CA
_13-20_Frequency_Guidance.pdf ................................................................ 7

Federal Deposit Insurance Corporation, Consumer Compliance Examinations –
Examination and Visitation Frequency (last accessed July 17, 2024),
https://www.fdic.gov/resources/supervision-and-examinations//consumer-
compliance-examination-manual/documents/2/ii-12-1.pdf .......................... 7

Office of the Comptroller of the Currency, Community Reinvestment Act (CRA)
Questions and Answers for Bank Customers, *How often does the OCC
conduct a CRA examination?* (last accessed July 17, 2024),
https://www.occ.treas.gov/topics/consumers-and-communities//cra/cra-
questions-and-answers.html#8 ...................................................................... 7

Office of the Comptroller of the Currency, Federal Reserve Board, Federal Deposit
Insurance Corporation, *Interagency Overview of the Community
Reinvestment Act Final Rule* (Oct. 2023), https://www.federalreserve.gov/
aboutthefed/boardmeetings/files/cra-key-objectives-20231024.pdf. ............. 9

*Webster's New Collegiate Dictionary* (1976) ............................................ 19, 20, 41

## INTRODUCTION

The Community Reinvestment Act ("CRA") was enacted in 1977 following years of "redlining" by banks, a practice in which banks did not lend in certain communities, including those comprised primarily of low- and moderate-income ("LMI") neighborhoods. In language that has remained unchanged since its enactment, the statute directs the FBAs to "assess [a bank's] record of meeting the credit needs of its entire community, including [LMI] neighborhoods" as part of the examination of that bank. 12 U.S.C. § 2903(a)(1). The statute also has, since 1977, directed that "[r]egulations to carry out the purposes of this chapter shall be published" by the FBAs. *Id.* § 2905. For nearly 50 years, the FBAs have followed these commands, and did so again recently, issuing a Final Rule that is the most comprehensive update of the implementing regulations since 1995. *See* 89 Fed. Reg. 6574 (Feb. 1, 2024).

The district court, however, preliminarily enjoined the Final Rule from taking effect. The court claimed to be interpreting the CRA's text to determine whether the FBAs exceeded their authority in issuing the Final Rule, but instead misconstrued the statutory text to find in Plaintiffs' favor with respect to the two issues presented.

*First*, following Congress's direction to assess a bank's CRA record within its "entire community," the Final Rule provides that the FBAs will evaluate a

bank's retail lending—*e.g.*, the origination and purchase of home mortgage loans and small business loans—not only in the geographic areas where the bank maintains deposit-taking facilities, but also, for a subset of banks that conduct significant activity away from branches, in other geographic areas where the bank conducts retail lending. *See* 89 Fed. Reg. at 7114-15. The existing regulations are mostly focused on retail lending occurring near a bank's main office, branches, and deposit-taking ATMs (*see, e.g.*, 12 C.F.R. app. G § 25.41(c)(2)),[1] but because of changes in the banking industry since the last comprehensive update to the regulations in 1995, a subset of banks, such as primarily online banks, are now conducting substantial shares of their retail lending away from these physical facilities, creating a lack of parity in how institutions with different business models are evaluated. *See, e.g.*, 89 Fed. Reg. at 6759. The best interpretation of the CRA is that it supports this regulatory improvement, as Congress directed that banks must be evaluated in their "entire community" and did not include any limitations on the "entire community." Nonetheless, the district court created a new limitation, indicating that the "entire community" must encompass only those "geographic areas surrounding a bank's *physical* facilities," and exclude the parts

---

[1] Throughout this brief, the reference to "existing regulations" refers to the regulations that were in effect prior to the Final Rule. The existing regulations are found in different parts of the Code of Federal Regulations, depending on the agency. For simplicity, this brief will cite to the OCC's regulations in the e-CFR, found at 12 C.F.R. part 25, appendix G, when referring to the existing regulations.

of a bank's "entire community" outside of those areas. ROA.595. Such rewriting of the statute is impermissible.

*Second*, following Congress's direction to assess whether a bank is "meeting the credit needs" of its entire community, the Final Rule provides that the CRA evaluation of certain banks will include, among many other factors, an evaluation of deposit products responsive to the needs of LMI individuals, families, and households, as well as digital services that facilitate the ability to access credit. 89 Fed. Reg. at 7120-22. By choosing the phrase "meeting the credit needs," rather than focusing merely on making loans, Congress signaled that the FBAs should evaluate factors other than merely whether a bank is making loans. Indeed, the statute provides examples elsewhere that do not concern the origination of loans. *See* 12 U.S.C. § 2903(b) ("capital investment, loan participation, and other ventures" can count toward "meet[ing] the credit needs" of communities); 12 U.S.C. § 2907(a) (one institution "donat[ing], sell[ing] on favorable terms … , or mak[ing] available on a rent-free basis any branch" located in certain neighborhoods to certain other institutions can count toward "meeting the credit needs" of a community). Nonetheless, the district court adopted an unduly cramped reading of the statute focused only on making loans. ROA.599. This, too, was error.

The district court compounded its statutory construction errors in its consideration of the other preliminary injunction factors. On irreparable harm, despite the FBAs demonstrating that Plaintiffs' claimed compliance costs are *de minimis* and do not need to be incurred imminently given a lengthy transition period and forthcoming guidance, the district court found irreparable harm simply because there would be *any* amount of "nonrecoverable compliance costs." ROA.602-04. As for the balance of equities and the public interest, the district court failed to properly take account of the record evidence indicating that numerous stakeholders supported updating the CRA regulations to ensure that every bank is "meeting the credit needs of its entire community," that 70% of banks will have the same or a *lower* regulatory burden under the Final Rule as compared with their burden under the existing regulations, and that the Final Rule contained many benefits related to community development activities that Plaintiffs themselves supported. ROA.606-08.

Because of the district court's errors, the FBAs respectfully request that its preliminary injunction order be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331 and moved for a preliminary injunction. ROA.96, 234. The district court granted that motion in an opinion and order dated March 29, 2024. ROA.586-608.

4

Defendants timely appealed on April 18, 2024. ROA.619-20; *see* Fed. R. App. P.

4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the Final Rule recently issued by the FBAs (89 Fed. Reg.

6574 (Feb. 1, 2024)) is consistent with the CRA (12 U.S.C. §§ 2901-2908) such

that Plaintiffs have failed to demonstrate that they are likely to succeed on the

merits of their claim that the FBAs exceeded their statutory authority.

2.      Whether other preliminary injunction factors further demonstrate that

the district court abused its discretion.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

1.      The CRA was enacted in 1977 following years of "redlining" by

banks, a practice in which banks did not lend in certain communities, including

those comprised primarily of LMI neighborhoods. *See* 91 Stat. 1147-48 (1977).

The operative provision of the statute, which has remained unchanged to the

present, requires an FBA, in examining an insured depository institution it

supervises, to "assess the institution's record of meeting the credit needs of its

entire community, including [LMI] neighborhoods." 91 Stat. 1148, § 804(1)

(codified at 12 U.S.C. § 2903(a)(1)). The CRA does not impose any penalties or civil liability for poor CRA performance, but instead instructs the FBAs to take an institution's record of meeting the credit needs of its entire community "into account in [the] evaluation of an application for a deposit facility by [the] institution." 91 Stat. 1148, § 804(2) (codified at 12 U.S.C. § 2903(a)(2)). The term "application for a deposit facility" is defined to include any of six types of banking applications, including an application for "the establishment of a domestic branch or other facility with the ability to accept deposits of a regulated financial institution," as well as "the merger or consolidation with, or the acquisition of the assets, or the assumption of the liabilities of a regulated financial institution." 91 Stat. 1147-48, § 803(3) (codified at 12 U.S.C. § 2902(3)).

The CRA directs that "[r]egulations to carry out the purposes of this title shall be published by each appropriate Federal financial supervisory agency." 91 Stat. 1148, § 806 (codified at 12 U.S.C. § 2905). The FBAs published the first CRA regulations in 1978. *See* 43 Fed. Reg. 47144 (Oct. 12, 1978). Since that time, the FBAs have revised and updated the regulations on various occasions, with the most recent comprehensive update—before the issuance of the Final Rule—completed in 1995. *See* 60 Fed. Reg. 22156 (May 4, 1995). In addition, the FBAs have periodically published guidance on the regulations in the form of Interagency Questions and Answers, with the most recent comprehensive Interagency

Questions and Answers finalized in 2016 after public notice and comment. *See* 81 Fed. Reg. 48506 (July 25, 2016).

**2.**    CRA examinations of a bank typically occur every three to five years.[2] The examinations vary depending on the asset size of the institution, with most banks categorized as "large," "intermediate," or "small."[3] Generally, under the existing regulations, a bank must delineate "assessment areas" where its main offices, branches, and deposit-taking ATMs are located, as well as surrounding census tracts where a substantial portion of its loans are originated or purchased. 12 C.F.R. app. G § 25.41(c)(2).

Within these assessment areas, all small, intermediate, and large banks are evaluated under lending tests that focus on whether a bank's lending activities are

---

[2] *See* Exam Frequency Schedules, *available at* https://www.federalreserve.gov/supervisionreg/caletters/Attachment_CA_13-20_Frequency_Guidance.pdf (Federal Reserve Board); https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/2/ii-12-1.pdf (FDIC); and https://www.occ.treas.gov/topics/consumers-and-communities/cra/cra-questions-and-answers.html#8 (OCC).

