No. 24-10367

# In the United States Court of Appeals for the Fifth Circuit

---

TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF COMMERCE FOR THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS, *Plaintiffs-Appellees,*

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; JEROME POWELL, CHAIRMAN; FEDERAL DEPOSIT INSURANCE CORPORATION; MARTIN GRUENBERG, CHAIRMAN; OFFICE OF THE COMPTROLLER OF THE CURRENCY; MICHAEL J. HSU, ACTING COMPTROLLER, *Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
Trial Court No. 2:24-CV-25

---

## BRIEF OF *AMICUS CURIAE* BENEFICIAL STATE BANK IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Jessica Anne Morton
Robin F. Thurston
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
*Counsel for* Amicus

## CERTIFICATE OF INTERESTED PERSONS

Case No. 24-10367, *Texas Bankers Ass'n* v. *Board of Governors*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| | |
|---|---|
| **Plaintiffs / Appellees:** | Texas Bankers Association<br>Amarillo Chamber of Commerce<br>American Bankers Association<br>Chamber of Commerce for the United States<br>   of America<br>Longview Chamber of Commerce<br>Independent Community Bankers of America<br>Independent Bankers Association of Texas |
| **Plaintiffs / Appellees' Counsel:** | Sarah M. Harris<br>Tyler J. Becker<br>Braden G. Currey<br>Alexander Cole Gaudio<br>Armani Jamal Madison<br>William Robert Murray, Jr.<br>Richard Alan Olderman<br>Ryan Thomas Scarborough<br>Jesse T. Smallwood<br>WILLIAMS & CONNOLLY, L.L.P. |

Tyler Stephen Badgley
Jennifer B. Dickey
Maria Monaghan
U.S. CHAMBER LITIGATION CENTER

Andrew Doersam
Thomas Pinder
AMERICAN BANKERS ASSOCIATION

Slater Chalfant Elza
UNDERWOOD LAW FIRM, P.C.

**Defendants / Appellants:**

Board of Governors of the Federal Reserve System
Jerome Powell, in his official capacity as Chairman of the Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Martin Gruenberg, in his official capacity as Chairman of the Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency
Michael J. Hsu, in his official capacity as Acting Comptroller of the Currency
U.S. Department of Treasury (as department within which OCC is housed)

**Defendants / Appellants' Counsel:**

Mark Van Der Weide
Richard M. Ashton
Joshua P. Chadwick
Nicholas Jabbour
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

Theodore J. Dowd II
Patricia S. Grady
Peter C. Koch
Ashley W. Walker
OFFICE OF THE COMPTROLLER OF THE
CURRENCY

Harrel M. Pettway
B. Amon James
J. Scott Watson
Michelle Ognibene
Andrew Jared Dober
Herbert G. Smith, II
FEDERAL DEPOSIT INSURANCE
CORPORATION

*Amici Curiae*:    Beneficial State Bank (which discloses,
    because of their ownership interest,
    Beneficial State Bancorp, Beneficial State
    Foundation, and KatTom Foundation,
    which are not themselves *amici* in this
    matter)

National Fair Housing Alliance
National Urban League
National Coalition on Black Civic
    Participation
UnidosUS
Raza Development Fund

*Amici Curiae* Counsel:    Jessica Anne Morton
Robin F. Thurston
DEMOCRACY FORWARD FOUNDATION

Ellora Thadaney Israni
Kenneth Scott
John Relman
RELMAN COLFAX PLLC

 /s/ Jessica Anne Morton
Jessica Anne Morton
*Attorney of record for Beneficial State Bank*

# TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE*............................................................ 1

STATEMENT REGARDING PARTIES' CONSENT ............................. 2

INTRODUCTION..................................................................................... 3

ARGUMENT ............................................................................................ 4

    I.    Plaintiffs Do Not Represent the Entire Banking
           Industry .................................................................................. 4

    II.   Regulated Entities—and the Public—Benefit from
           Clarity about Regulatory Status........................................... 9

    III.  The Final Rule Is Only a Moderate Step in the Right
           Direction. ............................................................................ 16

CONCLUSION ...................................................................................... 20

CERTIFICATE OF COMPLIANCE...................................................... 21

CERTIFICATE OF SERVICE............................................................... 22

# TABLE OF AUTHORITIES

CASES                                                                Page(s)

*Mississippi Power & Light Co.* v. *United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985)........................................................................14

