No. 24-10367

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

TEXAS BANKERS ASSOCIATION, *et al*.,
*Plaintiffs-Appellees*,

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *et al*.,
*Defendants-Appellants*.

———————————

**On Appeal from the United States District Court
for the Northern District of Texas**
No. 24-cv-025-Z-BR
Hon. Matthew J. Kacsmaryk, Judge

———————————

**AMICUS BRIEF OF THE STATES OF CALIFORNIA, COLORADO,
CONNECTICUT, DISTRICT OF COLUMBIA, DELAWARE, HAWAII,
ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN,
MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, NORTH
CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, AND
WASHINGTON, IN SUPPORT OF DEFENDANTS-APPELLANTS**

———————————

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
JAMES F. ZAHRADKA II
Supervising Deputy Attorney General

JENNIFER SOLIMAN
DELBERT TRAN
Deputy Attorneys General
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 229-0110
Email: Delbert.Tran@doj.ca.gov
*Attorneys for Amicus Curiae the State of
California*
(*Additional counsel on signature pages*)

July 25, 2024

# TABLE OF CONTENTS

**Page**

Interests of Amici Curiae ........................................................................1

Argument..................................................................................................3

I.    The Challenged Regulations Help Protect Full and Equal Access to
      Banking for Millions of the States' Most Vulnerable Residents ...................3

      A.    The Retail Lending Test Properly Recognizes that Modern
            Banking Is No Longer Tethered to Physical Branches ........................5

            1.    Bank branch closures disproportionately harm low- to
                  moderate-income communities and communities of color.........9

            2.    The Retail Lending Test ensures CRA benefits cover
                  underserved communities that no longer have nearby
                  physical bank branches ...........................................12

      B.    The Retail Services and Products Test Ensures Communities'
            Full and Equal Access to Credit and Participation in the
            Economy More Broadly .......................................................15

            1.    The Retail Services and Products Test is needed given
                  the barriers that millions face in accessing deposit
                  products ...................................................................16

            2.    Barriers to depository access cause significant harm to
                  residents throughout the States .................................19

            3.    Without access to deposit products, unbanked individuals
                  are forced to rely on predatory and expensive alternative
                  financial services ....................................................22

Conclusion ...........................................................................................26

Certificate of Compliance ......................................................................30

Certificate of Service ...........................................................................31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anibowei v. Morgan*
    70 F.4th 898 (5th Cir. 2023) ...................................................................3

*Cantero v. Bank of Am., N. A.*
    144 S. Ct. 1290 (2024) ...........................................................................2

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*
    710 F.3d 579 (5th Cir. 2013) ..................................................................5

*Def. Distributed v. U.S. Dep't of St.*
    838 F.3d 451 (5th Cir. 2016) ..................................................................3

*Guy Carpenter & Co. v. Provenzale*
    334 F.3d 459 (5th Cir. 2003) ..................................................................3

*Nken v. Holder*
    556 U.S. 418 (2009)................................................................................3

*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984)..............................................................................12

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*
    576 U.S. 519 (2015)................................................................................1

**STATUTES**

12 U.S.C.
    § 2903.....................................................................................................1
    § 2903(a)(1) .........................................................................................15
    § 2903(a)(2) ...........................................................................................4
    § 2905.....................................................................................................1
    § 2906(a) ................................................................................................4

Community Reinvestment Act.........................................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

**COURT RULES**

Federal Rules of Appellate Procedure, Rule 29(a)(2) ...............................................1

**OTHER AUTHORITIES**

12 C.F.R. § 225.84 .................................................................................................4

Community Reinvestment Act, 89 Fed. Reg. 6574 (Feb. 1, 2024) ....................6, 15

*Acting AG Platkin Announces Major Settlement with Trident Mortgage Company LP and Fox & Roach LP over Allegations of Race-Based 'Redlining' in Lending Practices in the Camden Area*, N.J. Off. of the Att'y Gen. (July 27, 2022), https://tinyurl.com/52m4beak ...............................................................................11

Alaina Barca & Harry Hou, *U.S. Bank Branch Closures and Banking Deserts*, Fed. Reserve Bank of Phila., 2 (2024), https://tinyurl.com/3sjz82x4 ...............................................................6, 7, 8, 10

Alina Selyukh, *Paycheck-to-Paycheck Nation: Why Even Americans with Higher Incomes Struggle with Bills*, NPR (Dec. 16, 2020), https://tinyurl.com/3j7xbpjt ...............................................................................21

*Alternative Financial Services: A Primer*, 3 FDIC Quarterly 39, 40 (2009), https://tinyurl.com/ymxdsb99 ...............................................................23

Anna Tranfaglia, *Shrinking Networks: A Spatial Analysis of Bank Branch Closures* 2 (Fed. Reserve Bank of Phila., Working Paper No. 18-12, 2018), https://tinyurl.com/bddn4c6a ...................................................8

Christopher R. Leslie, *Banking Deserts, Structural Racism, and Merger Law*, 108 Minn. L. Rev. 695, 743 (2023) .........................................9, 10

*Community Benefits Agreements: How Banks Ensure They Meet Local Needs*, Nat'l Cmty. Reinvestment Coal. (Jan. 2024), https://tinyurl.com/329js8ea ...............................................................................14

## TABLE OF AUTHORITIES
### (continued)

**Page**

Daniel Mollenkamp, *What is a Check-Cashing Service?*, Time (Feb. 24, 2024), https://tinyurl.com/3m9ajzy6 ............................................23

Deposit Accounts, FDIC (Aug. 1, 2023), https://tinyurl.com/mrx9bwwv ...........................................................15

Dung Pham et al., *The Decline of Branch Banking and the Transformation of Bank Accessibility*, 11 Rev. of Integrative Bus. & Econ. 1, 17 (2022) ..................................................................8, 11

Edlebi et al., *The Great Consolidation of Banks and Acceleration of Branch Closures Across America: Branch Closure Rate Has Doubled During the Pandemic*, Nat'l Cmty. Reinvestment Coal., 6 (Feb. 2022), https://tinyurl.com/3ne5yzsf .......................................6, 10

Emily Batdorf, *Living Paycheck to Paycheck Statistics 2024*, Forbes (Apr. 2, 2024), https://tinyurl.com/3bxcdwhn ...................................21

Emily Guy Birken, *The Costs of Being Unbanked or Underbanked*, Forbes (Dec. 2, 2022), https://tinyurl.com/38nd75s2 ........................22

*Established Direct Banking Brands Flex Their Digital Banking Muscle, According to J.D. Power*, J.D. Power (May 12, 2022), https://tinyurl.com/38wdp559 ..................................................8