[3] The existing regulations use the phrase "intermediate small," instead of "intermediate." *See, e.g.*, 88 Fed. Reg. 87895, 87897 (2023). For simplicity, this brief uses the term "intermediate" when describing the "intermediate small" category under the existing regulations. The existing regulations contain separate, non-size categories for banks with special business models, including limited purpose banks (banks that only offer a narrow product line such as credit cards), 12 C.F.R. app. G §§ 25.12(n), 25.25(b), and strategic plan banks (banks that develop a strategic plan with the input of the community), *id.* § 25.27. Plaintiffs' challenge does not concern provisions of the Final Rule expressly regarding these bank types.

meeting the credit needs of its community. *See id.* § 25.22 (lending test for large banks); *id.* § 25.26 (lending test for small and intermediate banks). In addition, current guidance provides for some CRA consideration of retail lending in areas outside of assessment areas. 81 Fed. Reg. at 48538 ("Consideration will be given for loans to low- and moderate-income persons and small business and farm loans outside of an institution's assessment area(s), provided the institution has adequately addressed the needs of borrowers within its assessment area(s).").

In addition, large banks are evaluated under a service test that assesses "the availability and effectiveness of a bank's systems for delivering retail banking services." *Id.* § 25.24. Products such as "low-cost deposit accounts" are evaluated under the service test as a retail banking service that "improve access to financial services, or decrease costs, for [LMI] individuals." 81 Fed. Reg. at 48542. Thus, in assessing a bank's performance in meeting community credit needs, examiners review "data regarding the costs and features of loan and deposit products, account usage and retention, [and] geographic location of accountholders," including whether they are "meet[ing] the particular needs of [LMI] geographies." 81 Fed. Reg. at 48543.[4]

**3.**     On June 3, 2022, the FBAs published a notice of proposed rulemaking

---

[4] The existing regulations also have an investment test (12 C.F.R. app. G § 25.23), but that test does not bear on any of the issues that Plaintiffs raised in the district court.

to, among other things, "[u]pdate CRA regulations to strengthen the achievement of the core purpose of the statute," and "[a]dapt to changes in the banking industry, including the expanded role of mobile and online banking." 87 Fed. Reg. 33884, 33885 (June 3, 2022); *see also* 89 Fed. Reg. at 6575. Among other updates, the FBAs proposed to revise the existing performance tests to promote clarity and consistency in CRA evaluations. The table below summarizes the performance tests in the Final Rule for small, intermediate, and large banks:[5]



At issue in this appeal are elements of two of the new performance tests—the Retail Lending Test and the Retail Services and Products Test.[6]

---

[5] This table is adapted from the *Interagency Overview of the Community Reinvestment Act Final Rule* (Oct. 2023), *available at* https://www.federalreserve.gov/aboutthefed/boardmeetings/files/cra-key-objectives-20231024.pdf.

[6] Plaintiffs' preliminary injunction motion did not challenge the other two performance tests reflected in the table—the Community Development Financing Test and the Community Development Services Test.

a.  **Retail Lending Test:** An important focus of the rulemaking was that a subset of banks now conduct a substantial share of their banking activities online, away from physical offices, branches, and ATMs. The existing regulations do not address this business model despite the CRA's command that the FBAs assess each institution's record of "meeting the credit needs of its entire community." 12 U.S.C. § 2903(a)(1); *see* 89 Fed. Reg. at 6575. Thus, for example, "under the current approach, a bank that maintains branches in multiple States and conducts retail lending in the geographic areas served by those branches would have its retail lending evaluated in multiple assessment areas based on the location of its branches." 89 Fed. Reg. at 6759. However, "a bank that operates exclusively online would only have its retail lending performance evaluated in one assessment area based on the location of the bank's main office, which may not be representative of the bank's overall retail lending performance." *Id.*

Accordingly, under the Retail Lending Test, the FBAs would continue to evaluate a bank's record of meeting community credit needs in the geographic areas where a bank maintains its deposit-taking facilities (known in the Final Rule as "facility-based assessment areas"). However, in addition, to evaluate a bank's retail lending in its entire community, the Final Rule would expand the current assessment area framework to also evaluate certain banks' retail lending performance in retail lending assessment areas ("RLAAs") and outside retail

lending areas ("ORLAs"). 89 Fed. Reg. at 6737-38, 6759-60, 7114-15. The addition of these geographic areas "improv[es] parity in the evaluation framework for banks with different business models." *Id.* at 6759.

*Retail Lending Assessment Areas:* Under the Final Rule, RLAAs are applicable only to large banks. *Id.* at 7114-15. RLAAs are areas where a bank has concentrations of retail lending outside of the bank's facility-based assessment areas. *Id.* at 7115. Specifically, "a large bank must delineate … a [RLAA] in any [metropolitan statistical area] or in the nonmetropolitan area of any State in which it originated: (1) At least 150 closed-end home mortgage loans … in each year of the prior two calendar years; or (2) At least 400 small business loans … in each year of the prior two calendar years." *Id.*

Large banks that conduct more than 80% of their retail lending within their facility-based assessment areas—*i.e.*, banks that are "predominantly branch-based"—are exempt from RLAAs. *Id.* at 6739, 7115. Based on historical data from 2018 to 2020, the FBAs estimated that the requirement to delineate RLAAs would have applied to only 63 banks, out of over 4,600 banks, if it had been in effect during that time. *Id.* at 6740.

*Outside Retail Lending Areas:* The Final Rule requires certain large and intermediate banks to be evaluated in the bank's ORLA. *Id.* at 7115. The ORLA consists of a nationwide area excluding: (i) the bank's facility-based assessment

areas and RLAAs; and (ii) any county in a nonmetropolitan area in which the bank did not originate or purchase any retail loan types evaluated for that bank. *Id.* Subject to these exclusions, the evaluation focuses on the bank's lending in "component geographic areas," which are "any [metropolitan statistical area] or the nonmetropolitan area of any State, or portion thereof." *Id.* Component geographic areas with more of a bank's lending would "carry greater weight in calculating the agencies' performance expectations for the [ORLA] as a whole." *Id.* at 6880.

For large banks, the evaluation of retail lending in an ORLA is mandatory only if the bank "originate[d] or purchase[d]" certain retail loans outside of its facility-based assessment areas and RLAAs during the evaluation period. *Id.* at 7115. For intermediate banks, the evaluation of retail lending in an ORLA is mandatory only if "[i]n the prior two calendar years, the bank originated or purchased outside the bank's facility-based assessment areas more than 50 percent" of certain categories of retail loans. *Id.*

  **b.**  **Retail Services and Products Test:** The Final Rule's Retail Services and Products Test, which applies only to a subset of large banks (89 Fed. Reg. at 7120-21), clarifies and expands upon the activities that are currently evaluated in assessing a bank's performance in "meeting the credit needs" of its entire community.

At issue here is that, as part of this test, the FBAs would evaluate the availability and usage of the bank's deposit products responsive to the needs of LMI individuals, families, and households, including whether the bank's deposit products offer low-cost features (*e.g.*, accounts with no or low minimum balance requirements or monthly fees), features facilitating accessibility (*e.g.*, in-network ATM access, debit cards, and immediate access to funds when cashing certain checks), and other features facilitating access to individuals without banking or credit histories. 89 Fed. Reg. at 7121. The evaluation of a bank's deposit products "may only contribute positively to the bank's Retail Services and Products Test conclusion." *Id.* at 7122. The Final Rule explained that "the agencies have found that there is a sufficient nexus between deposit products and the provision of credit such that … it is appropriate to evaluate deposit accounts responsive to the needs of [LMI] individuals, families, or households." *Id.* at 6943.

In addition, Plaintiffs also challenge the aspect of this test that would require the FBAs to consider, as part of an evaluation of the bank's digital and other delivery systems for delivering retail banking services, "[t]he number of checking and savings accounts opened each calendar year during the evaluation period digitally and through other delivery systems in low-, moderate-, middle-, and upper-income census tracts," and the number of accounts active at year-end. *Id.* at 7121. The Final Rule explained that, "[b]ecause usage of online and mobile

13

banking delivery systems by households is pervasive and is expected to continue to grow, … these trends support a renewed focus on the evaluation of digital and other delivery systems" with respect to how retail banking products are accessed. *Id.* at 6934.

    **4.**    As in the current framework, the Final Rule would continue to require banks to be evaluated differently based on their asset size, but would increase the thresholds, resulting in more banks being classified as "small" or "intermediate" based on recent data:

|  | **Existing Regulations (2023 Asset-Size Thresholds)** | **Final Rule** |
|---|---|---|
| Small Bank | Less than $376 million<br>2,610 banks | Less than $600 million<br>3,219 banks |
| Intermediate Bank | $376 million to $1.503 billion<br>1,363 banks | $600 million to $2 billion<br>889 banks |
| Large Bank | More than $1.503 billion<br>654 banks | More than $2 billion<br>519 banks |

*See* 88 Fed. Reg. at 87897; 89 Fed. Reg. at 6575, 6598 n.118, 7093. As this table shows, out of a total of 4,627 depository institutions, the FBAs estimated that the change to the "small" bank asset-size threshold will result in 609 banks transitioning from the current "intermediate" bank category to the proposed "small" bank category, joining the 2,610 banks already in that category.

    The category of 3,219 "small" banks—comprising 70% of all banks to which the Final Rule applies—is particularly noteworthy. As the table in section 3

above demonstrates, although the 2,610 banks currently categorized as "small"
have the option to be evaluated under the Final Rule's Retail Lending Test, they
will otherwise be evaluated using a substantively identical lending test for CRA
compliance as is used today. And for the 609 banks that will transition from
"intermediate" to "small" under the Final Rule, there will be *fewer* CRA evaluation
criteria, because those banks also will be subject to the lending test used today, and
in addition, they will no longer be subject to a mandatory community development
test. *See* 12 C.F.R. app. G § 25.26(c).