STATUTES, RULES & REGULATIONS

Community Reinvestment Act, 89 Fed. Reg. 6574 (Feb. 1, 2024)
    (codified at 12 CFR pts. 25, 228, 345),
    https://www.federalregister.gov/d/2023-25797...........................3, 6, 14

OTHER AUTHORITIES

Adrian Ma & Darian Woods, *Why banks are fighting changes to an anti-
    redlining program*, National Public Radio (Feb. 15, 2024),
    https://www.npr.org/transcripts/1197961870 ......................................11

American Bankers Ass'n, Comment Letter on Community
    Reinvestment Act Regulations (Aug. 5, 2022), https://www.aba.com/-
    /media/documents/comment-
    letter/craletter20220805.pdf?rev=48a90b0859444f0ea484b1f17589b08
    0...................................................................................................................7

American Bankers Ass'n, Comment Letter on Notice of Proposed
    Rulemaking Implementing the Provisions of Section 619 of the Dodd-
    Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank
    Act), Concerning Restrictions on Proprietary Trading and Certain
    Interests in, and Relationships with, Hedge Funds and Private
    Equity Funds (Feb. 13, 2012),
    https://www.federalreserve.gov/SECRS/2012/March/20120309/R-
    1432/R-1432_021312_105526_519231400402_1.pdf...........................13

American Bankers Ass'n, Comment Letter on Small Business Lending
    Data Collection Under the Equal Credit Opportunity Act (Regulation
    B) (Jan. 6, 2022), https://www.aba.com/-/media/documents/comment-
    letter/jointcl107120220106.pdf?rev=c9309c4cacbb4b6ca2365ba100f1a
    cb6 ............................................................................................................13

Bank Policy Institute & American Bankers Ass'n, Comment Letter on
    Regulatory Capital Rule:  Large Banking Organizations and Banking

Organizations with Significant Trading Activity (Jan. 16, 2024), https://www.regulations.gov/comment/OCC-2023-0008-0218 ............ 13

Beneficial State Bank, Comment Letter on Community Reinvestment Act (Feb. 16, 2021), https://beneficialstate.org/wp-content/uploads/2021/02/Beneficial-State-Community-Reinvestment-Act-Docket-No-R-1723-RIN-7100-AF94.pdf ........................................ 18

Beneficial State Bank, *Community Reinvestment Act*, https://www.beneficialstatebank.com/impact/community-reinvestment-act-cra-public-file (last visited July 7, 2024) ............ 9, 18

Community Development Bankers Ass'n, *Community Reinvestment Act Modernization* (Oct. 24, 2023), https://www.cdbanks.org/news/community-reinvestment-act-modernization ........................................................................................ 8

Eugene A. Ludwig et al., *The Community Reinvestment Act:  Past Successes and Future Opportunities*, 4 Community Development Innovation Rev. 1 (2009), https://www.frbsf.org/wp-content/uploads/cra_past_successes_future_opportunities1.pdf ........ 10

*Federal Reserve Statistical Release:  Large Commercial Banks*, Federal Reserve (Mar. 31, 2024), https://www.federalreserve.gov/releases/lbr/current/default.htm ........ 6

Independent Community Bankers of America, Comment Letter on Community Reinvestment Act Regulations (Aug. 5, 2022), https://www.icba.org/docs/default-source/icba/advocacy-documents/letters-to-regulators/comments-on-cra-modernization-proposal.pdf?sfvrsn=41a11b17_0 ........................................................ 16

Kevin Hill, *NCRC's Guide to the 2023 Community Reinvestment Act Final Rule* (Dec. 2023), https://ncrc.org/ncrcs-guide-to-the-2023-community-reinvestment-act-final-rule/ ............................................ 19

LendingClub, Comment Letter on Community Reinvestment Act (Aug. 5, 2022), https://www.regulations.gov/comment/OCC-2022-0002-0640 ................................................................................................................ 7

Mortgage Bankers Ass'n, Comment Letter on Community Reinvestment Act (Aug. 5, 2022), https://www.regulations.gov/comment/OCC-2022-0002-0383 ................................................................................................................ 7

National Community Reinvestment Coalition, *NCRC Statement on Final CRA Rules Release* (Oct. 24, 2023), https://ncrc.org/ncrc-statement-on-final-cra-rules-release/ ................................................... 18