Eugene A. Ludwig et al., *The Community Reinvestment Act: Past Successes and future Opportunities*, Revisiting the CRA: Perspectives on the Future of the Community Reinvestment Act, Fed. Reserve Banks of Boston and S.F. 101 (2009), https://tinyurl.com/5t48wawc ...............................................9, 12, 14

Fed. Deposit Ins. Corp., *2013 FDIC National Survey of Unbanked and Underbanked Households* at 9, 28, https://tinyurl.com/2u66bkrz....................20

Fed. Deposit Ins. Corp., *2015 FDIC National Survey of Unbanked and Underbanked Households* 7, https://tinyurl.com/ydt34xze ................................23

# TABLE OF AUTHORITIES
## (continued)

Page

Fed. Deposit Ins. Corp., *2021 FDIC National Survey of Unbanked and Underbanked Households* at 18, 19 Figure 3.5, https://tinyurl.com/52rdukjk .................................................................*passim*

FedCommunities, *Banking Deserts Dashboard*, https://tinyurl.com/3uzhfn9h...........................................................7, 8

Gregg Gelzinis et al., *How Workers Get Paid is Changing: Consumer Protections Need to Catch Up*, Ctr. for Am. Progress (Jan. 17, 2019), https://tinyurl.com/2962x8mx ...........................................15, 20

Hoai-Luu Q. Nguyen, *Are Credit Markets Still Local? Evidence from Bank Branch Closings*, 11 Am. Econ. J. 1, 3 (2019)...........................................7

Isaac Scher, *14 Million American Adults Don't Have a Bank Account. They're Still Waiting for a Stimulus Payment*, Bus. Insider (May 5, 2020), https://tinyurl.com/nhe2jy4w ...................................................20

Jacob William Faber & Terri Friedline, *The Racialized Costs of "Traditional" Banking in Segregated America: Evidence from Entry-Level Checking Accounts*, 12 Race & Soc. Probs. 344, 345 (2020)..........................................................................10, 18, 19, 22

Jacob William Faber, *Segregation and the Cost of Money: Race, Poverty, and the Prevalence of Alternative Financial Institutions*, Social Forces, 817, 819 (2019) ......................................15, 22, 24, 25

Jenn Underwood & Elizabeth Aldrich, *U.S. Consumer Banking Statistics 2024*, Forbes (Jan. 31, 2024), https://tinyurl.com/53kcbcxy ...............................................................8

Jim Dobbs, *Why the Torrid Pace of Branch Closings Has Cooled*, Am. Banker (Feb. 27, 2024), https://tinyurl.com/5uysmbtx ...........................6, 8

John F. Creamer & Lewis H. Warren, *Unbanked and Impoverished? Exploring Banking and Poverty Interactions over Time* (U.S. Census Bureau, Working Paper No. 2022-16, 2022), https://tinyurl.com/2p9naup3 ..............................................................20

# TABLE OF AUTHORITIES
## (continued)

**Page**

John P. Caskey, *Reaching Out to the Unbanked*, Inclusion in The American Dream: Assets, Poverty, and Public Policy 154 (2005) ....................21

Kristen Broady et al., *An Analysis of Financial Institutions in Black-Majority Communities: Black Borrowers and Depositors Face Considerable Challenges in Accessing Banking Services*, Brookings Inst. (Nov. 2, 2021), https://tinyurl.com/2pfjcrsh ............................24

Lei Ding & Carolina K. Reid, *The Community Reinvestment Act (CRA) and Bank Branching Patterns*, 30 Hous. Pol'y Debate 27, 28 (2019) ...............................................................................................................17

Lei Ding & Leonard Nakamura, *"Don't Know What You Got Till It's Gone"-the Community Reinvestment Act in a Changing Financial Landscape*, 43 J. of Real Estate Rsch. 96, 98 (2021) ........................................12

Lei Ding et al., *Effects of the Community Reinvestment Act (CRA) on Small Business Lending*, Joint Ctr. for Hous. Studies of Harv. U. 1, 1 (2019), https://tinyurl.com/3k2s2nr3 ...............................................................13

Letter from the Att'ys Gen. of Cal. et al., to Ann E. Misback, Sec'y, Bd. of Govs. of the Fed. Reserve Sys. (Aug. 5, 2022), https://tinyurl.com/2ysks5uh.......................................................................5, 6, 16

Letter from the Att'ys Gen. of Cal. et al., to Ann E. Misback, Sec'y, Bd. of Govs. of the Fed. Reserve Sys. (Feb. 16, 2021), https://tinyurl.com/2z4ptznr...........................................................................6, 16

Letter from the Att'ys Gen. of Cal. et al., to Joseph M. Ottig, Comptroller of the Currency, and Jelena McWilliams, Chairwoman, Fed. Deposit Ins. Corp. (Apr. 8, 2020), https://tinyurl.com/yck9suv2 ................................................................................6

Letter from the Att'ys Gen. of Cal. et al., to Joseph M. Ottig, Comptroller of the Currency (Nov. 19, 2018), https://tinyurl.com/92frua4u ...............................................................................6

## TABLE OF AUTHORITIES
### (continued)

Luisa Blanco et al., *Impact of Great Recession Bank Failures on Use of Financial Services Among Racial/Ethnic and Income Groups*, 88 S. Econ. J. 1574, 1575-76 (2022) ................................................................22

Mallika Mitra, *Banks Are Ditching Their Branches. Maybe You Should Too*, Wall Street J. (May 21, 2024), https://tinyurl.com/ms38s7zv..............................................................6, 8

Michael S. Barr, *An Inclusive, Progressive National Savings and Financial Services Policy*, 1 Harv. L. & Pol'y Rev. 161, 164 (2007) .........*passim*

*NCRC Forecast: Weakening the Community Reinvestment Act Would Reduce Lending by Hundreds of Billions of Dollars*, Nat'l Cmty. Reinvestment Coal. 4-6 (Sept. 2018), https://tinyurl.com/k6fvc76y .................14

Patricia D. Posey, *Information Inequality: How Race and Financial Access Reflect the Information Needs of Lower-Income Individuals*, 707 The Annals of the Am. Acad. 125, 130 (2023) ......................18

Raphael W. Bostic & Breck L. Robinson, *Do CRA Agreements Influence Lending Patterns*, 31 Real Estate Econ. 23, 24 (2003)......................13

Scott W. Hegerty, *Bank Density, Population Density, and Economic Deprivation Across the United States: Implications for Public Health Outcomes*, Econ. and Mathematical Modeling in Health-Related Rsch. 158 (Marzenna Anna Weresa et al. eds.).......................................7

Soohyung Cho et al., *Determinants of Bank Closures: What Ensures Sustainable Profitability in Mobile Banking*, 12 Electronics 1196, 1120 (2023)............................................................................8