    **5.**    The provisions of the Final Rule with few changes or limited
effects—for example, the provisions on authority, purpose, scope, schedule of
planned examinations, and public engagement—as well as the transition rules,
were to have become applicable on April 1, 2024. 89 Fed. Reg. at 6578-79. The
applicability date of the key operational provisions, including those dealing with
RLAAs, ORLAs, and the evaluation of deposit products and services, was to have
been January 1, 2026. *Id.* The data reporting requirements were to have applied
beginning January 1, 2027. *Id.*

    **B.**    **Procedural History**

    Plaintiffs are various trade associations; none of them is actually a bank. In
their Complaint, Plaintiffs brought two claims for relief under the Administrative
Procedure Act: (1) a claim that the FBAs exceeded their statutory authority

because the Final Rule evaluates banks "on their responsiveness to credit needs outside of their geographic deposit-taking footprint" and on "their digital delivery systems and deposit products"; and (2) a claim that the Final Rule is "arbitrary and capricious." ROA.135-40. Shortly after filing their Complaint, Plaintiffs filed their motion for a preliminary injunction. That motion sought relief based only on the first claim, that the FBAs exceeded their statutory authority. ROA.235.

On March 29, 2024, the district court issued an opinion and order granting Plaintiffs' motion. ROA.586-608. The court held that Plaintiffs are likely to succeed on the merits of their claim because "entire community" should be limited to "the geography of the bank's physical presence." ROA.594. In addition, the court held that the phrase "meeting the credit needs" meant that "only *credit*" can be considered by the FBAs. ROA.599. Finally, the court determined that the other preliminary injunction factors favored granting Plaintiffs' motion. ROA.601-08.

The court entered an injunction prohibiting the FBAs "from enforcing the regulations published at 89 Fed. Reg. 6574 … against Plaintiffs pending the resolution of this lawsuit." ROA.608. The court also indicated that "[t]he effective date of April 1, 2024, along with all other implementation dates, are hereby EXTENDED, day for day, for each day this injunction remains in place." *Id.*

The FBAs appealed to this Court (ROA.619), and the district court stayed proceedings while this appeal is pending (ROA.631-33).

## SUMMARY OF ARGUMENT

The district court erred in granting Plaintiffs' motion for a preliminary injunction, as Plaintiffs failed to carry their burden on the preliminary injunction factors. *First*, the district court found in Plaintiffs' favor on the critical likelihood of success on the merits factor, but only by grafting onto the CRA two exclusions found nowhere in the statute's text: (1) an exclusion of geographic areas where a bank conducts retail lending away from deposit-taking facilities from the scope of a bank's "entire community"; and (2) an exclusion of a bank's deposit activities from the assessment of whether it is "meeting the credit needs" of its entire community. The district court's opinion embraced this rewriting, stating that "entire community" is limited to "geographic areas surrounding a bank's *physical* facilities," ROA.595, and that "meeting the credit needs" means "only *credit*" can be evaluated. ROA.599. A proper analysis of the text, structure, history, and purpose of the CRA—without any such rewriting—demonstrates that the Final Rule is an appropriate exercise of the FBAs' statutory authority.

*Second*, the district court erred in its conclusion that any amount of nonrecoverable costs constituted irreparable harm. Where, as here, Plaintiffs' claimed compliance costs are *de minimis* and need not be incurred imminently, it was improper to grant preliminary injunctive relief.

*Finally*, the district court failed to properly take account of the record

17

evidence demonstrating that the balance of the equities and the public interest weighed against the granting of the preliminary injunction.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022). A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion." *Id.* at 342 (quotation omitted). A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.     The FBAs Did Not Exceed Their Statutory Authority by Issuing Regulations That Evaluate Retail Lending in a Bank's "Entire Community"**

In construing a statute, this Court must use the "the traditional interpretive toolkit" of "text, structure, history, and purpose." *Huntington Ingalls, Inc. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*, 70 F.4th 245, 250

(5th Cir. 2023) (quotation omitted); *see also Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) ("[i]n an agency case as in any other," courts should apply "the traditional tools of statutory construction"). In this case, these tools show that the FBAs did not exceed their authority under the CRA in promulgating a rule that evaluates certain banks' retail lending in geographic areas in which the bank conducts retail lending, including areas away from deposit-taking facilities.

### A.    The text of the CRA contains no exclusions with respect to a bank's "entire community"

The CRA commands the FBAs to "assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." 12 U.S.C. § 2903(a)(1). The FBAs have not exceeded this grant of authority in the statute by providing in the Final Rule that, for certain banks, the bank's "entire community" includes both the geographic areas where the bank maintains deposit-taking facilities as well as other geographic areas where the bank conducts retail lending.

In the CRA, Congress did not indicate that the FBAs should limit a bank's "entire community" to encompass only those areas where the bank has physical deposit-taking facilities. The term "entire" is comprehensive in scope and means "having no element or part left out." *Webster's New Collegiate Dictionary* 381

19

(1976).[7] Consistent with this definition, the Final Rule evaluates a bank's retail lending in facility-based assessment areas (the geographic areas where a bank maintains its deposit-taking facilities), and for certain banks, in RLAAs and ORLAs (the geographic locations, away from deposit-taking facilities, where a bank conducts retail lending). 89 Fed. Reg. 7114-15. Thus, facility-based assessment areas, RLAAs, and ORLAs help effectuate Congress's command that a bank be assessed based on its performance in its "entire community." Congress did not indicate that the FBAs should categorically exclude geographic areas where a bank provides customers with retail loans from a bank's "entire community," and the FBAs did not do so in the Final Rule.

Where statutory text includes no exceptions, it is not appropriate for courts to add exceptions; only Congress can do that. *See, e.g.*, *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (recognizing the "fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts'" (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)); *Cheapside Mins., Ltd. v. Devon Energy Prod. Co., L.P.*, 94 F.4th 492, 500 (5th Cir. 2024) ("we may not add terms or provisions [to a statute] where congress has

---

[7] To understand the meanings of statutory terms, it is appropriate to consult dictionaries published around the time that a statute was enacted. *Huntington Ingalls, Inc.*, 70 F.4th at 248 (citing *Bostock v. Clayton County*, 590 U.S. 644, 657 (2020)).

omitted them" (quotation omitted)); *Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 447 (5th Cir. 2023) ("Congress's omission of any exceptions emphatically forbids us from writing [an] exception into the statute."); *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 539 (5th Cir. 2024) (Oldham, J., concurring) ("It is not for federal district courts to add additional qualifications on top of statutory law."). Here, Congress's command that the FBAs should "assess the institution's record of meeting the credit needs of its entire community, including [LMI] neighborhoods, consistent with the safe and sound operation of such institution," 12 U.S.C. § 2903(a)(1), contains no carveouts or exceptions to the scope of a bank's "entire community."

In particular, Congress did not narrow the scope of "entire community," much less indicate that the "entire community" was to be drawn solely based on locations of deposit facilities. Notably, Congress could have written the CRA to require that the FBAs "assess the institution's record of meeting the credit needs of the *areas surrounding its deposit facilities*," or, if Congress wanted to use the term "community," it could have written "*communities surrounding its deposit facilities*." Instead, however, Congress opted, in the CRA's central provision, to use the more comprehensive and unqualified phrase "*entire community*, including [LMI] neighborhoods, consistent with the safe and sound operation of such institution." 91 Stat. 1148, § 804(1) (codified at 12 U.S.C. § 2903(a)(1)) (emphasis

21

added). Because Congress did not use "deposit facilities" to define the geographic area that could be considered, that drafting choice signals that Congress did not want the geographic area to be limited in that way. *See Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) ("When legislators did not adopt obvious alternative language, the natural implication is that they did not intend the alternative." (quotation omitted)); *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (rejecting "the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way").

### B.    The structure, history, and purpose of the CRA confirm that there are no exclusions from a bank's "entire community"

The structure of the CRA, the history of enacted amendments to the statute, and the "purposes" provision, confirm that there are no exclusions or carveouts from the "entire community."

1.    **Structure:** The original text of the CRA was less than two pages. *See* 91 Stat. 1147-48 (1977). Yet, in those two pages, Congress was careful not to circumscribe "community" solely based on the location of deposit facilities. Specifically, the key provision of the CRA, which has remained unchanged since its 1977 enactment, states:

> In connection with its examination of a financial institution, the
> appropriate Federal financial supervisory agency shall—

(1) assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution; and

(2) take such record into account in its evaluation of an application for a deposit facility by such institution.

91 Stat. 1148, § 804 (codified at 12 U.S.C. § 2903(a)). In addition, Congress defined "application for a deposit facility" to include, *inter alia*, an application for "the establishment of a domestic branch." 91 Stat. 1147-48, § 803(3) (codified at 12 U.S.C. § 2902(3)). This language makes plain that Congress was familiar with the phrase "deposit facility" (12 U.S.C. § 2903(a)(2)), as well as the phrase "domestic branch" (12 U.S.C. § 2902(3)). However, Congress chose not to use any language about a "deposit facility" or "domestic branch" in 12 U.S.C. § 2903(a)(1), instead opting to use the phrase "entire community."

If Congress had intended an "entire community" to be based on the location of deposit facilities or domestic branches, there was no reason to use different language within the two pages of statutory text that were enacted in 1977. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation omitted)). Construing "entire community" to be constrained to locations where a "deposit facility" or "domestic

23

branch" is located—as the district court did—thus runs afoul of the "well settled rule of statutory construction that where different language is used … in different parts of a statute it is presumed that the Legislature intended a different meaning and effect." *In re Ramirez*, 204 F.3d 595, 599 (5th Cir. 2000) (quotation omitted); *accord Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 102 n.5 (2012).