Opportunity Finance Network, *About Opportunity Finance Network (OFN)*, https://www.ofn.org/about-ofn/ (last visited July 7, 2024) ........ 5

Opportunity Finance Network, *Find a CDFI*, https://www.ofn.org/cdfi-locator/#organization=&org-type=Bank&area-served=&lending-type=&posts=100 (last visited July 24, 2024) ..................................... 5

Opportunity Finance Network, *OFN Opposes Lawsuit Against Community Reinvestment Act Reforms* (Mar. 4, 2024), https://www.ofn.org/blog/ofn-opposes-lawsuit-against-community-reinvestment-act-reforms/ .................................................................... 5

Opportunity Finance Network, *What Is a CDFI?*, https://www.ofn.org/what-is-a-cdfi/ (last visited July 7, 2024) ............. 5

Pete Schroeder, *U.S. bank profits jump 79.5% as large firms shake off failed bank costs*, Reuters (May 29, 2024), https://www.reuters.com/markets/us/us-bank-profits-jump-795-large-firms-shake-off-failed-bank-costs-2024-05-29/ .................................... 16

Piscataqua Savings Bank, Comment Letter on Community Reinvestment Act (Aug. 1, 2022), https://www.regulations.gov/comment/OCC-2022-0002-0674 .............. 6

Reuters, *Banks need increased regulatory certainty – ECB's Nouy* (Nov. 15, 2016), https://www.reuters.com/article/eurozone-banks-ecb-idUSF9N15G024/ .................................................................................. 12

Rise Economy, Comment Letter on Proposed Rule Regarding Business Combinations Under the Bank Merger Act and Statement of Policy on Bank Merger Transactions (June 14, 2024), https://rise-economy.org/wp-content/uploads/2024/06/CA-community-groups-comment-on-FDIC-Proposed-Statement-of-Policy-on-Bank-Merger-Transactions.pdf .................................................................................. 11

Rise Economy, *Rise Economy Responds to Bank Regulators' Final CRA Rule* (Oct. 24, 2023), https://rise-economy.org/rise-economy-responds-to-bank-regulators-final-cra-rule/ ........................................................ 19

Urban Institute, *Nine Charts about Wealth Inequality in America* (Apr. 25, 2024), https://apps.urban.org/features/wealth-inequality-charts/ ................................................................................. 11

Victor Ramirez, *New rules modernizing the CRA bring us closer to an equitable financial system,* Beneficial State Bank (Nov. 3, 2023), https://www.beneficialstatebank.com/better-banking-blog/news-and-announcements/new-rules-modernizing-the-cra-bring-us-closer-to-an-equitable-financial-system ............................................................ 8, 17

# INTEREST OF *AMICUS CURIAE*[1]

Beneficial State Bank is a $1.7 billion asset state-chartered, federally insured bank and certified B Corporation with branches in California, Oregon, and Washington.  Beneficial State Bank was founded to demonstrate that there is a viable, equitable, and sustainable model for banking that prioritizes people, the planet, and long-term financial stability (a triple bottom line approach).  As a Community Development Financial Institution, Beneficial State Bank focuses on uplifting low-to-moderate income populations and communities and ensures that at least 60% of its lending goes towards these communities.

Beneficial State Bank is subject to regulations implementing the Community Reinvestment Act.  The bank therefore has a strong interest in ensuring that those regulations hew to the law and its purpose of serving the convenience and needs of communities.

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *Amicus* and its counsel contributed money to fund this brief.

1

**STATEMENT REGARDING PARTIES' CONSENT**

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, on July 22, 2024, counsel for *Amicus* conferred with counsel for Plaintiffs-Appellees and counsel for Defendants-Appellants, and all parties consented to the filing of this brief.

## INTRODUCTION

The banking associations in this case purport to speak for their industry. But banking is not a monolith and the associations do not speak for all banks. Beneficial State Bank—like many other institutions—is subject to regulations under the Community Reinvestment Act.[2] And Beneficial State Bank—like many other institutions—welcomes the clarity and stability provided by those regulations. The final rule that has been preliminarily enjoined as a result of this lawsuit is not, as Plaintiffs characterize it, a radical agency action that re-writes the Community Reinvestment Act. It is only a modest step in the right direction, although hardly the fulfillment of the promise of the CRA. Having the final rule in place is still better—for regulated entities, and for the public—than not having it at all. Beneficial State Bank therefore respectfully urges this Court to find that the ongoing injunction is not in the public interest, and to vacate it during the pendency of this lawsuit.