*Stimulus Checks: Direct Payments to Individuals during the COVID-19 Pandemic*, U.S. Gov't Accountability Off. (June 29, 2022), https://tinyurl.com/yubew2bk ...............................................................20

# TABLE OF AUTHORITIES
## (continued)

**Page**

Sydney Goldstein & Lei Ding, Banks' Community Reinvestment Act (CRA) Opportunities for Promoting Job Creation, Workforce Development, and Place-Based Investments, Fed. Reserve Bank of Phila. 7-10 (2017), https://tinyurl.com/yb8h66v6 ...............................................14

Terri Friedline et al., *Digital Redlining: Poor Rural Communities' Access to Fintech and Implications for Financial Inclusion*, 24 J. of Poverty 517, 533 (2020) ............................................................................9, 11

Villanueva Alarcón et al., *Latiné, Latinx, Latina, Latino, or Hispanic: Problematizing Terms Often Used in Engineering Education*, 111 J. of Eng'g Educ. 735, 735-739 (2022) ...............................................17

Vonde Eanes, *How Community Development-Related Rehabilitation Efforts Can Qualify for Community Reinvestment Act Consideration*, Off. of the Comptroller of the Currency, U.S. Dep't of Treasury (Feb. 2018), https://tinyurl.com/c5c2m475......................................11

Zach Fox et al., *Bank Branch Closures Take Greatest Toll on Majority-Black Areas*, S&P Global (July 25, 2019), https://tinyurl.com/etfma48h .......................................................................10, 11

## INTERESTS OF AMICI CURIAE

*Amici Curiae* States of California, Colorado, Connecticut, District of Columbia, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, and Washington ("*Amici* States") submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) to support the federal government's defense of regulations that implement the Community Reinvestment Act ("CRA") and protect full and equal banking access for the *Amici* States' 164 million citizens. The CRA is a landmark civil rights law that Congress enacted to combat the racially discriminatory practice of redlining and to encourage banks to meet the credit and deposit needs of all members of their communities. To that end, the CRA's text broadly delegates to the Federal Reserve Board of Governors, Federal Deposit Insurance Corporation, and Office of the Comptroller of the Currency (collectively, the "Federal Banking Agencies") the authority to promulgate regulations to ensure that banks serve their entire communities. *See* 12 U.S.C. §§ 2903, 2905.

But despite some successes in combating redlining and other discriminatory behavior, the vestiges of such discrimination "remain today, intertwined with the country's economic and social life." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 528 (2015). While the overt, de jure

redlining of the 20th century is no longer the law of the land, bank consolidation and a shift toward online or alternative forms of finance have reproduced its effects: modern bank branch closures have led to "banking deserts" that predominantly affect low- to moderate-income communities and communities of color. When numerous stakeholders—including the *Amici* States—called for the Federal Banking Agencies to update the CRA's regulations to address these realities, the Agencies responded with the regulations challenged here.

The *Amici* States share a sovereign and substantial interest in the CRA's protections to guarantee that banks fully serve the *Amici* States' residents. Due to the obligations that the CRA has imposed on banks, the *Amici* States have collectively seen hundreds of billions of dollars in investments and lending flow into their communities. The *Amici* States maintain an interest in the proper implementation of the CRA and in ensuring that banks remedy discriminatory practices and provide full access to low-income communities and communities of color. Further, under this nation's dual system of banking, *see Cantero v. Bank of Am., N. A.*, 144 S. Ct. 1290, 1294 (2024), the *Amici* States promulgate and enforce their own banking regulations, offering them insight into the banking industry and how regulations may impact the *Amici* States' communities. With that perspective, the *Amici* States have submitted multiple comment letters over the past several

years regarding the promulgation of CRA regulations, including the Final Rules at issue here.

The challenged provisions of the Final Rules properly implement the CRA and help protect all communities' access to banking services. The *Amici* States agree with the Federal Banking Agencies' argument that the Final Rules faithfully carry out the CRA's text, and respectfully submit this brief to explain why the balance of equities and public interest also call for reversal of the district court's preliminary injunction below.

## ARGUMENT

### I.  THE CHALLENGED REGULATIONS HELP PROTECT FULL AND EQUAL ACCESS TO BANKING FOR MILLIONS OF THE STATES' MOST VULNERABLE RESIDENTS

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (citation omitted). To obtain a preliminary injunction, a movant must show: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury absent the preliminary injunction; (3) the balance of equities favors a preliminary injunction; and (4) the preliminary injunction will not harm the public interest. *Id.* A movant cannot obtain a preliminary injunction if they fail to clearly satisfy "all four elements," *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003),

3

and courts generally consider the latter two elements together when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Def. Distributed v. U.S. Dep't of St.*, 838 F.3d 451, 460 (5th Cir. 2016) (affirming denial of preliminary injunction based solely on the balance of equities and public interest factors).

Here, Plaintiffs challenge two specific provisions of the Final Rules: (1) the Retail Lending Test, which requires the Federal Banking Agencies to evaluate certain banks' lending activity in neighborhoods receiving substantial numbers of loans by those banks; and (2) the Retail Services and Products Test, which requires the Federal Banking Agencies to evaluate large banks' deposit products—such as checking and savings accounts—in addition to their lending services. ROA.587-88. The results of these two Tests, like other evaluations required by the CRA, are published by the Federal Banking Agencies for public scrutiny, and banks that fail to receive a satisfactory rating may be restricted from engaging in certain activities. *See* 12 U.S.C. §§ 2903(a)(2), 2906(a); 12 C.F.R. § 225.84. Thus, the challenged provisions of the Final Rules incentivize banks to preserve access to banking for

underserved community members, and the district court's preliminary injunction harms the public interest.[1]

### A. The Retail Lending Test Properly Recognizes that Modern Banking Is No Longer Tethered to Physical Branches

The district court's preliminary injunction against the Final Rules harms the public interest because it prevents the Retail Lending Test from going into effect.[2] By including lending activity by certain banks—independent of a physical branch's presence—within the CRA's assessments, the Retail Lending Test incentivizes banks to provide full and equal access to loans in neighborhoods lacking a physical branch. Such an assessment will be critical to help vulnerable

---

[1] Separately, *Amici* States also agree with the Federal Banking Agencies that the scope of the district court's order raises concern. *See* Opening Br. at 53-55. Despite Plaintiffs challenging only two provisions in Final Rules that span over 600 pages of discussion addressing other regulatory provisions, the district court issued a preliminary injunction as to the entirety of the Final Rules, rather than the two challenged provisions. ROA.608; *see Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013) ("[T]he court 'must narrowly tailor an injunction to remedy the specific action which gives rise to the order.'").