2.    **History:** Congress has amended the CRA on nine occasions, and the language of 12 U.S.C. § 2903(a) has remained exactly the same throughout all of those amendments. *See* Pub. L. 95–630 § 1502 (1978); Pub. L. 101–73 §§ 744(q), 1212 (1989); Pub. L. 102–233 § 402(b) (1991); Pub. L. 102–242 § 222 (1991); Pub. L. 102–550 § 909 (1992); Pub. L. 103–328 § 110 (1994); Pub. L. 106–102 §§ 103(b), 712 (1999); Pub. L. 110–315 § 1031(a) (2008); Pub. L. 111–203 § 358 (2010). Indeed, in one amendment, Congress reinforced the operative command of section 2903(a), creating a new requirement for "written" evaluations and specifying that written evaluations had to address "the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods." Pub L. 101–73, § 1212(b) (1989) (codified at 12 U.S.C. § 2906(a)(1)). As with section 2903(a), the newly added section 2906(a)(1) contained no carveouts to or exceptions from "entire community." Thus, rather than using amendments to alter the language of section 2903, and thereby signal that a change in meaning was intended, Congress time and again signaled no intent

24

to change that CRA evaluations were to be focused on an "entire community." *Cf.*
A. Scalia & B. Garner, *supra*, at 256 (indicating that repealing or amending an
existing statutory provision "connotes a change in meaning" to that provision);
*accord In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019).

    **3.**    **Purpose:** In the "Congressional findings and statement of purpose"
section, which also has remained unchanged from 1977 to the present, Congress
indicated that the "purpose" of the CRA was "to require each appropriate Federal
financial supervisory agency to use its authority when examining financial
institutions, to encourage such institutions to help meet *the credit needs of the local
communities in which they are chartered* consistent with the safe and sound
operation of such institutions." 91 Stat. 1147, § 802(b) (codified at 12 U.S.C.
§ 2901(b)) (emphasis added).[8] A "bank charter," as commonly understood,
"permit[s] a bank to operate and transact business," *Black's Law Dictionary* 214
(5th ed. 1979), and the business of banking has always included making loans—

---

[8] The phrase "local communities" in 12 U.S.C. § 2901 differs from the "entire community" language in 12 U.S.C. § 2903(a)(1). The FBAs have treated the "entire community" as including all of the "local communities" that a bank serves. *See, e.g.*, 43 Fed. Reg. 47144, 47149 (Oct. 12, 1978) ("Each [bank] shall prepare, and at least annually review, a delineation of the local community or communities that comprise its entire community."); Community Reinvestment Act Examination Procedures 9 (1978), *available at* https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/regulation-bb--community-reinvestment-act-542590 ("a statewide branching institution [might] serve a number of 'local communities,' the sum total of which would constitute its 'entire community'").

further underscoring that "entire community" was not intended to be limited only to locations of deposit-taking facilities.

Specifically, a bank charter can come from the federal government or a state government. *Cantero v. Bank of Am., N.A.*, 144 S. Ct. 1290, 1294 (2024). A bank charter may allow not just taking deposits, but also engaging in banking activities more broadly, including making loans. For example, when a bank "obtains a federal charter under the National Bank Act, the national bank gains various enumerated and incidental powers." *Id.* at 1295 (citing 12 U.S.C. § 24). Those powers may include "all such incidental powers as shall be necessary to carry on the business of banking," such as "receiving deposits" and "loaning money on personal security." 12 U.S.C. § 24 (Seventh); *see also* 12 U.S.C. § 1464 (detailing the powers of Federal savings associations to take deposits and lend). Similarly, state charters allow for not just taking deposits, but also making loans. *See, e.g.*, Tex. Fin. Code § 32.001 ("A state bank may … receive and pay deposits with or without interest, discount and negotiate promissory notes, borrow or lend money with or without security or interest, … and exercise incidental powers as necessary to carry on the business of banking as provided by this subtitle."). Thus, Congress's use of the phrase "communities in which they are chartered" in the "purpose" provision of the CRA reinforces that "the entire community" was not intended to

be limited to locations where banks take deposits, but also encompasses communities in which they make loans.

## C.     The district court's analysis of the statute was flawed

### 1.     The district court erred in its interpretation of a CRA amendment concerning institutions serving military personnel

The district court focused on one amendment to the CRA concerning banks serving military personnel and, despite that amendment not containing any indication that it was constraining the scope of the "entire community" for other banks, the court applied the *expressio unius* canon to do just that.

Specifically, in 1978, Congress added to the CRA a provision indicating that "[a] financial institution whose business predominately consists of serving the needs of military personnel who are not located within a defined geographic area may define its 'entire community' to include its entire deposit customer base without regard to geographic proximity." Pub. L. 95–630 § 1502 (1978) (codified at 12 U.S.C. § 2902(4)). The district court interpreted this language to find that only institutions serving military personnel can have an "entire community" that is not defined by the location of deposit-taking facilities, and for all other institutions, the "entire community" must be limited to geographic areas surrounding banks' physical facilities. ROA.595-96. This was error, as the provision concerning military personnel provides a specific rule for identifying the entire community for

a particular type of bank without generally altering how entire community may be identified for other types of banks, and, significantly for this case, without excluding locations where a bank makes significant retail loans from a bank's entire community.

As the Supreme Court has stated, "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003); *see also Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 381 (2013); *Coastal Conservation Ass'n v. U.S. Dep't of Commerce*, 846 F.3d 99, 106 (5th Cir. 2017). For example, in *Marx*, the Supreme Court considered the effect of a debt collection statute allowing for an award of costs where a lawsuit is "brought in bad faith and for the purpose of harassment." 568 U.S. at 380 (quotation omitted). Specifically, the case presented the issue of whether the *expressio unius* canon meant that an award of costs was prohibited in a debt collection case brought in good faith. *Id.* The Supreme Court interpreted the statute as doing nothing more than "codifying … pre-existing authority" to award costs under the Federal Rules of Civil Procedure and did not prohibit costs from being awarded when cases are brought in good faith. *Id.* at 382. In particular, the Court noted that the statute did not say that "only" in cases of bad faith could costs be awarded, nor that costs are disallowed "unless" there is bad faith. *Id.* at 384. The Court held that the statute

28

"was simply confirming the background rule that courts may award … costs when the plaintiff brings an action in bad faith," and that "[t]he statute speaks to one type of case—the case of the bad-faith and harassing plaintiff"—without excluding awards of costs in other cases. *Id.* at 387.

Similarly here, the amendment concerning military personnel indicates that Congress was only speaking to one type of case of particular importance to it—institutions predominantly serving military personnel—without dictating an exclusive or exhaustive description of the scope of the "entire community" for other types of banks. If Congress had meant for the amendment to have an exclusionary effect, it could easily have used language providing that, in no other circumstance could a bank's entire community be defined to include its customer base without regard to proximity, such as by writing: "A financial institution whose business predominately consists of serving the needs of military personnel who are not located within a defined geographic area, *and only such an institution*, may define its 'entire community' to include its entire deposit customer base without regard to geographic proximity." Alternatively, Congress could have amended the CRA's central directive that the FBAs must "assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." 12 U.S.C. § 2903(a)(1). But Congress did neither of these things, nor

anything else "to signal any exclusion." *United States v. Vonn*, 535 U.S. 55, 65 (2002).

The CRA contains several other amendments in which Congress similarly provided examples without any indication of exclusionary intent. For example, in 1989, Congress added 12 U.S.C. § 2906 to the CRA, which provided that the FBAs must prepare "a written evaluation of the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods." Pub. L. 101–73 § 1212(b) (1989). Later, in 1994, Congress enacted a law indicating that the written evaluations must contain information regarding the geographic areas where banks have "domestic branches" or "domestic branch offices." Pub. L. 103–328 § 110 (1994). But the general 1989 language remained intact. And the requirements instituted in 1994 for specific types of information that were required to be presented in the written evaluation do not contain any indication that only that information, and nothing more, can be included in the written evaluation.

Similarly, on three occasions, Congress sought to elaborate on activities that show how institutions can meet "credit needs" of their communities. Specifically, Congress allowed for CRA consideration: (1) for an institution "which donates, sells on favorable terms …, or makes available on a rent-free basis any branch of such institution which is located in any predominantly minority neighborhood,"

Pub. L. 102–233 § 402(b) (1991), amended by Pub. L. 102–550 § 909(2) (1992) (codified at 12 U.S.C. § 2907(a)); (2) for institutions that undertake "capital investment, loan participation, and other ventures … in cooperation with minority- and women-owned financial institutions and low-income credit unions," Pub. L. 102–550 § 909(1) (1992) (codified at 12 U.S.C. § 2903(b)); and (3) for "low-cost education loans provided … to low-income borrowers," Pub. L. 110–315 § 1031(a) (2008) (codified at 12 U.S.C. § 2903(d)). As with the provision concerning military personnel, none of these examples contains any language suggesting an intent to constrain the types of activities that should appropriately be evaluated under the CRA to those described in these provisions. Instead, they demonstrate that Congress saw fit to address specific situations over time, while always leaving intact and unchanged the background rule that the FBAs must "assess the institution's record of meeting the credit needs of its entire community." 12 U.S.C. § 2903(a)(1).

The Supreme Court "ordinarily resist[s] reading words or elements into a statute that do not appear on its face," *Dean v. United States*, 556 U.S. 568, 572 (2009) (quotation omitted), and there is no basis for deviating from that rule here. Rather than crafting amendments to suggest that Congress was saying "no" to "unnamed possibilit[ies]," *Coastal Conservation Ass'n*, 846 F.3d at 106 (quotations omitted), the provision concerning military personnel—as well as other

31

amendments to the CRA—demonstrate that Congress was providing non-exhaustive examples of inclusion. None of the amendments provides any indication that Congress considered that the central command of the CRA—that the FBAs must "assess the institution's record of meeting the credit needs of its entire community"—would be narrowed in the manner decided by the district court, or that Congress affirmatively desired this narrowing.

**2.    The district court erred in using the "whole-text canon" to rewrite the statute**

The district court cited the "whole-text canon" to hold that "entire community" equates to "geographic areas surrounding a bank's *physical* facilities," ROA.595; however, the whole-text canon does not allow for disregarding "the purpose and context of the statute." *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 585 (5th Cir. 2020) (quoting *Dolan v. Postal Service*, 546 U.S. 481, 486, (2006)). Specifically, the canon requires recognizing that there is no language in the CRA restricting the concept of "entire community" to locations of deposit facilities, and that Congress knew how to use language focused on the locations of branches and deposit facilities when that was intended. The whole-text canon also requires that, if the military personnel provision is to be considered, it must be considered in the context of the other instances in which Congress provided examples of inclusion, all without amending the language of section 2903(a)(1) or otherwise signaling that the examples were meant to have exclusionary effects.