---

[2] Community Reinvestment Act, 89 Fed. Reg. 6574 (Feb. 1, 2024) (codified at 12 CFR pts. 25, 228, 345), https://www.federalregister.gov/d/2023-25797 [hereinafter the final rule].

# ARGUMENT

The district court preliminarily enjoined the final rule based on its assessment that the Plaintiffs were likely to succeed on the merits of their challenge (including in their assertion of the major questions doctrine), that the Plaintiffs showed a substantial threat of irreparable injury absent an injunction, and that the balance of equities and the public interest support injunctive relief.  Beneficial State Bank submits this brief to explain that Plaintiffs' challenges do not represent universal views within the banking industry, and, correspondingly, why the district court erred (among other reasons) in its assessment of the public interest analysis.

## I.    Plaintiffs Do Not Represent the Entire Banking Industry.

Plaintiff American Bankers Association alleges, in its complaint, that it "is the voice for the nation's $23.7 trillion banking industry." ROA.30.  In reality, it is but one of the voices for a complex, multifaceted industry that takes a variety of views on federal regulation in general and the Community Reinvestment Act in particular.  Plaintiffs represent only a slice of reactions to the final rule, and not a perspective to which every financial institution accedes.  As set forth more fully below, other

banks, including Beneficial State Bank, oppose this lawsuit and view the final rule as a necessary—if insufficient—modernization that provides benefits both to communities (by more closely tethering banks' CRA obligations to the customers they actually serve) and to small and intermediate lenders (by increasing thresholds for bank size standards). Indeed, the Opportunity Finance Network—a national network of more than 400 CDFIs, including several banks[3]—opposes this lawsuit, noting that Plaintiffs' allegations of burden "do[] not represent the comprehensive, consultative process that shaped these reforms in response to the urgent need to address persistent economic disparities."[4]

---

[3] Opportunity Finance Network, *About Opportunity Finance Network (OFN)*, https://www.ofn.org/about-ofn/ (last visited July 7, 2024); Opportunity Finance Network, *Find a CDFI*, https://www.ofn.org/cdfi-locator/#organization=&org-type=Bank&area-served=&lending-type=&posts=100 (last visited July 24, 2024). A CDFI is a community development financial institution that specializes in lending in under-resourced communities. *See* Opportunity Finance Network, *What Is a CDFI?*, https://www.ofn.org/what-is-a-cdfi/ (last visited July 7, 2024). Beneficial State Bank is a CDFI, and under the final rule, would be recategorized from a large bank to an intermediate bank, accruing fewer obligations.

[4] Opportunity Finance Network, *OFN Opposes Lawsuit Against Community Reinvestment Act Reforms* (Mar. 4, 2024), https://www.ofn.org/blog/ofn-opposes-lawsuit-against-community-reinvestment-act-reforms/.

As the government argued below, *see* ROA.607, and the regulatory record demonstrates, the final rule provided meaningful regulatory relief to smaller and intermediate-sized banks, including reforms that were not only unchallenged, but lauded by the industry. For example— demonstrating that the public interest is broader than the preferences of a handful of megabanks—Piscataqua Savings Bank, a small bank of about $350 million, commented that it "appreciate[d] the agencies' effort to tailor the proposal to avoid imposing regulatory burden on smaller community banks like us."[5] This is not a benefit only to Piscataqua Savings Bank, however. Beneficial State Bank roughly estimates that hundreds of banks would benefit under the final rule by being recategorized from intermediate to small, or from large to intermediate.[6]

---

[5] Piscataqua Savings Bank, Comment Letter on Community Reinvestment Act 1 (Aug. 1, 2022), https://www.regulations.gov/comment/OCC-2022-0002-0674.

[6] This rough estimate was based on assets reported in the most recent Federal Reserve Statistical Release, rather than an assessment of the prior two calendar years. *See Federal Reserve Statistical Release: Large Commercial Banks*, Federal Reserve (Mar. 31, 2024), https://www.federalreserve.gov/releases/lbr/current/default.htm; *see also* 89 Fed. Reg. at 6,598 (describing new asset-size threshold calculations).