[2] The *Amici* States agree with the Federal Banking Agencies that the Plaintiffs' claims of imminent or current harm are speculative and unsupported, in part due to the gradual phase-in of the Final Rules. *See* Opening Br. at 48-50. However, to the extent this Court credits Plaintiffs' claims that banks are now incurring costs to comply with the Final Rules, the *Amici* States urge this Court to give weight to the substantial benefits to the States and their vulnerable communities brought by such compliance, and how the balance of equities requires reversal of the district court's order, as discussed in this brief.

communities gain access in a modern banking landscape increasingly detached from physical branches.[3]

"An uninterrupted march toward fewer branches has permeated the banking industry since 2010."[4] In 2009, there were nearly 100,000 bank branches across the United States.[5] Today, there are fewer than 80,000.[6] Since 2020, the pace of bank

---

[3] Contrary to the district court's conclusions, ROA.606, there was ample evidence before the Federal Banking Agencies to support the conclusion that the Final Rules are likely to increase CRA lending across the country. For example, the *Amici* States and other stakeholders raised these facts in the administrative record with their comment letters supporting the Final Rules. *See, e.g.*, Letter from the Att'ys Gen. of Cal. et al., to Ann E. Misback, Sec'y, Bd. of Govs. of the Fed. Reserve Sys. (Aug. 5, 2022), https://tinyurl.com/2ysks5uh; Letter from the Att'ys Gen. of Cal. et al., to Ann E. Misback, Sec'y, Bd. of Govs. of the Fed. Reserve Sys. (Feb. 16, 2021), https://tinyurl.com/2z4ptznr; Letter from the Att'ys Gen. of Cal. et al., to Joseph M. Ottig, Comptroller of the Currency, and Jelena McWilliams, Chairwoman, Fed. Deposit Ins. Corp. (Apr. 8, 2020), https://tinyurl.com/yck9suv2; Letter from the Att'ys Gen. of Cal. et al., to Joseph M. Ottig, Comptroller of the Currency (Nov. 19, 2018), https://tinyurl.com/92frua4u; *see also* Community Reinvestment Act, 89 Fed. Reg. 6574, 6736 (Feb. 1, 2024) ("A number of commentators stated that the proposed retail lending assessment area approach would improve CRA coverage in underserved geographic areas, with various commenters suggesting that rural areas, banking deserts, impoverished communities, majority-minority communities, and Native Land areas would particularly benefit from the proposed approach.").

[4] Jim Dobbs, *Why the Torrid Pace of Branch Closings Has Cooled*, Am. Banker (Feb. 27, 2024), https://tinyurl.com/5uysmbtx.

[5] *Id.*

[6] *Id.*; *see also* Edlebi et al., *The Great Consolidation of Banks and Acceleration of Branch Closures Across America: Branch Closure Rate Has Doubled During the Pandemic*, Nat'l Cmty. Reinvestment Coal., 6 (Feb. 2022), https://tinyurl.com/3ne5yzsf; Mallika Mitra, *Banks Are Ditching Their Branches.*

branch closures across the country has doubled,[7] while 42 States and the District of Columbia have experienced a net loss in physical bank branches since 2019.[8] For example, the States that lost the most branches since 2019 include California (640 branches), New York (457 branches), Pennsylvania (430 branches), and Florida (424 branches).[9]

As a result, millions of Americans live in "banking deserts"—neighborhoods without a single banking branch within several miles—a circumstance that most significantly impacts low- and moderate-income communities and communities of color.[10] Since 2010, 20% of bank branch closures have produced a banking desert.[11] In 2019, 11.5 million Americans lived in a banking desert.[12] By 2023, that

---

*Maybe You Should Too*, Wall Street J. (May 21, 2024), https://tinyurl.com/ms38s7zv.

[7] Alaina Barca & Harry Hou, *U.S. Bank Branch Closures and Banking Deserts*, Fed. Reserve Bank of Phila., 2 (2024), https://tinyurl.com/3sjz82x4.

[8] *Id.* at 4.

[9] *Id.*

[10] Barca & Hou, *supra* note 7, at 2; *see also* Scott W. Hegerty, *Bank Density, Population Density, and Economic Deprivation Across the United States: Implications for Public Health Outcomes*, Econ. and Mathematical Modeling in Health-Related Rsch. 158 (Marzenna Anna Weresa et al. eds.) (discussing how relevant distances for a "banking desert" may vary depending upon whether the census tract is urban, suburban, or rural).

[11] Hoai-Luu Q. Nguyen, *Are Credit Markets Still Local? Evidence from Bank Branch Closings*, 11 Am. Econ. J. 1, 3 (2019).

[12] Barca & Hou, *supra* note 7, at 7.

number had grown to 12.3 million Americans.[13] According to data collected by the Federal Reserve, in 2023, 8% of all U.S. census tracts were either banking deserts or could become a banking desert if a single branch closed.[14]

Moreover, "[t]he long-term trend of shrinking branch numbers will continue" due to persisting shifts toward banking consolidation and online banking.[15] "[O]nline banking transactions have gradually replaced the traditional banking transactions in physical branches."[16] Consumer data confirms this trend, as "more consumers are switching to primarily or entirely mobile and online banking," causing declines in branch foot traffic that "have made closing branches a common way for banks to cut costs while retaining many of their customers through online

---

[13] *Id.*

[14] FedCommunities, *Banking Deserts Dashboard*, https://tinyurl.com/3uzhfn9h. Banking deserts exist in every geographic region of the country. For example, in 2023, 9% of census tracts in Colorado, 8% of tracts in Minnesota, and 10% of tracts in Texas either were banking deserts or were on the precipice of becoming one. *Id.*

[15] Dobbs, *supra* note 4; *see also* Mitra, *supra* note 6 ("If you're still relying on in-person banking services, it might be time to open an online account. Soon, you may not even have a choice."); Anna Tranfaglia, *Shrinking Networks: A Spatial Analysis of Bank Branch Closures* 2 (Fed. Reserve Bank of Phila., Working Paper No. 18-12, 2018), https://tinyurl.com/bddn4c6a.

[16] Dung Pham et al., *The Decline of Branch Banking and the Transformation of Bank Accessibility*, 11 Rev. of Integrative Bus. & Econ. 1, 17 (2022); *see also* Soohyung Cho et al., *Determinants of Bank Closures: What Ensures Sustainable Profitability in Mobile Banking*, 12 Electronics 1196, 1120 (2023).

channels."[17] Recent studies show that 27% of banking customers in America solely use an online-only bank,[18] while 78% of American adults prefer to bank digitally.[19] Consequently, numerous communities throughout the *Amici* States conduct their banking primarily online, without attachment to a physical branch.