32

Instead of grappling with the whole text of the CRA, the district court simply stated that "entire community" must mean "geographic areas surrounding a bank's *physical* facilities," because, "[o]therwise, Congress's repeated focus on 'local communities,' 'low- and moderate-income neighborhoods,' and 'metropolitan areas' with 'domestic branch offices' is inexplicable." ROA.595. But there is an explanation: Congress meant for different words to mean different things, and it did not want "entire community" to mean the same thing as any of those other terms. If "entire community" was supposed to have a definition narrowly focused on only certain geographic areas, Congress could easily have said that. But it didn't, and the district court was not permitted to rewrite the statute under the guise of the "whole-text" canon. *See Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020) (indicating that the whole-text canon requires looking to "context," and specifically that "different words within the same statute should, if possible, be given different meanings" (quotations omitted)).

### 3. The district court erred in using subsequent unenacted legislation as a statutory construction tool

The district court claimed that subsequent *unenacted* legislation, introduced in Congress from 2000 to 2009, should inform the interpretation of the CRA. Specifically, the court claimed that these unenacted bills "would have shifted assessment areas from those areas surrounding deposit-taking facilities to areas

where banks make loans," and the fact that they "never passed" signaled an intent to constrain the reach of the CRA. ROA.600-01 (quotation omitted). This was error.

The Supreme Court has warned against placing significance on subsequent unenacted legislation, noting that "[i]t is a particularly dangerous ground on which to rest an interpretation of a prior statute." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). While the district court hypothesized that unenacted legislation meant that Congress meant to constrain the FBAs' authority, an "equally tenable inference[]" is that the existing CRA "already incorporated the offered change." *Id.* (quotation omitted); *see also Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001) ("A bill can be proposed for any number reasons, and it can be rejected for just as many others").

Thus, "[w]here a subsequent Congress has *not* enacted a valid amendment, … the intent of the prior Congress is the best guide to the meaning of the statute it promulgated." *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 400 (5th Cir. 2008); *see also* Scalia & Garner, *supra*, at 29 ("In the interpretation of legislation, we aspire to be 'a nation of laws, not of men.' This means … giving *no* effect to lawmakers' unenacted desires."). Just as prior legislative history is not given weight where it has not become law through bicameralism and presentment, the same is true for subsequent legislative history. *See Deanda v. Becerra*, 96 F.4th

750, 764 (5th Cir. 2024). Tellingly, the only case cited by the district court for its proposition that subsequent unenacted legislation can inform the meaning of prior statutes concerned subsequent *enacted* legislation. ROA.601 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)); *FDA*, 529 U.S. at 137-38, 143-44 (discussing six statutes enacted since the statute at issue).

### D.    The FBAs adequately justified their decision to evaluate more locations where retail lending is conducted

As the Supreme Court has noted, an agency's "body of experience and informed judgment" can be helpful and "especially informative" in determining how to interpret a statute. *Loper Bright Enterprises*, 144 S. Ct. at 2267 (quotations omitted). Here, as described in the rulemaking record, the changing nature of banking since the last comprehensive update to the CRA regulations in 1995 supports the FBAs' decision to add more geographic areas to the assessment of the "entire community" where certain banks' retail lending will be evaluated under the CRA.

As the FBAs described in their rulemaking proposal, "[t]he financial services industry has undergone transformative changes since the CRA statute was enacted, including the removal of national bank interstate branching restrictions and the expanded role of mobile and online banking." 87 Fed. Reg. at 33887. These changes have "transformed the financial services industry and how banking services are delivered and consumed." *Id.* at 34009. For example, according to the

2019 FDIC Survey of Household Use of Banking and Financial Services, a

majority of customers now use online and mobile banking as their primary method

for accessing their accounts, and "[t]he usage of online and mobile banking

delivery systems is expected to continue to grow." *Id.* at 33964. In addition, the

removal of interstate banking restrictions through the Riegle-Neal Interstate

Banking and Branching Efficiency Act of 1994 allowed banking organizations to

operate more readily in multiple states and to complete mergers and acquisitions

across state lines. *See id.* at 33887.

 These changes in the ways that banks conduct business have been profound,

"affect[ing] all banks, regardless of size or location," and have been "most evident

in banks that have a limited physical presence or that rely heavily on technology to

deliver their products and services." *Id.* at 34009. It follows that, "[a]s banking has

evolved, banks' communities are not solely identifiable by the areas that surround

their physical locations." *Id.* Specifically, the FBAs "recognize[d] that changes in

technology and in bank business models have resulted in banks serving local

communities that may extend beyond the geographic footprint of the bank's main

office, branches, and other deposit-taking facilities." *Id.* at 33916.

 The FBAs articulated how both the evolution of broad-based interstate

banking and the rise in online and mobile banking changed the business of banking

and the geographic areas that comprise a bank's "entire community," and it is

appropriate to give weight to this experience and judgment in interpreting the statute.

### E.     The Major Questions Doctrine is inapplicable

In the district court, Plaintiffs argued that the consideration of retail lending in geographic areas where a bank does not have deposit facilities violates the Major Questions Doctrine, and the court agreed. ROA.600-01.[9] However, nothing about the Final Rule remotely meets any of the factors required for invocation of the doctrine.

As an initial matter, before applying the Major Questions Doctrine, the Supreme Court has considered whether the challenged action is within the agency's traditional field of expertise. *West Virginia v. EPA*, 597 U.S. 697, 721-22 (2022). Here, the FBAs' field of expertise is the business of banking, including understanding where banks' customers are located and how banks serve those customers, as the FBAs have done since the enactment of the CRA in 1977. Thus, the FBAs are well-equipped to understand how banks' "entire communit[ies]" have evolved over time, including how a subset of banks is increasingly adopting models that do not focus on physical branches. This case thus contrasts sharply with Major Questions cases involving "an attempt by a public health agency to

---

[9] Plaintiffs did not argue that the Final Rule's consideration of deposit products and digital delivery systems, discussed in the next section of this brief, was a major question.

regulate housing," or "an effort by a workplace safety agency to ordain broad public health measures … outside [its] sphere of expertise." *Id.* at 748 (Gorsuch, J., concurring) (quotations omitted).

In addition, the Supreme Court has applied the doctrine when an administrative action involves an expansion of regulatory authority premised on "ancillary" statutory provisions. *West Virginia*, 597 U.S. at 710, 724. Here, the phrase "entire community" is not an "ancillary" provision in the CRA; it is central to *the key operative provision*. Accordingly, in their rulemakings the FBAs have consistently focused on the geographic areas that define the "entire community." For example, in the first rulemaking in 1978, the FBAs indicated that the "entire community" could be delineated "as that local area or areas around each office or group of offices where [a bank] makes a substantial portion of its loans." 43 Fed. Reg. at 47147. In 1996 and again in 2016, the FBAs indicated that a bank's "entire community" could include areas away from deposit-taking facilities. 61 Fed. Reg. 54647, 54656 (Oct. 21, 1996) ("Favorable consideration will be given for loans to [LMI] persons and small business and farm loans outside of an institution's assessment area(s)."); 81 Fed. Reg. at 48538 (similar). Thus, the FBAs have always been focused on defining a bank's "entire community" where CRA evaluations should occur; the Final Rule merely adds locations, for certain banks, to those evaluations. This is a far cry from *West Virginia*, where, with respect to the

statutory provision at issue, it was "only a slight overstatement … to refer to [it] as an 'obscure, never-used section of the law.'" 597 U.S. at 711.

Finally, the Major Questions Doctrine applies only "in certain extraordinary cases" that involve "decisions of vast economic and political significance," assertions of "extravagant statutory power over the national economy," or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 716, 724 (quotations omitted). Examples of such "extraordinary cases" include an eviction moratorium implemented during the Covid pandemic that imposed an economic burden of $50 billion and applied to "[a]t least 80% of the country." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). Similarly, the Supreme Court invoked the doctrine in a case challenging an emergency rule concerning Covid vaccination that would have affected 84 million workers. *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 115 (2022). Other "major questions" cases have had similarly profound impacts. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (applying doctrine to forgiveness program that would "release 43 million borrowers from their obligations to repay $430 billion in student loans"); *West Virginia*, 597 U.S. at 715 (applying doctrine to agency action that "would reduce GDP by a least a trillion 2009 dollars by 2040"); *King v. Burwell*, 576 U.S. 473, 485 (2015) (applying doctrine to Affordable Care Act tax credits "involving billions of dollars in

39

spending each year"). Here, the Final Rule does not rise to this level of impact, as it affects only a subset of depository institutions. As discussed above, as a result of the higher asset-size thresholds in the Final Rule, the number of small banks is increasing to 70% of the institutions supervised by the FBAs. These small banks either will have no added evaluation criteria under the Final Rule, or will have *fewer* criteria than under the existing regulations. Of the remaining banks, analysis of historical lending data resulted in estimates that, if the Final Rule had been in place during the 2018-2020 calendar years, approximately 63 banks (out of a total of over 4,600), all of which are large, would have been affected by the requirement to delineate RLAAs. 89 Fed. Reg. at 6740. As for ORLAs, they apply on a mandatory basis for large banks only if the bank "originate[d] or purchase[d] loans in any product lines" outside of its facility-based assessment areas and RLAAs during the evaluation period, and for intermediate banks, only if "[i]n the prior two calendar years, the bank originated or purchased outside the bank's facility-based assessment areas more than 50 percent" of certain loan types. *Id.* at 7115. A rule that adds geographic areas where retail lending is evaluated, but exempts small banks (which comprise 70% of all banks) and applies only to certain other banks, is far from reaching the Major Question Doctrine's "extraordinary case" threshold.