Several banks agreed with the principle of updating CRA regulations to recognize the reality of modern, online banking, even if they disagreed with the details: LendingClub, an "almost entirely online" bank, "strongly support[ed] efforts to integrate digital banking business models into CRA" and "believe[d] it is appropriate and valuable for digital banks to have obligations to the LMI [low-to-moderate income] communities they serve online."[7]  Similarly, the Mortgage Bankers Association "agree[d] that a modernized CRA regulatory framework should not continue to strictly adhere to physical presence as the only basis for a bank's CRA evaluation."[8]  And the American Bankers Association itself acknowledged that the CRA's "geographically-focused statutory and regulatory scheme has not kept pace with technological developments and evolving customer preferences."[9]

---

[7] LendingClub, Comment Letter on Community Reinvestment Act 1, 31 (Aug. 5, 2022), https://www.regulations.gov/comment/OCC-2022-0002-0640.

[8] Mortgage Bankers Ass'n, Comment Letter on Community Reinvestment Act 5 (Aug. 5, 2022), https://www.regulations.gov/comment/OCC-2022-0002-0383.

[9] American Bankers Ass'n, Comment Letter on Community Reinvestment Act Regulations 9 (Aug. 5, 2022), https://www.aba.com/-/media/documents/comment-letter/craletter20220805.pdf?rev=48a90b0859444f0ea484b1f17589b080.

The Community Development Bankers Association celebrated "several changes [in the final rule that] are positive for CDFI-certified banks and their communities," including increased thresholds for bank size standards, deposit data reporting requirements that apply only to the largest banks, and community development consideration for certain CDFI activities.[10] Beneficial State Bank also noted "several changes that have the potential to positively impact individuals and communities of color," including "encouraging banks to establish and implement Special Purpose Credit Programs tailored to meet the borrowing needs of individuals of color, including products such as home loans, small business lending, and consumer auto loans," as well as changes that "emphasize initiatives that benefit Native communities."[11]

---

[10] Community Development Bankers Ass'n, *Community Reinvestment Act Modernization* (Oct. 24, 2023), https://www.cdbanks.org/news/community-reinvestment-act-modernization.

[11] Victor Ramirez, *New rules modernizing the CRA bring us closer to an equitable financial system,* Beneficial State Bank (Nov. 3, 2023), https://www.beneficialstatebank.com/better-banking-blog/news-and-announcements/new-rules-modernizing-the-cra-bring-us-closer-to-an-equitable-financial-system.

Unfortunately, the district court gave these salutary provisions short shrift in its determination that the public interest weighed in favor of granting the preliminary injunction. *See* ROA.607-08. It did not meaningfully analyze these benefits, but seemed to take for granted that an alleged harm to the largest banks was necessarily a harm to the public interest.

## II. Regulated Entities—and the Public—Benefit from Clarity about Regulatory Status.

As Beneficial State Bank has long believed, "[t]he CRA is good for communities, consumers, businesses, and the banking industry."[12] In Beneficial State Bank's view, investing in LMI communities enables individuals to move from being unbanked and underbanked into the market, where they are new customers. This further encourages financial empowerment, autonomy, and stability (which can be linked to other quality of life indicators like health and longevity). In other words, in Beneficial State Bank's view, the CRA is truly an opportunity, not a burden. A retrospective at the thirty-year anniversary of the CRA noted

---

[12] Beneficial State Bank, *Community Reinvestment Act*, https://www.beneficialstatebank.com/impact/community-reinvestment-act-cra-public-file (last visited July 7, 2024).

that "[t]he overwhelming majority of studies find that the CRA has succeeded in increasing lending in low- and moderate-income neighborhoods."[13]  But the CRA can only live up to that promise through effective, modern, and clear regulation that accounts for the reality of contemporary digital banking.

Despite the CRA's successes to date, its mission is hardly complete. Even so, the district court accepted at face value Plaintiffs' assertions that "the CRA is working well: 'Over 98% of banks achieved an Outstanding or Satisfactory rating in their most recent assessment.'" ROA.606 (internal citation omitted).  That statistic, however, is not a sign of a healthy, functioning CRA, but one in need of regulatory reform.  If nearly all banks are passing their CRA exams, that does not necessarily mean that the banks are in near universal compliance.  It could also mean that the CRA exams are insufficiently stringent, and are passing banks that should be failing.  An understanding of the broader regulatory context shows that the latter is true:  "the Department of Justice recently

---

[13] Eugene A. Ludwig et al., *The Community Reinvestment Act:  Past Successes and Future Opportunities*, 4 Community Development Innovation Rev. 1, 84 (2009), https://www.frbsf.org/wp-content/uploads/cra_past_successes_future_opportunities1.pdf.

settled with multiple banks after accusing them of discrimination"—even though "most of these very same banks passed their CRA exams."[14]

Strong regulations are therefore critical to maintaining the CRA's efficacy and ensuring that banks are truly meeting the needs and convenience of their communities. And the complaints about regulatory burden raised by the loudest banks—those apparently driving Plaintiff associations here—do not represent a unified industry view.