For many banking firms, then, "anchoring CRA obligations to the low- and moderate-income area surrounding [a branch] does not reflect the reality of their businesses or their impact on low- and moderate-income consumers."[20] Thus, the Retail Lending Test's assessment of banks' lending in areas beyond those in the immediate vicinity of their physical branches is essential to preserve the CRA's function today.

---

[17] Barca & Hou, *supra* note 7, at 2.

[18] *Established Direct Banking Brands Flex Their Digital Banking Muscle, According to J.D. Power*, J.D. Power (May 12, 2022), https://tinyurl.com/38wdp559.

[19] Jenn Underwood & Elizabeth Aldrich, *U.S. Consumer Banking Statistics 2024*, Forbes (Jan. 31, 2024), https://tinyurl.com/53kcbcxy.

[20] Eugene A. Ludwig et al., *The Community Reinvestment Act: Past Successes and future Opportunities*, Revisiting the CRA: Perspectives on the Future of the Community Reinvestment Act, Fed. Reserve Banks of Boston and S.F. 101 (2009), https://tinyurl.com/5t48wawc.

**1. Bank branch closures disproportionately harm low- to moderate-income communities and communities of color.**

Though bank branch closures have been persistent and widespread, such closures have especially impacted low-income communities and communities of color, creating what some scholars describe as another iteration of discriminatory redlining.[21] "A wide literature has documented banks' exclusionary practices, such as their tendencies to disproportionately open and operate branches in white communities."[22] In contrast, one-third of all bank branches that closed between 2017 and 2021 were located in either a low- to moderate-income community or community of color.[23] Since 2019, banking deserts increased in majority-Black areas at "a significantly faster rate" than the rest of the nation, while nearly half of all majority-American Indian and Alaska Native communities in the United States are situated in banking deserts—a proportion "over 12 times the national average."[24] Banks also closed branches disproportionately in majority-Black

---

[21] *See, e.g.*, Christopher R. Leslie, *Banking Deserts, Structural Racism, and Merger Law*, 108 Minn. L. Rev. 695, 743 (2023); Terri Friedline et al., *Digital Redlining: Poor Rural Communities' Access to Fintech and Implications for Financial Inclusion*, 24 J. of Poverty 517, 533 (2020).

[22] Jacob William Faber & Terri Friedline, *The Racialized Costs of "Traditional" Banking in Segregated America: Evidence from Entry-Level Checking Accounts*, 12 Race & Soc. Probs. 344, 345 (2020).

[23] Edlebi et al., *supra* note 6, at 11.

[24] Barca & Hou, *supra* note 7, at 8.

communities, with disparities growing "even greater when focusing on income."[25] One scholar observed that "banking practices in the aftermath of branch closures can replicate the intentional discrimination of redlining" and "create de facto redlining when banks reduce business loans in neighborhoods where they no longer maintain a physical branch office."[26]

Further, while online banking can sometimes provide a substitute for access to banking at physical branches, not all banks have provided online alternatives in the wake of branch closures,[27] and online access remains particularly difficult for rural communities, low-income communities, and communities of color.[28] For example, studies find that poor white rural communities have a higher rate of high-speed internet access than affluent Black rural communities.[29] Due to racial inequalities in access to digital infrastructure, "it is likely that fintech patterns replicate the legacies of slavery and Jim Crow that have helped to cement anti-Black disparities."[30]

---

[25] Zach Fox et al., *Bank Branch Closures Take Greatest Toll on Majority-Black Areas*, S&P Global (July 25, 2019), https://tinyurl.com/etfma48h.

[26] Leslie, *supra* note 21, at 743.

[27] *See* Pham et al., *supra* note 16, at 17.

[28] Friedline et al., *supra* note 21, at 533-35.

[29] *Id.* at 534-35.

[30] *Id.* at 535.

These modern realities represent the kinds of harms that Congress enacted the CRA to combat.[31] And the *Amici* States' experiences confirm the need for continued vigilance in combating redlining in whatever forms it may take.[32] Consequently, the district court's injunction against the Final Rules and their Retail Lending Test harms the public interest by denying the Federal Banking Agencies the ability to fulfill CRA's anti-discrimination mandate in a banking landscape no longer tethered to physical branches. These harms warrant reversal of the preliminary injunction, as the "commitment to eliminating discrimination and assuring . . . citizens equal access to publicly available goods and services" represent "compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984).

---

[31] *See* Vonde Eanes, *How Community Development-Related Rehabilitation Efforts Can Qualify for Community Reinvestment Act Consideration*, Off. of the Comptroller of the Currency, U.S. Dep't of Treasury (Feb. 2018), https://tinyurl.com/c5c2m475.

[32] *See, e.g.*, *Acting AG Platkin Announces Major Settlement with Trident Mortgage Company LP and Fox & Roach LP over Allegations of Race-Based 'Redlining' in Lending Practices in the Camden Area*, N.J. Off. of the Att'y Gen. (July 27, 2022), https://tinyurl.com/52m4beak.

### 2. The Retail Lending Test ensures CRA benefits cover underserved communities that no longer have nearby physical bank branches.

The Retail Lending Test is designed to ensure that the benefits of the CRA cover the underserved communities that lack access to physical bank branches. "The overwhelming majority of studies find that the CRA has succeeded in increasing lending in low- and moderate-income neighborhoods."[33] To begin, studies find that the CRA has increased the availability of safe mortgage loans in underserved communities.[34] For example, loss of CRA eligibility status in a neighborhood leads to a decrease of about 10 to 20% in the volume of purchase mortgage originations by CRA-regulated lenders.[35]

Studies also find that CRA oversight increases the number of small business loans that are offered in low-income communities. One study—examining the CRA's impact across nearly 1,000 different census tracts across different periods of time—found "quite consistent evidence" that the CRA has had a "significant impact" on the volume of small business lending in lower-income neighborhoods,

---

[33] Ludwig et al., *supra* note 20, at 84.

[34] *See, e.g.*, Lei Ding & Leonard Nakamura, *"Don't Know What You Got Till It's Gone"—the Community Reinvestment Act in a Changing Financial Landscape*, 43 J. of Real Estate Rsch. 96, 98 (2021).

[35] *Id.*

with census tracts that lost CRA coverage seeing an average of more than two lost small business loans annually.[36]

In particular, the CRA has increased lending in underserved communities by incentivizing the creation of community benefit agreements, which require banking institutions to extend a certain volume of loans to particular low-income groups and communities.[37] Between the early 1980s and 2003, community organizations and banking institutions entered into over 300 CRA agreements, across nearly every State in the country.[38] Since 2016, one community organization alone has facilitated the creation of community benefit agreements worth a combined $580 billion in loans.[39] Beyond the immediate funds that these loans provide, the CRA also has increased the significant opportunities that come with access to credit. Such loans have facilitated businesses, created jobs, and revitalized homes, local businesses, and communities.[40]

---

[36] Lei Ding et al., *Effects of the Community Reinvestment Act (CRA) on Small Business Lending*, Joint Ctr. for Hous. Studies of Harv. U. 1, 1 (2019), https://tinyurl.com/3k2s2nr3.