## II. The FBAs Did Not Exceed Their Statutory Authority by Including Deposit Products and Digital Delivery Systems in Evaluating Whether "Credit Needs" Are Being Met

The CRA commands the FBAs to "assess the institution's record of meeting the credit needs of its entire community." 12 U.S.C. § 2903(a)(1). In the Final Rule, the FBAs indicated that they would evaluate an institution's deposit products and services in determining whether that institution is "meeting the credit needs" of its community because those products and services facilitate the ability to access credit; however, the district court held that the FBAs exceeded their statutory authority, taking the narrow position that only credit could be considered. ROA.599.

The district court erred in not adhering to the plain text of the CRA, which does not contain a list of exclusive factors that must be used to evaluate a bank's record in "meeting the credit needs" of its community. 12 U.S.C. § 2903(a)(1). Indeed, the very formulation chosen by Congress and never changed since 1977—"assessing [a bank's] record of meeting the credit needs of its entire community"—is broader than simply documenting the amount of a bank's lending. As a noun, "needs" includes "a lack of something requisite, desirable, or useful." *Webster's New Collegiate Dictionary* 768 (1976). Thus, the concept of "meeting the credit needs" encompasses a bank undertaking activities that are requisite, desirable, or useful in connection with their customers' ability to access credit. It does not

41

merely mean making loans. *Cf.* Pub. L. 94-200 § 304(a)(1) (1975) (home mortgage disclosure statute requiring reporting on "the number and total dollar amount of mortgage loans").

The fact that a record of "meeting the credit needs" of an entire community encompasses more than just making loans is further supported by examples elsewhere in the CRA of activities that count toward "meeting the credit needs" of an entire community. Specifically, 12 U.S.C. § 2903(b) states that "capital investment, loan participation, and other ventures" can meet credit needs. And 12 U.S.C. § 2907(a) states that one institution "donat[ing], sell[ing] on favorable terms … , or mak[ing] available on a rent-free basis" a branch to certain other institutions can also count toward meeting credit needs. If capital investment and donating branches can count toward "meeting the credit needs" of communities, so too can other factors that facilitate the ability of households and businesses to access credit.

In addition, the CRA leaves it to the FBAs to publish regulations "to carry out the purposes of this chapter." 12 U.S.C. § 2905. The Supreme Court has held that, "[w]here the empowering provision of a statute states simply that the agency may make … such rules and regulations as may be necessary to carry out the provisions of this Act, … the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling

legislation." *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) (quotation omitted); *see also Loper Bright Enterprises*, 144 S. Ct. at 2273 ("when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation"). Here, the CRA has prescribed an objective (assessing a bank's record of meeting the credit needs of its entire community), but does not direct how the FBAs must achieve it. The rulemaking record amply describes how the FBAs "engaged in reasoned decisionmaking," *Loper Bright Enterprises*, 144 S. Ct. at 2263, to determine that evaluating an institution's deposit activities is relevant to whether a community's credit needs are being met.

As explained in the Final Rule, "the agencies have found that there is a sufficient nexus between deposit products and the provision of credit such that, to comprehensively assess large bank performance for banks with more than $10 billion in assets, it is appropriate to evaluate deposit accounts responsive to the needs of [LMI] individuals, families, or households." 89 Fed. Reg. at 6943. Specifically, "the availability of bank deposit products that meet the needs of [LMI] individuals, families, or households frequently assumes a foundational role in the ability for individuals to access credit responsive to their particular needs." *Id.*

The FBAs described various ways that deposit products and services help individuals access credit. First, "deposit products … increase credit access by helping individuals improve their financial stability and build wealth through deposit accounts," and therefore "[a] greater focus on responsive deposit products could strengthen a bank's ability to serve the credit needs of its communities." *Id.* at 6943-44 (citing academic literature). Second, "deposit products can help consumers qualify for loans by facilitating consumers' savings so that they can post collateral and to pay transactions costs." *Id.* at 6944. As part of this point, the FBAs noted that consumers frequently rely on checking and savings accounts "to save for and then fund the down payment for a house, the money down on a car, or the initial capital for a small business." *Id.* In addition, the agencies noted that "[d]ata from consumers' use of deposit accounts are also sometimes included in credit evaluations as 'alternative data.'" *Id.* Third, "deposit products are a pathway for a bank customer to establish an ongoing relationship with a bank." *Id.* In the course of this relationship, "[b]anks can use various touch points to market credit products, explain how credit products can help consumers meet financial needs, and provide services to improve consumers' financial literacy," and "[s]ome banks rely on 'relationship lending,' or using this 'soft' data based on an ongoing relationship with a customer to make underwriting decisions." *Id.* (citing academic literature). Indeed, "[d]ata and empirical studies support the idea that deposit

accounts facilitate lending and improved financial outcomes." *Id.* (citing academic literature).

In sum, the FBAs acted within their statutory authority in determining that deposit products and digital delivery systems are within the scope of assessing a bank's record of "meeting the credit needs" of its entire community.

## III. The District Court Erred in Finding that Plaintiffs Showed Irreparable Harm

The FBAs acknowledge that certain banks would have incurred some level of costs to comply with the Final Rule by the time of its original applicability dates in 2026 and 2027; however, to demonstrate irreparable harm sufficient to obtain a preliminary injunction, Plaintiffs had to demonstrate that those costs would have been more than *de minimis* and would have been incurred imminently. Plaintiffs failed to make either showing.

### A. The district court failed to assess whether the claimed compliance costs were more than *de minimis*

The district court failed to apply the controlling legal standard, which requires a movant to demonstrate that likely compliance costs are more than *de minimis*, instead seemingly suggesting that *any* amount of nonrecoverable costs would suffice. ROA.602. Indeed, Plaintiffs did not contest that their likely compliance costs represent an insignificant percentage of banks' expenses, which should have been fatal to their claim of irreparable harm.

Fifth Circuit precedent requires that, when evaluating whether claimed harm is irreparable, alleged compliance costs must be more than *de minimis*. *See, e.g., Career Colleges & Schools of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024); *Restaurant Law Ctr. v. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023); *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) ("Under our precedent, it is sufficient to show that … enough employees would likely leave as to constitute more than *de minimis* harm … *at which point* it is not so much the magnitude but the irreparability that counts." (emphasis added, quotations omitted)). Allowing a preliminary injunction to be granted where the plaintiffs have shown only *de minimis* harm would improperly aid in transforming the "extraordinary remedy" of preliminary injunction from the exception to the norm. *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

Before the district court, Plaintiffs did not demonstrate that their members would suffer more than *de minimis* harm, failing to put forth any evidence contextualizing their members' alleged compliance burdens in relation to their members' overall financial condition. Nor could they credibly have done so. Put in the context of banks' overall expenses, the figures that comprise the total estimated regulatory impact of $91.8 million contained in the Final Rule's preamble (89 Fed. Reg. at 7106) represent *tiny fractions of a single percentage point* of the affected

banks' aggregate total noninterest expenses. *See* ROA.542 ("The estimated

compliance cost, to collect, maintain, and report annually geographic data on

deposits, of $82 million represents 0.0224% of $366 billion in aggregate total

noninterest expenses of the 54 [affected] banks."); *id.* ("The estimated compliance

cost, to collect, maintain, and report [other] data, of $7.9 million represents

0.0021% of $375 billion in aggregate total noninterest expenses of the 139

[affected] banks."); ROA.542-43 ("The estimated compliance cost, for seven (7)

banks to revise their strategic plans in one year, of $1.9 million represents 0.0297%

of $6.4 billion in aggregate total noninterest expenses estimated for the seven (7)

[affected] banks."). In short, Plaintiffs' alleged compliance costs are not

extraordinary and do not reflect harm so "certain and great … that there is a clear

and present need for equitable relief." *Morehouse Enterprises, LLC v. ATF*, 78

F.4th 1011, 1017 (8th Cir. 2023) (quotation omitted).

### B. Plaintiffs' claimed compliance costs lacked the immediacy necessary for preliminary relief

The district court also erred in relying on Plaintiffs' claims concerning the

timing of compliance activities. Plaintiffs' declarants asserted that they were

required to presently or imminently incur significant costs to comply with the Final

Rule, but the record as a whole demonstrated that the compliance activities

described by Plaintiffs and their declarants were premature.

Irreparable harm requires that the claimed harm be immediate or urgent in some manner. *See, e.g.*, *Career Colleges & Schools of Texas*, 98 F.4th at 235 (finding irreparable harm due to "immediate threats" of costs); *Texas v. EPA*, 662 F. Supp. 3d 739, 756 (S.D. Tex. 2023) ("[i]n addition to requiring more specificity, the law generally compels industry plaintiffs to ascribe more urgency to the consequences of a challenged action" to demonstrate irreparable harm). The claimed harm also must be more than speculative. *See Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."); *Div. 80, LLC v. Garland*, 2022 WL 3648454, at *4 (S.D. Tex. Aug. 23, 2022) (harm must be "significant, tangible, and likely"). Where harm is caused by actions that a plaintiff chooses to undertake, that injury is "self-inflicted" and does not constitute irreparable harm. *Div. 80, LLC v. Garland*, 2022 WL 3648454, at *5 ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.") (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed. Apr. 2021 update)); *Texas v. EPA*, 662 F. Supp. 3d at 756 (noting that "self-inflicted harm is not irreparable") (citing *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021)).

After the notice-and-comment process, the FBAs extended the implementation period in the Final Rule to address concerns raised by commenters

that an earlier implementation date was impractical. *See* 89 Fed. Reg. at 7091-93.