---

[14] Adrian Ma & Darian Woods, *Why banks are fighting changes to an anti-redlining program*, National Public Radio (Feb. 15, 2024), https://www.npr.org/transcripts/1197961870; *see also* Rise Economy, Comment Letter on Proposed Rule Regarding Business Combinations Under the Bank Merger Act and Statement of Policy on Bank Merger Transactions 5 (June 14, 2024), https://rise-economy.org/wp-content/uploads/2024/06/CA-community-groups-comment-on-FDIC-Proposed-Statement-of-Policy-on-Bank-Merger-Transactions.pdf ("Importantly, [CRA Performance Evaluation] ratings have been notoriously forgiving, with a strong majority of the last 19 banks entering into Department of Justice (DOJ) redlining consent orders having passed their CRA evaluations with 'Satisfactory' or 'Outstanding' ratings. In other words, at the same time that the DOJ was charging certain banks with redlining in communities of color, the banking regulators determined that these same banks were doing a fine or excellent job serving their communities under the nation's anti-redlining law."). Moreover, the fact that the wealth gap is only increasing under the current regulations, Urban Institute, *Nine Charts about Wealth Inequality in America* (Apr. 25, 2024), https://apps.urban.org/features/wealth-inequality-charts/, demonstrates that the CRA exams must not be accurately measuring activities indicative of successful actions necessary to reduce the wealth gap.

First, Beneficial State Bank and others in the industry will continue to be subject to CRA regulation in some form or another, and it would prefer the certainty of being able to work towards implementing a final rule as soon as it is finalized, rather than beginning that process only to be interrupted by an injunction that puts the future of regulation in question.[15] Because Beneficial State Bank is subject to CRA examinations, it must plan its CRA activities in advance of those examinations to ensure successful outcomes. Uncertainty about the requirements makes it difficult for Beneficial State Bank to strategically develop and efficiently implement programs to ensure that it meets regulatory expectations and its mission-related goals.

Second, Plaintiffs' complaints about the regulatory burden sound a familiar refrain. Plaintiff American Bankers Association, for example, has also commented that proposed regulation under Section 1071 of the Dodd-Frank Act will increase costs, reduce competition, drive consolidation, and result in "the gradual loss of community banks" and

---

[15] *See, e.g.*, Reuters, *Banks need increased regulatory certainty – ECB's Nouy* (Nov. 15, 2016), https://www.reuters.com/article/eurozone-banks-ecb-idUSF9N15G024/ (commenting, in the Basel III context, "How can banks plan for the future when they do not know what rules they will have to comply with?").

higher prices in the market.[16]  It has warned that an "unnecessary and inappropriate burden" associated with a proposed regulation implementation Section 619 of Dodd-Frank "may interfere with liquidity."[17]  And most recently, in its opposition to the proposed Basel III Endgame rules, it has warned that implementation of the proposal would reduce liquidity in capital markets, "with resulting harm to U.S. businesses, consumers and Americans saving for their retirement."[18]  But this constant refrain must, at some point, ring hollow.  Any new regulation is going to require regulated entities to adapt and thus entails

---

[16] American Bankers Ass'n, Comment Letter on Small Business Lending Data Collection Under the Equal Credit Opportunity Act 2 (Regulation B) (Jan. 6, 2022), https://www.aba.com/-/media/documents/comment-letter/jointcl107120220106.pdf?rev=c9309c4cacbb4b6ca2365ba100f1acb6.

[17] American Bankers Ass'n, Comment Letter on Notice of Proposed Rulemaking Implementing the Provisions of Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), Concerning Restrictions on Proprietary Trading and Certain Interests in, and Relationships with, Hedge Funds and Private Equity Funds 23 (Feb. 13, 2012), https://www.federalreserve.gov/SECRS/2012/March/20120309/R-1432/R-1432_021312_105526_519231400402_1.pdf.