[37] Raphael W. Bostic & Breck L. Robinson, *Do CRA Agreements Influence Lending Patterns*, 31 Real Estate Econ. 23, 24 (2003).

[38] *Id.*

[39] *Community Benefits Agreements: How Banks Ensure They Meet Local Needs*, Nat'l Cmty. Reinvestment Coal. (Jan. 2024), https://tinyurl.com/329js8ea.

[40] *See, e.g.*, Sydney Goldstein & Lei Ding, Banks' Community Reinvestment Act (CRA) Opportunities for Promoting Job Creation, Workforce Development, and

In other words, research consistently shows that low- and moderate-income communities subject to CRA evaluations receive increased investments and loans worth billions of dollars.[41] However, the district court's preliminary injunction of the Final Rules threatens to deprive underserved communities of these financial lifelines by restricting the CRA's coverage to lending activity within the immediate vicinity of a bank branch—an increasingly narrow slice of communities throughout the States, as bank branches continue to close.[42] In doing so, the district court's injunction will diminish the CRA's benefits—i.e., full and equal access to financial credit and the myriad opportunities that access can bring—to these communities and the millions of individuals living and working in them. The balance of equities warrants reversal of the district court's order.

### B. The Retail Services and Products Test Ensures Communities' Full and Equal Access to Credit and Participation in the Economy More Broadly

Like the Retail Lending Test, the Final Rule's Retail Services and Products Test—which requires the Federal Banking Agencies to assess the availability and

---

Place-Based Investments, Fed. Reserve Bank of Phila. 7-10 (2017), https://tinyurl.com/yb8h66v6.

[41] *See NCRC Forecast: Weakening the Community Reinvestment Act Would Reduce Lending by Hundreds of Billions of Dollars*, Nat'l Cmty. Reinvestment Coal. 4-6 (Sept. 2018), https://tinyurl.com/k6fvc76y.

[42] *See* Ludwig et al., *supra* note 20, at 85 ("If the CRA is to continue to be effective, it must be modernized by expanding its . . . service area focus").

usage of banks' deposit products—is essential to the CRA's stated purpose "of meeting the credit needs of . . . entire communit[ies]." *See* Community Reinvestment Act, 89 Fed. Reg. 6574 (Feb. 1, 2024); 12 U.S.C. § 2903(a)(1). Deposit products include savings accounts, checking accounts, certificates of deposit, and money market accounts.[43] Most Americans depend on such deposit products every day to receive their wages, build savings, or acquire credit.[44] Indeed, there is a strong correlation between a community's access to deposit products and its ability to access credit.[45] In the same way that the CRA's assessments of lending activity have incentivized and increased lending to underserved communities,[46] the Retail Services and Products Test's evaluations of deposit products will incentivize banks to provide communities with full and equal access to such products as well.

---

[43] Deposit Accounts, FDIC (Aug. 1, 2023), https://tinyurl.com/mrx9bwwv.

[44] *See* Jacob William Faber, *Segregation and the Cost of Money: Race, Poverty, and the Prevalence of Alternative Financial Institutions*, Social Forces, 817, 819 (2019); Gregg Gelzinis et al., *How Workers Get Paid is Changing: Consumer Protections Need to Catch Up*, Ctr. for Am. Progress (Jan. 17, 2019), https://tinyurl.com/2962x8mx (finding that as of 2015, 82% of American workers received their wages through direct deposit to a bank account); Michael S. Barr, *An Inclusive, Progressive National Savings and Financial Services Policy*, 1 Harv. L. & Pol'y Rev. 161, 164 (2007).

[45] *See* Letter from the Att'ys Gen. of Cal. et al., to Ann E. Misback (Aug. 5, 2022), *supra* note 3; Letter from the Att'ys Gen. of Cal. et al., to Ann E. Misback (Feb. 16, 2021), *supra* note 3.

[46] *See supra* pp. 13-15.

Because banks still do not meet millions of Americans' needs for deposit products, the district court's injunction would maintain existing barriers and inequities in access, depriving millions of Americans of access to the banking tools they need to pay their bills, build credit, and save for a brighter future. Further, absent the Retail Services and Products Test, individuals who lack banking access will depend even more on costly alternative financial services that carry exorbitant fees, trap them in debt, and deprive them of opportunities for economic growth.

### 1. The Retail Services and Products Test is needed given the barriers that millions face in accessing deposit products.

The Retail Services and Products Test, and its assessments of deposit products, is critical to ensure that banks provide full and equal access to deposit products to all consumers. Millions of Americans currently face barriers in accessing deposit products due to inaccessible bank branches or high minimum balances and fees.[47] In 2021, approximately 5.9 million households were "unbanked," meaning that no one in the household had a checking or savings

---

[47] *See* Fed. Deposit Ins. Corp., *2021 FDIC National Survey of Unbanked and Underbanked Households* at 18, 19 Figure 3.5, https://tinyurl.com/52rdukjk (hereinafter "2021 FDIC National Survey"); *cf.* Lei Ding & Carolina K. Reid, *The Community Reinvestment Act (CRA) and Bank Branching Patterns*, 30 Hous. Pol'y Debate 27, 28 (2019) (finding that neighborhoods' CRA eligibility is associated with lower risk of bank branch closures or banking deserts).

account at a bank or credit union.[48] Importantly, individuals of color and low-income individuals were substantially more likely to be unbanked. Black households were over five times as likely, and Hispanic or Latino households four times as likely, to be unbanked than white households.[49] Meanwhile, nearly one-third of households with annual incomes of $30,000 or less were unbanked.[50]

Many of these households lack access to depository products due to discriminatory policies or practices by banking institutions.[51] As described above, banking branch closures have disproportionately occurred in Black communities, depriving these communities of access to banks and their deposit products.[52]

---

[48] 2021 FDIC National Survey, *supra* note 47, at 13.

[49] *Id.* at 14-15. In 2021, 11.3% of Black households and 9.3% of Hispanic or Latino households were unbanked, while 2.1% of white households were unbanked. *Id.*

This brief uses the terms "Hispanic or Latino" throughout to refer to Americans of Latin American descent because these are the terms used by the federal government. *See id.* at 88 (noting terms' usage by the U.S. Census Bureau and Office of Personnel Management). The *Amici* States recognize that the terms "Hispanic or Latino" may not be as inclusive as some would prefer. *See, e.g.*, Villanueva Alarcón et al., *Latiné, Latinx, Latina, Latino, or Hispanic: Problematizing Terms Often Used in Engineering Education*, 111 J. of Eng'g Educ. 735, 735-739 (2022).