Accordingly, the applicability date of the operational provisions, including those

dealing with RLAAs, ORLAs, and the evaluation of deposit products and services,

would have been January 1, 2026, and the data reporting requirements would have

applied beginning January 1, 2027. *Id.* at 6578-79, 7091-93. This change meant

that *over two years* would elapse from the adoption of the rule on October 24, 2023

until the Final Rule's operational provisions took effect. As one Plaintiff conceded,

given these extended timetables for implementation of the Final Rule, the bulk of

compliance activities were not immediate, noting that "[t]he costs incurred by

banks" in planning for compliance with the Final Rule are "ongoing and *will*

*increase as we approach the effective date for implementation of the rule*."

ROA.324 (emphasis added). This observation—that costs associated with

compliance are weighted toward the latter stages of implementation (in this case, in

at least 2025 or beyond)—is sensible. The district court erred in finding "the

necessity of swift action obvious" (ROA.605) where, at the time of the district

court's decision, the operational provisions of the statute would not have taken

effect for 21 months.

    In addition, the FBAs announced that they intended to develop guidance,

templates, and technology tools to assist banks with the transition. 89 Fed. Reg. at

7092-93. Specifically, in response to suggestions of commenters during the

rulemaking, the FBAs indicated that they intended to develop templates and guidance to standardize compliance and reduce burden on banks in connection with data on digital and other delivery systems (*id.* at 7060-62), responsive deposit products (*id.* at 7061-62), community development lending and investment (*id.* at 7063-65, 7066-67), and deposits (*id.* at 7070, 7075). Similarly, and also in response to comments, the FBAs announced additional forthcoming guidance to support banks in achieving readiness for the new assessment area provisions. 89 Fed. Reg at 6579, 6736, 6741, 6751, 6792, 6815, 6845, 7079. As of the filing of Plaintiffs' Complaint, the FBAs had not issued the guidance, templates, or tools announced with the Final Rule. Incurring costs before that time, and asserting in conclusory fashion that waiting is not possible, does not meet the standard for irreparability.

Due to the tremendous benefits of the CRA to the public welfare on which all parties in this case agree (*see* ROA.88-89), the FBAs have consistently and publicly communicated that they will be working with banks to ensure a smooth transition to the Final Rule framework and facilitate compliance over an extended implementation period. *See, e.g.*, 89 Fed. Reg. at 6579, 7093. In a situation such as this, where Plaintiffs were unable to meet their burden to show irreparable harm, a preliminary injunction should not have been granted.

**IV.    The District Court's Assessment of the Balance of Equities and Public Interest Was Flawed**

This Court "has repeatedly cautioned that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (quotation omitted). However, despite Plaintiffs having the burden of persuasion, the district court improperly credited their flawed claims concerning the balance of equities and the public interest, and failed to adequately evaluate strong equitable and public interest benefits cited by the FBAs.

*First*, the district court improperly credited Plaintiffs' characterizations about the effectiveness of the existing regulations. The court concluded that the injunction would impose no harm based on Plaintiffs' assertion that "the CRA is working well" because "[o]ver 98% of banks achieved an Outstanding or Satisfactory rating in their most recent assessment." ROA.606 (quotation omitted). But the fact that most banks are receiving favorable ratings says nothing about whether the evaluation criteria are appropriate in light of how banks' business models have changed since the criteria were developed. As the FBAs documented, in deciding to promulgate new regulations, the FBAs took into account that stakeholders raised a variety of concerns with the existing regulations, including concerns regarding "assessment area definitions; incentives for banks to serve low-

51

and moderate-income, unbanked, underbanked, and rural communities; regulatory burdens associated with recordkeeping and reporting requirements; and asset thresholds for the various CRA examination methods." 89 Fed. Reg. at 6581. The FBAs also indicated that some commenters "not[ed] that now is the time to update the CRA regulations, given advances in banking technology," including that "the current CRA regulations and guidance do not recognize the wide diversity in business practices of banks or the changes in the financial services industry." *Id.* at 6587. Indeed, the Independent Community Bankers of America (a plaintiff in this lawsuit) wrote in a comment letter that some community banks remarked on the "inadequacy of the current rules addressing internet banks," and "expressed that there is some fairness to the idea of requiring a larger bank who enters their market and begins conducting significant lending to become subject to CRA obligations in that area."[10] In light of the immense public interest in ensuring that retail lending by depository institutions is not excluding LMI neighborhoods (*see, e.g.*, 89 Fed. Reg. at 6586), the district court should have more carefully assessed whether existing regulations—which mostly do not address the lending occurring away from deposit facilities by large, primarily online banks—are adequately fulfilling that public interest.

---

[10] Comment Letter of ICBA, at 9 (Aug. 5, 2022), *available at* https://www.regulations.gov/comment/OCC-2022-0002-0315.

*Second*, the district court also found that an injunction was warranted because, in response to a survey conducted by one of the trade associations that is a plaintiff, "62.8% of respondents indicated their [compliance] costs will somewhat or significantly increase." ROA.317. But the survey cited was in response to the rule as initially proposed, not the Final Rule (which, among other things, would require fewer RLAAs than required under the proposal and therefore affect fewer banks), and included responses from only 2% of insured depository institutions. *See id.* The survey instrument and full results were not provided to the district court, but there is reason to be skeptical of the results: as described above, 70% of banks will see no added regulatory requirements, or fewer requirements, under the Final Rule, meaning that costs will be the same or lower for these 70% of institutions. Thus, the fact that 62.8% of respondents to the survey believed that their compliance costs would increase suggests that the respondents were not responding based on an understanding of the Final Rule, or that the respondents were not representative of supervised banks. In either event, the district court erred in crediting the survey.

*Third*, the Final Rule contains four main performance tests, yet Plaintiffs' request for preliminary relief pertains only to certain components of two of the performance tests (*i.e.*, the Retail Lending Test and the Retail Services and Products Test). Plaintiffs do not argue that any component of either the Community

Development Financing Test or the Community Development Services Test

supports preliminary relief. *See* 89 Fed. Reg. at 6577 (describing these tests). With

respect to these two tests, the Final Rule revises and clarifies the criteria for, and

provides for a confirmation of eligibility process and illustrative list of examples

of, the types of loans, investments, and services that the FBAs regard as supporting

community development. *See id.* at 7111-14. These changes have been widely

supported and desired by industry members. *See id.* at 6708 (noting that "most

commenters" supported the proposed non-exhaustive illustrative list of qualifying

activities, stating that "an illustrative list would simplify compliance, and provide

more regulatory certainty regarding community development activities that meet

the requirements for CRA credit"). Indeed, Plaintiffs themselves argued for this

change in comment letters.[11] The district court did not grapple with this benefit,

---

[11] Comment Letter of ABA, at 2 (Aug. 5, 2022), *available at*
https://www.regulations.gov/comment/OCC-2022-0002-0484 (stating support for
"provisions that will give banks greater certainty regarding the activities that will
receive credit, allowing them to concentrate their efforts on providing the products
and services that will address community needs instead of spending time and
resources trying to figure out what will count"); Comment Letter of ICBA, at 2
(Aug. 5, 2022), *available at* https://www.regulations.gov/comment/OCC-2022-
0002-0315 ("Modernization of CRA is also needed to provide banks and other
stakeholders greater clarity about which loans and investments are eligible for
CRA credit"); Comment Letter of Independent Bankers Ass'n of Tex., at 3 (July
27, 2022), *available at* https://www.regulations.gov/comment/OCC-2022-0002-
0055 ("maintenance of this list [of qualifying activities] would provide critical
certainty"); Comment Letter of U.S. Chamber of Commerce, at 3 (Aug. 5, 2022),
*available at* https://www.regulations.gov/comment/OCC-2022-0002-0448 ("The

except to claim that the FBAs were required to provide "quantification" of the benefit. ROA.608. The district court, however, cited no authority for this duty to "quantif[y]" the interests of others. "Under the proper view of the law, it should not have been incumbent upon the defendants to prove by a preponderance of the evidence … that the interests they represent would suffer irreparable harm. The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiffs." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). Plaintiffs did not meet that burden.

## CONCLUSION

For the foregoing reasons, the FBAs respectfully request that the Court reverse the district court's order.

Dated: July 18, 2024

Respectfully submitted,

  /s/ *Nicholas Jabbour*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel
Nicholas Jabbour, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
nick.jabbour@frb.gov
Phone: (202) 815-7450

---

Chamber appreciates the … non-exhaustive list of activities eligible for CRA consideration. … Banks want to have the assurance that the investments they make will receive credit when they make the investment.").

*Counsel for Defendants-Appellants Board of Governors of the Federal Reserve System and Jerome Powell, in his Official Capacity*

/s/ *Ashley W. Walker*

Theodore J. Dowd II, Acting Chief Counsel
Patricia S. Grady, Deputy Chief Counsel
Peter C. Koch, Director for Litigation
Ashley W. Walker, Special Counsel, Litigation
Office of the Comptroller of the Currency
400 7th Street SW, Mailstop 9E-1
Washington, DC 20219
ashley.walker@occ.treas.gov
Phone: (202) 649-6315

*Counsel for Defendants-Appellants Office of the Comptroller of the Currency and Michael J. Hsu, in his Official Capacity*

/s/ *Michelle Ognibene*

Harrel M. Pettway, General Counsel
B. Amon James, Assistant General Counsel
J. Scott Watson, Senior Counsel
Michelle Ognibene, Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Drive
Arlington, VA 22226-3500
mognibene@fdic.gov
Phone: (703) 562-2121

*Counsel for Defendants-Appellants Federal Deposit Insurance Corporation and Martin Gruenberg, in his Official Capacity*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 18, 2024, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

 /s/ *Nicholas Jabbour*
Nicholas Jabbour
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
nick.jabbour@frb.gov
Phone: (202) 815-7450

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,830 words, according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font, a proportionally spaced typeface.