[18] Bank Policy Institute & American Bankers Ass'n, Comment Letter on Regulatory Capital Rule:  Large Banking Organizations and Banking Organizations with Significant Trading Activity 2 (Jan. 16, 2024), https://www.regulations.gov/comment/OCC-2023-0008-0218.

some burden[19]—and that typical occurrence should not be permitted to outweigh the public interest in permitting that regulation to move forward. Because a preliminary injunction may be granted only "if the movant has clearly carried the burden of persuasion on all four *Calloway* prerequisites," that is, likelihood of success on the merits, irreparable injury, balance of equities, and the public interest, *Mississippi Power & Light Co.* v. *United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985), irreparable injury alone is insufficient to sustain an injunction.

Finally, in analyzing whether the public interest would be served by a preliminary injunction, the district court was too quick to credit some banks' threats to reduce liquidity as a result of the final rule. *See* ROA.606. The court relied upon a declaration from the Independent Community Banks of America that described a survey it had conducted after the proposed rule was published, to which more than one hundred banks responded (compared to the "thousands of community banks" in ICBA's membership). *See id.*; *see also* ROA.32, 315, 317. According to

---

[19] As the government pointed out below, the estimated burden for the final rule roughly averaged only 11 hours per bank more than the burden for the current CRA rule. *See* Defs.' Resp. in Opp'n at 35, Dkt. No. 67 (citing 89 Fed. Reg. at 7102–06).

ICBA, when asked if their bank would reduce lending in areas to avoid triggering a Retail Lending Assessment Area, 28.2% said yes, and 25.6% said they didn't know.  ROA.317.

But ICBA failed to state how many banks responded to that survey question, how many of those banks were actually designated as large banks under the final rule, whether any of the remaining 46.2% of respondents said they might increase liquidity despite the regulation, and whether the one hundred banks that responded were in any way a representative sample of the industry more broadly.  And the survey put forward by ICBA likewise failed to provide any comparator, to show that any alleged reduction in liquidity (difficulty to quantify, given the limitations of the survey data and the imprecision of the question it posed) would not be offset by increases in liquidity from banks recategorized as smaller under the final rule.  In any event, as a financial institution itself, Beneficial State Bank is skeptical that the final rule would reduce liquidity in a measurable way:  addressing CRA regulations

has been a cost of doing business for decades, and banks with CRA obligations have managed to be extremely profitable nonetheless.[20]

## III.  The Final Rule Is Only a Moderate Step in the Right Direction.

In preliminarily enjoining the final rule, the district court characterized it as novel and sweeping, such that it implicated the major questions doctrine.  *See* ROA.600.  But the final rule is not such a radical departure, nor an incursion into areas where the federal agencies that issued the rule lacked expertise.  Rather, the final rule merely continues to meet banks where they are—online.[21]  And indeed, other financial

---

[20] Pete Schroeder, *U.S. bank profits jump 79.5% as large firms shake off failed bank costs*, Reuters (May 29, 2024), https://www.reuters.com/markets/us/us-bank-profits-jump-795-large-firms-shake-off-failed-bank-costs-2024-05-29/ (noting profits for the U.S. banking sector of $64.2 billion in the first quarter of 2024).

[21] Ironically, the Independent Community Bankers of America previously "commend[ed] the agencies for allowing banks to receive credit for community development credit outside of their assessment areas and urge[d] the agencies to finalize this provision of the rule," which would "allow banks to direct resources to the most impactful community development projects, regardless of whether they are located in proximity to a bank branch"—in other words, acknowledging the benefit of acting beyond strict geographical borders where it benefits the banks, but not where it imposes obligations.  *See* Independent Community Bankers of America, Comment Letter on Community Reinvestment Act Regulations 2 (Aug. 5, 2022), https://www.icba.org/docs/default-source/icba/advocacy-documents/letters-to-regulators/comments-on-cra-modernization-

institutions—including Beneficial State Bank—believe that the rule did not go far enough.  As Beneficial State Bank stated after the rule was finalized, "there was insufficient consideration of race and ethnicity as equally important factors. . . . Without comprehensive CRA regulation that fully acknowledges the importance of race and ethnicity as critical factors, there remains a significant journey ahead in our efforts to address and close the racial wealth gap."[22]

This statement built on Beneficial State Bank's comments to the advance notice of proposed rulemaking.  There, Beneficial State Bank proposed that CRA reform should include "nam[ing] racial equity as a modernization objective"; "[p]rioritiz[ing] LMI individuals and people of color instead of place"; requiring that "[p]roducts must meet non-predatory standards to qualify"; "[m]aintaining emphasis on performance context and community input"; providing for "[r]eal penalties (including double downgrades) for harming communities"; "[a]lign[ing] CRA and CDFI reporting"; and "[m]andat[ing] demographic data collection of all

proposal.pdf?sfvrsn=41a11b17_0.