[50] *See* 2021 FDIC National Survey, *supra* note 47, at 14 Table 3.1.

[51] Faber & Friedline, *supra* note 22, at 345; *see* Patricia D. Posey, *Information Inequality: How Race and Financial Access Reflect the Information Needs of Lower-Income Individuals*, 707 The Annals of the Am. Acad. 125, 130 (2023).

[52] *See supra* pp. 10-12.

Further, research shows that maintaining a bank account is more expensive for Black and Hispanic or Latino customers, even controlling for income.[53] On average, bank branches in communities of color charge more for entry-level checking accounts across a range of costs and fees.[54] One study found that Black and Hispanic or Latino Americans are required to initially deposit 3% more of their paychecks than white Americans to open an account.[55] After opening an account, Black Americans are required to keep 32% more—and Hispanic or Latino Americans 26% more—of their paychecks in their accounts than white Americans to avoid a fee or account closure.[56] Meanwhile, typical monthly maintenance fees for Black Americans are 68 cents higher than white Americans, while monthly fees for Hispanic or Latino Americans are $1.33 higher.[57] While these differences in fee amounts appear small individually, they accumulate over time, especially when fees are assessed on a daily or monthly basis.[58] "[T]hese increased expenses of opening and maintaining a checking account are exacerbated by the fact that

---

[53] *See* Faber & Friedline, *supra* note 22, at 350-52.

[54] *Id.* at 356.

[55] *Id.*

[56] *Id.*

[57] *Id.* at 355.

[58] *Id.*

'Black and Latinx Americans also typically earn less than white Americans, highlighting an important way in which their economic power may be further constrained by requiring a greater share of their earnings to be detained in the financial system.'"[59]

> **2.    Barriers to depository access cause significant harm to residents throughout the States.**

The barriers to accessing depository products result in significant harms for the American public, as individuals without deposit products experience greater costs and challenges in meeting basic needs. While individuals with banking accounts can pay bills online and enjoy near-immediate access to their funds, those without such accounts must either pay higher fees or experience greater delays.[60] For example, at the height of the coronavirus pandemic, individuals with banking

---

[59] *Id.* at 356. The median income of Black Americans is $23,847 less than that of white Americans, while the median income of Hispanics or Latinos is $16,891 less than that of white Americans. *See id.* at 355.

[60] *See* Fed. Deposit Ins. Corp., *2013 FDIC National Survey of Unbanked and Underbanked Households* at 9, 28, https://tinyurl.com/2u66bkrz; John F. Creamer & Lewis H. Warren, *Unbanked and Impoverished? Exploring Banking and Poverty Interactions over Time* at 2 (U.S. Census Bureau, Working Paper No. 2022-16, 2022), https://tinyurl.com/2p9naup3. While some employers have used prepaid debit cards to provide employees their wages, such cards often also carry significant fees. Gelzinis et al., *supra* note 44 (noting that a 2014 U.S. Department of Labor investigation found that a payroll card program cost workers about $2.10 in fees per week, pushing some workers' pay below minimum wage).

accounts received stimulus checks through direct deposit.[61] In contrast, unbanked individuals waited weeks for paper checks to arrive by mail, and many had to pay fees to access the money at check cashing stores or similar entities.[62]

These delays and increased costs prove especially detrimental to the vast majority of American families who live paycheck to paycheck. A 2023 survey showed that 78% of Americans live paycheck to paycheck, with their income barely covering essential living expenses like housing, utilities, groceries, and transportation.[63] Consequently, being unbanked and experiencing delayed access to funds—or the extra costs to access them through alternative services—could cause a family to go hungry or have their lights go out.[64] Moreover, unbanked households struggle to save without a savings account,[65] rendering them especially

---

[61] *See* Creamer & Warren, *supra* note 60 at 2; Isaac Scher, *14 Million American Adults Don't Have a Bank Account. They're Still Waiting for a Stimulus Payment*, Bus. Insider (May 5, 2020), https://tinyurl.com/nhe2jy4w.

[62] *See* Scher, *supra* note 61; *Stimulus Checks: Direct Payments to Individuals during the COVID-19 Pandemic*, U.S. Gov't Accountability Off. (June 29, 2022), https://tinyurl.com/yubew2bk.

[63] Emily Batdorf, *Living Paycheck to Paycheck Statistics 2024*, Forbes (Apr. 2, 2024), https://tinyurl.com/3bxcdwhn.

[64] *See* John P. Caskey, *Reaching Out to the Unbanked*, Inclusion in The American Dream: Assets, Poverty, and Public Policy 154 (2005); Alina Selyukh, *Paycheck-to-Paycheck Nation: Why Even Americans with Higher Incomes Struggle with Bills*, NPR (Dec. 16, 2020), https://tinyurl.com/3j7xbpjt (describing challenges faced by families living paycheck to paycheck).

[65] Barr, *supra* note 44 at 164.

vulnerable to unexpected expenses or interruptions in income, which lead to further disruptions like an inability to pay rent or fix a car needed to get to work.[66] These disruptions may lead to compounding crises, such as losing housing or employment, which further perpetuate a cycle of poverty.

Finally, deposit products enable Americans to not only survive, but thrive. "[A] basic checking account is still essential for a wide range of transactions and other services that shape everyday life," including consumers' ability to make transactions that facilitate credit, qualify them for a home or automobile loan, invest in their children's education, or open a small business.[67] Conversely, unbanked individuals face greater hurdles in accessing these various means of investment. Many institutions will not extend conventional forms of credit to individuals without a checking account.[68] And alternatives to deposit products—

---

[66] In a 2021 national survey, 28.7% of households reported suffering from a negative economic event, such as job loss, and 22.9% had a significant loss of income. 2021 FDIC National Survey, *supra* note 47, at 13.

[67] Faber & Friedline, *supra* note 22, at 356; *See, e.g.,* Luisa Blanco et al., *Impact of Great Recession Bank Failures on Use of Financial Services Among Racial/Ethnic and Income Groups*, 88 S. Econ. J. 1574, 1575-76 (2022).

[68] *See* Emily Guy Birken, *The Costs of Being Unbanked or Underbanked*, Forbes (Dec. 2, 2022), https://tinyurl.com/38nd75s2.

such as prepaid cards—"do nothing to help their users build and maintain a credit history," depriving unbanked individuals of the ability to access loans.[69]

### 3. Without access to deposit products, unbanked individuals are forced to rely on predatory and expensive alternative financial services.