 */s/ Nicholas Jabbour*
Nicholas Jabbour
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
nick.jabbour@frb.gov
Phone: (202) 815-7450

**ADDENDUM**

# **TABLE OF CONTENTS TO ADDENDUM**

The Community Reinvestment Act

12 U.S.C. § 2901................................................................A1

12 U.S.C. § 2902................................................................A2

12 U.S.C. § 2903................................................................A4

12 U.S.C. § 2905................................................................A5

12 U.S.C. § 2906................................................................A6

12 U.S.C. § 2907..............................................................A10

# THE COMMUNITY REINVESTMENT ACT

## 12 U.S.C. § 2901: Congressional findings and statement of purpose

**(a)** The Congress finds that--

> **(1)** regulated financial institutions are required by law to demonstrate that their deposit facilities serve the convenience and needs of the communities in which they are chartered to do business;

> **(2)** the convenience and needs of communities include the need for credit services as well as deposit services; and

> **(3)** regulated financial institutions have continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered.

**(b)** It is the purpose of this chapter to require each appropriate Federal financial supervisory agency to use its authority when examining financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions.

**12 U.S.C. § 2902: Definitions**

For the purposes of this chapter--

**(1)** the term "appropriate Federal financial supervisory agency" means--

> **(A)** the Comptroller of the Currency with respect to national banks and Federal savings associations (the deposits of which are insured by the Federal Deposit Insurance Corporation);

> **(B)** the Board of Governors of the Federal Reserve System with respect to State chartered banks which are members of the Federal Reserve System, bank holding companies, and savings and loan holding companies;

> **(C)** the Federal Deposit Insurance Corporation with respect to State chartered banks and savings banks which are not members of the Federal Reserve System and the deposits of which are insured by the Corporation, and State savings associations (the deposits of which are insured by the Federal Deposit Insurance Corporation).

**(2)** the term "regulated financial institution" means an insured depository institution (as defined in section 1813 of this title); and

**(3)** the term "application for a deposit facility" means an application to the appropriate Federal financial supervisory agency otherwise required under Federal law or regulations thereunder for--

> **(A)** a charter for a national bank or Federal savings and loan association;

> **(B)** deposit insurance in connection with a newly chartered State bank, savings bank, savings and loan association or similar institution;

> **(C)** the establishment of a domestic branch or other facility with the ability to accept deposits of a regulated financial institution;

> **(D)** the relocation of the home office or a branch office of a regulated financial institution;

> **(E)** the merger or consolidation with, or the acquisition of the assets, or the assumption of the liabilities of a regulated financial institution requiring

approval under section 1828(c) of this title or under regulations issued under the authority of Title IV of the National Housing Act; or

**(F)** the acquisition of shares in, or the assets of, a regulated financial institution requiring approval under section 1842 of this title or section 408(e) of the National Housing Act.

**(4)** A financial institution whose business predominately consists of serving the needs of military personnel who are not located within a defined geographic area may define its "entire community" to include its entire deposit customer base without regard to geographic proximity.

**12 U.S.C. § 2903: Financial institutions; evaluation**

**(a)** In general
In connection with its examination of a financial institution, the appropriate Federal financial supervisory agency shall—

> **(1)** assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution; and

> **(2)** take such record into account in its evaluation of an application for a deposit facility by such institution.

**(b)** Majority-owned institutions
In assessing and taking into account, under subsection (a), the record of a nonminority-owned and nonwomen-owned financial institution, the appropriate Federal financial supervisory agency may consider as a factor capital investment, loan participation, and other ventures undertaken by the institution in cooperation with minority- and women-owned financial institutions and low-income credit unions provided that these activities help meet the credit needs of local communities in which such institutions and credit unions are chartered.

\*\*\*

**(d)** Low-cost education loans
In assessing and taking into account, under subsection (a), the record of a financial institution, the appropriate Federal financial supervisory agency shall consider, as a factor, low-cost education loans provided by the financial institution to low-income borrowers.

**12 U.S.C. § 2905: Regulations**

Regulations to carry out the purposes of this chapter shall be published by each appropriate Federal financial supervisory agency, except that the Comptroller of the Currency shall prescribe regulations applicable to savings associations and the Board of Governors shall prescribe regulations applicable to insured State member banks, bank holding companies and savings and loan holding companies, and shall take effect no later than 390 days after October 12, 1977.

**12 U.S.C. § 2906: Written evaluations**

**(a)** Required

> **(1)** In general
> Upon the conclusion of each examination of an insured depository institution under section 2903 of this title, the appropriate Federal financial supervisory agency shall prepare a written evaluation of the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods.

> **(2)** Public and confidential sections
> Each written evaluation required under paragraph (1) shall have a public section and a confidential section.

**(b)** Public section of report

> **(1)** Findings and conclusions

>> **(A)** Contents of written evaluation
>> The public section of the written evaluation shall--

>>> **(i)** state the appropriate Federal financial supervisory agency's conclusions for each assessment factor identified in the regulations prescribed by the Federal financial supervisory agencies to implement this chapter;

>>> **(ii)** discuss the facts and data supporting such conclusions; and

>>> **(iii)** contain the institution's rating and a statement describing the basis for the rating.

>> **(B)** Metropolitan area distinctions
>> The information required by clauses (i) and (ii) of subparagraph (A) shall be presented separately for each metropolitan area in which a regulated depository institution maintains one or more domestic branch offices.

> **(2)** Assigned rating
> The institution's rating referred to in paragraph (1)(C)1 shall be 1 of the

following:
(A) "Outstanding record of meeting community credit needs".
(B) "Satisfactory record of meeting community credit needs".
(C) "Needs to improve record of meeting community credit needs".
(D) "Substantial noncompliance in meeting community credit needs".

Such ratings shall be disclosed to the public on and after July 1, 1990.

**(c)** Confidential section of report

**(1)** Privacy of named individuals
The confidential section of the written evaluation shall contain all references
that identify any customer of the institution, any employee or officer of the
institution, or any person or organization that has provided information in
confidence to a Federal or State financial supervisory agency.

**(2)** Topics not suitable for disclosure
The confidential section shall also contain any statements obtained or made
by the appropriate Federal financial supervisory agency in the course of an
examination which, in the judgment of the agency, are too sensitive or
speculative in nature to disclose to the institution or the public.

**(3)** Disclosure to depository institution
The confidential section may be disclosed, in whole or part, to the
institution, if the appropriate Federal financial supervisory agency
determines that such disclosure will promote the objectives of this chapter.
However, disclosure under this paragraph shall not identify a person or
organization that has provided information in confidence to a Federal or
State financial supervisory agency.

**(d)** Institutions with interstate branches

**(1)** State-by-State evaluation
In the case of a regulated financial institution that maintains domestic
branches in 2 or more States, the appropriate Federal financial supervisory
agency shall prepare--

**(A)** a written evaluation of the entire institution's record of
performance under this chapter, as required by subsections (a), (b),
and (c); and

**(B)** for each State in which the institution maintains 1 or more domestic branches, a separate written evaluation of the institution's record of performance within such State under this chapter, as required by subsections (a), (b), and (c).

**(2)** Multistate metropolitan areas
In the case of a regulated financial institution that maintains domestic branches in 2 or more States within a multistate metropolitan area, the appropriate Federal financial supervisory agency shall prepare a separate written evaluation of the institution's record of performance within such metropolitan area under this chapter, as required by subsections (a), (b), and (c). If the agency prepares a written evaluation pursuant to this paragraph, the scope of the written evaluation required under paragraph (1)(B) shall be adjusted accordingly.

**(3)** Content of State level evaluation
A written evaluation prepared pursuant to paragraph (1)(B) shall--

**(A)** present the information required by subparagraphs (A) and (B) of subsection (b)(1) separately for each metropolitan area in which the institution maintains 1 or more domestic branch offices and separately for the remainder of the nonmetropolitan area of the State if the institution maintains 1 or more domestic branch offices in such nonmetropolitan area; and

**(B)** describe how the Federal financial supervisory agency has performed the examination of the institution, including a list of the individual branches examined.

**(e)** Definitions
For purposes of this section the following definitions shall apply:

**(1)** Domestic branch
The term "domestic branch" means any branch office or other facility of a regulated financial institution that accepts deposits, located in any State.

**(2)** Metropolitan area
The term "metropolitan area" means any primary metropolitan statistical area, metropolitan statistical area, or consolidated metropolitan statistical

area, as defined by the Director of the Office of Management and Budget, with a population of 250,000 or more, and any other area designated as such by the appropriate Federal financial supervisory agency.

**(3)** State
The term "State" has the same meaning as in section 1813 of this title.

**12 U.S.C. § 2907: Operation of branch facilities by minorities and women**

**(a)** In general

In the case of any depository institution which donates, sells on favorable terms (as determined by the appropriate Federal financial supervisory agency), or makes available on a rent-free basis any branch of such institution which is located in any predominantly minority neighborhood to any minority depository institution or women's depository institution, the amount of the contribution or the amount of the loss incurred in connection with such activity may be a factor in determining whether the depository institution is meeting the credit needs of the institution's community for purposes of this chapter.

**(b)** Definitions
For purposes of this section—

> **(1)** Minority depository institution
> The term "minority institution" means a depository institution (as defined in section 1813(c) of this title)—
>
> > (A) more than 50 percent of the ownership or control of which is held by 1 or more minority individuals; and
> >
> > (B) more than 50 percent of the net profit or loss of which accrues to 1 or more minority individuals.
>
> **(2)** Women's depository institution
> The term "women's depository institution" means a depository institution (as defined in section 1813(c) of this title)—
>
> > (A) more than 50 percent of the ownership or control of which is held by 1 or more women;
> >
> > (B) more than 50 percent of the net profit or loss of which accrues to 1 or more women; and
> >
> > (C) a significant percentage of senior management positions of which are held by women.
>
> **(3)** Minority

A10

The term "minority" has the meaning given to such term by section 1204(c)(3) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989.