[22] Ramirez, *supra* n. 11.

17

loans using the Dodd-Frank Section 1071 framework."[23] As to the deposit products at issue in this lawsuit, Beneficial State Bank recommended that "[b]anks should be incentivized under CRA to offer retail banking services and products tailored to LMI customers, Black customers, and people of color."[24] Needless to say, in Beneficial State Bank's view, the final rule did not take sufficiently enough of these recommendations or fulfill the CRA's initial goal and promise of reversing the years of racism in the banking industry that had precipitated its passage.[25]

It is therefore unsurprising that many advocates, like Beneficial State Bank, found themselves disappointed by the final rule. The National Community Reinvestment Coalition, for example, expressed appreciation for the "long overdue and essential" update to CRA regulation, but noted that its "deep disappointment that these new final rules still fail to make the racial wealth equity goals of the law explicit."[26]

---

[23] Beneficial State Bank, Comment Letter on Community Reinvestment Act 3 (Feb. 16, 2021), https://beneficialstate.org/wp-content/uploads/2021/02/Beneficial-State-Community-Reinvestment-Act-Docket-No-R-1723-RIN-7100-AF94.pdf.

[24] *Id.* at 7.

[25] *See* Beneficial State Bank, *Community Reinvestment Act, supra* n. 12.

[26] National Community Reinvestment Coalition, *NCRC Statement on*

Similarly, Rise Economy described the final rule as a "lost opportunity to close racial wealth gaps," even as it "acknowledg[ed] reinvestment advancements."[27] Rise Economy explained that the final rule "does not align with the statute's anti-redlining heritage," and "misses several important opportunities" to "incorporate race in any meaningful way into the CRA framework" or to "prioritize bank branches in low-to-moderate-income communities of color," among other issues.[28] In short: the final rule was hardly a radical change to CRA regulation. To many interested parties—including regulated entities like Beneficial State Bank—the final rule was a half-measure at best that failed to fulfill the statutory promise of the CRA, let alone assert a "substantial" breadth of authority, *see* ROA.600.

---

*Final CRA Rules Release* (Oct. 24, 2023), https://ncrc.org/ncrc-statement-on-final-cra-rules-release/; *see also* Kevin Hill, *NCRC's Guide to the 2023 Community Reinvestment Act Final Rule* (Dec. 2023), https://ncrc.org/ncrcs-guide-to-the-2023-community-reinvestment-act-final-rule/ (describing what NCRC deemed positive changes, unhelpful changes, and missed opportunities in the final rule).

[27] Rise Economy, *Rise Economy Responds to Bank Regulators' Final CRA Rule* (Oct. 24, 2023), https://rise-economy.org/rise-economy-responds-to-bank-regulators-final-cra-rule/.

[28] *Id.*

## CONCLUSION

For the foregoing reasons, Beneficial State Bank respectfully requests that this Court reverse the district court's ruling and vacate the preliminary injunction.

Respectfully Submitted,

Dated: July 25, 2024       */s/ Jessica Anne Morton*
Jessica Anne Morton
Robin F. Thurston
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
jmorton@democracyforward.org
rthurston@democracyforward.org

*Counsel for* Amicus

# CERTIFICATE OF COMPLIANCE

### With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

I certify that this filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,463 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This filing also complies with the typeface requirements of Federal Rule of Civil Procedure 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 MSO Version 2406 in Century Schoolbook 14-point font typeface.

*/s/ Jessica Anne Morton*
Jessica Anne Morton

## CERTIFICATE OF SERVICE

I, Jessica Anne Morton, counsel for Proposed *Amicus*, certify that on July 25, 2024, I caused a copy of the foregoing brief to be filed electronically through the appellate CM/ECF system with the Clerk of the Court, which provides electronic notice to all attorneys who have entered an appearance.

I further certify that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1: and (3) the document has been scanned for viruses and has been found to be free of viruses.

*/s/ Jessica Anne Morton*
Jessica Anne Morton

July 25, 2024