Without access to deposit products, unbanked individuals must rely on expensive—and often predatory—alternative financial services such as check cashing, bill payment, and tax preparation entities.[70] In 2015, over half of unbanked households used alternative financial services, compared to just 15% of banked households.[71]

Alternative financial service providers charge costly fees for unbanked individuals to access their own money. For instance, check-cashing stores will exchange cash for checks, but at a high fee.[72] According to the FDIC, check

---

[69] *Id.*

[70] *See, e.g.*, Blanco et al., *supra* note 67, at 1576; Faber, *supra* note 44, at 819-20; Barr, *supra* note 44, at 163. Alternative financial services also include short-term loans, payday lenders, pawn shops, and rent-to-own stores. Faber, *supra* note 44, at 819-20; Barr, *supra* note 44, at 163.

[71] Fed. Deposit Ins. Corp., *2015 FDIC National Survey of Unbanked and Underbanked Households* 7, https://tinyurl.com/ydt34xze.

[72] Daniel Mollenkamp, *What is a Check-Cashing Service?*, Time (Feb. 24, 2024), https://tinyurl.com/3m9ajzy6.

cashers typically charge 1 to 4% of the face value of the check.[73] These fees add up; a 2009 study found that check cashers processed more than 170 million checks per year with a face value of more than $58 billion.[74]

Worse, many of those most likely to incur these fees are also low-income individuals who are most impacted by losing portions of their checks to these exorbitant fees.[75] Considering households who make less than $15,000 a year were the most likely income group to use check-cashing services in 2021,[76] check-cashing fees are high relative to the income of users, particularly since such services are generally free for banked individuals.[77] A full-time worker can lose $40,000 over the course of a career using a check-cashing service.[78] In 2021, unbanked households were almost ten times as likely as banked households to use

---

[73] *Alternative Financial Services: A Primer*, 3 FDIC Quarterly 39, 40 (2009), https://tinyurl.com/ymxdsb99.

[74] *Id.* at 39.

[75] Barr, *supra* note 44, at 161. Among households that used check-cashing services in 2021, more than two-thirds (68.4%) cashed a check from work, retirement, or a government agency. 2021 FDIC National Survey, *supra* note 47, at 13. Households with less than $15,000 in income (82.0%), households with no high school diploma (74.9%), and households aged 34 or younger (79.1%) were more likely than other segments of the population to cash a check from work, retirement, or a government agency. *Id.*

[76] *See* 2021 FDIC National Survey, *supra* note 47, at 38 Table 7.1.

[77] *See* Barr, *supra* note 44, at 163.

[78] Faber, *supra* note 44, at 820.

nonbank check-cashing services, making unbanked households significantly more susceptible to losing income just to access their own money.[79]

These predatory practices exacerbate existing racial and wealth disparities.[80] Majority Black and Hispanic or Latino neighborhoods have fewer bank options than white neighborhoods, and banks in these neighborhoods are more likely to be outnumbered by alternative financial service options.[81] Consequently, low-income households and racial minorities are much more likely to use alternative financial services like check-cashing services.[82] Inequitable barriers to deposit products have thus caused communities of color to rely heavily on alternative financial services, trapping members of these communities in cycles of debt.[83]

Accordingly, without an assessment of banks' deposit products, as required by the Retail Services and Products Test, the existing racial and wealth disparities that cause numerous communities across the *Amici* States to have their banking

---

[79] *See* 2021 FDIC National Survey, *supra* note 47, at 39.

[80] *See* Kristen Broady et al., *An Analysis of Financial Institutions in Black-Majority Communities: Black Borrowers and Depositors Face Considerable Challenges in Accessing Banking Services*, Brookings Inst. (Nov. 2, 2021), https://tinyurl.com/2pfjcrsh.

[81] Faber, *supra* note 44, at 839.

[82] 2021 FDIC National Survey, *supra* note 47, at 37; *id.* at 38 Table 7.1 (finding that Black households were over three times more likely to use check-cashing services than white households, while Hispanic or Latino households were about three times as likely).

[83] Faber, *supra* note 44, at 819-22, 828-33.

and credit needs unmet will continue. Today, more than ever, Americans need access to a bank. Full and equal access to banking services provides a lifeline for the first-generation college student who otherwise could not afford tuition, the entrepreneur starting a new business, the family seeking to buy their first home, and the parents who wish to create a savings account for their child's future. The Final Rules incentivize banks to provide full and equal access to such opportunities for millions of Americans, making them critical to fulfilling the CRA's promise that banks meet the needs of their entire communities. Thus, the public interest and balance of equities weigh heavily against the district court's preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should reverse the order below.

Dated:  July 25, 2024                    Respectfully submitted,


                                         ROB BONTA
                                         Attorney General of California
                                         MICHAEL L. NEWMAN
                                         Senior Assistant Attorney General
                                         JAMES F. ZAHRADKA II
                                         Supervising Deputy Attorney General
                                         JENNIFER SOLIMAN
                                         Deputy Attorney General


                                         *Delbert Tran*

                                         DELBERT TRAN
                                         Deputy Attorney General
                                         *Attorneys for Amicus Curiae the State of*
                                         *California*

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 North French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street, 12th Floor
Springfield, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
1 Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

JOSHUA STEIN
*Attorney General*
*State of North Carolina*
9001 Mail Service Center
Raleigh, NC 27699

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

MICHELLE A. HENRY
*Attorney General*
*State of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

**CERTIFICATE OF COMPLIANCE**

Pursuant to 5th Cir. R. 32.3, undersigned counsel certifies that this brief complies with the typeface and type-volume limitations of 5th Cir. R. 32.1 and 32.2.

1.    Exclusive of the portions exempted by Fed. R. App. P. 32(f), this brief contains 5,989 words printed in a proportionally spaced typeface.

2.    This brief is printed in a proportionally spaced, serif typeface using Times New Roman 14-point font produced by Microsoft Word software.

Dated:  July 25, 2024

DELBERT TRAN

**CERTIFICATE OF SERVICE**

I certify that on July 25, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, and that I served copies of the foregoing document via mail upon the following counsel, who are not registered CM/ECF users:

Andrew Jared Dober
Herbert G. Smith II
Federal Deposit Insurance
Corporation
Appellate Litigation Unit-Legal
Division
3501 Fairfax Drive
Arlington, VA 22226

Peter Chadwell Koch
Office of the Comptroller of the
Currency
400 7th Street, S.W.
Washington, DC 20219

Richard Alan Olderman
Williams & Connolly LLP
680 Maine Avenue S.W.
Washington, DC 20024

I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  July 25, 2024

DELBERT TRAN