No. 24-10367

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Texas Bankers Association; Amarillo Chamber of Commerce; American Bankers Association; Chamber of Commerce of the United States of America; Longview Chamber of Commerce; Independent Community Bankers of America; Independent Bankers Association of Texas,

*Plaintiffs-Appellees*,

v.

Board of Governors of the Federal Reserve System; Jerome Powell, Chairman; Federal Deposit Insurance Corporation; Martin Gruenberg, Chairman; Office of the Comptroller of the Currency; Michael J. Hsu, Acting Comptroller,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Northern District of Texas, Amarillo Division, Civil Action No. 2:24-cv-00025

**BRIEF OF NATIONAL CIVIL RIGHTS ORGANIZATIONS
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

Ellora Thadaney Israni
Kenneth Scott
John Relman
RELMAN COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
(202) 969-4727
eisrani@relmanlaw.com

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to those already listed in the parties' briefs, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amici*: National Fair Housing Alliance, National Urban League, National Coalition on Black Civic Participation, UnidosUS, Raza Development Fund.

*Counsel for Amici*: Ellora Thadaney Israni, Kenneth Scott, and John Relman, all of Relman Colfax PLLC.

Furthermore, *amici curiae* certify that they have no outstanding shares or debt securities in the hands of the public, they have no parent companies, and no publicly held company has a 10% or greater ownership interest in any of the *amici curiae*, except that *amicus* Raza Development Fund is a support corporation of *amicus* UnidosUS.

Dated: July 25, 2024                    /s/ Ellora Thadaney Israni
                                        Ellora Thadaney Israni
                                        Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES ........................ i

TABLE OF CONTENTS .......................................................................... ii

INTERESTS OF *AMICI CURIAE* ........................................................... 1

SUMMARY OF ARGUMENT ................................................................. 6

ARGUMENT ........................................................................................ 9

    I.     Judge-Shopping Is the Disfavored Practice of Strategically Filing a Lawsuit in a Single-Judge Division to Guarantee a Desired Judge ...................... 9

    II.    The Northern District of Texas is a Haven for Judge-Shopping Industry Groups ................................................................................................. 14

    III.   There Is No Credible Reason for Plaintiffs-Appellees to Have Filed in the Amarillo Division Except to Shop for Their Preferred Judge ........................... 18

    IV.   Because Preliminary Injunctions Obtained Via Judge-Shopping Are Not in the Public Interest, this Court Should Reverse and Remand with Instructions to Transfer the Case ................................................................................ 22

CONCLUSION .................................................................................... 24

CERTIFICATE OF COMPLIANCE ....................................................... 26

CERTIFICATE OF SERVICE ............................................................... 27

# TABLE OF CITATIONS

**Cases**                                                                 **Page(s)**

*Ahmed v. Miller*,
   452 F. Supp. 3d 721 (E.D. Mich. 2020) ....................................................10

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   668 F. Supp. 3d 507 (N.D. Tex. 2023) .............................................................15

*Barton v. C. R. Bard, Inc.*,
   No. 2:19-CV-181-Z, 2020 WL 1809702
   (N.D. Tex. Apr. 9, 2020)...............................................................................16

*Chamber of Com. of the U.S.A. v. CFPB*,
   No. 4:24-CV-00213-P, 2024 WL 2310515
   (N.D. Tex. May 10, 2024) ............................................................................19

*Chamber of Com. of the U.S.A. v. CFPB*,
   No. 4:24-CV-00213-P, 2024 WL 1329959
   (N.D. Tex. Mar. 28, 2024) ...........................................................................17

*Chamber of Com. of the U.S.A. v. CFPB*,
   No. 4:24-CV-00213-P, 2024 WL 2724181
   (N.D. Tex. May 28, 2024) .......................................................................17, 19

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
   51 F.4th 616 (5th Cir. 2022) .......................................................................20

*Coates v. SAIA Motor Freight Line*,
   *LLC*, No. 3:20-CV-25, 2020 WL 1812020
   (N.D. Miss. Apr. 8, 2020) ............................................................................11

*Dakota Rural Action v. U.S. Dep't of Agric.*,
   No. CV 18-2852, 2019 WL 1440134 (D.D.C. Apr. 1, 2019)............................10

*Deanda v. Becerra*,
   645 F. Supp. 3d 600 (N.D. Tex. 2022) ...........................................................15

*In re Gibson*,
   423 F. App'x 385 (5th Cir. 2011) (unpublished)............................................24

*Grutter v. Bollinger*,
    16 F. Supp. 2d 797 (E.D. Mich. 1998) ............................................................10

*Jenkins v. Bellsouth Corp.*,
    No. CIV.A.CV-02-1057, 2002 WL 32818728
    (N.D. Ala. Sept. 13, 2002) ...............................................................................23

*McCuin v. Texas Power & Light Co.*,
    714 F.2d 1255 (5th Cir. 1983) .......................................................................9, 11

*Strickland v. U.S. Dep't of Agric.*,
    No. 2:24-CV-60-Z, 2024 WL 2886574 (N.D. Tex. June 7, 2024)...................16

*Texas Bankers Ass'n v. CFPB*,
    685 F. Supp. 3d 445 (S.D. Tex. 2023)............................................................19

*Texas v. Becerra*,
    575 F. Supp. 3d 701 (N.D. Tex. 2021) ............................................................15

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) ............................................................16

*Texas v. Equal Emp. Opportunity Comm'n*,
    633 F. Supp. 3d 824 (N.D. Tex. 2022) ............................................................15

*Tripp v. Exec. Off. Of President*,
    196 F.R.D. 201 (D.D.C. 2000) .......................................................................10

*UCP Int'l Co. Ltd. v. Balsam Brands Inc.*,
    261 F. Supp. 3d 1056 (N.D. Cal. 2017)..........................................................12

*United States v. Phillips*,
    59 F. Supp. 2d 1178 (D. Utah 1999)..........................................................10, 12

*United States v. Planned Parenthood Fed'n of America*, *Inc.*,
    No. 2:21-cv-22 (N.D. Tex. Sept. 20, 2022) ...................................................16

*Utah v. Walsh*,
    No. 2:23-CV-016-Z, 2023 WL 2663256 (N.D. Tex. Mar. 28, 2023) ...............16

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)........................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................7, 22

*Yakus v. United States*,
321 U.S. 414 (1944).................................................................................22

**Statutes**

12 U.S.C. § 1813(c)(2)...............................................................................4

28 U.S.C. §§ 81–131..................................................................................9

28 U.S.C. § 133...........................................................................................9

28 U.S.C. § 137(a)...............................................................................9, 14

28 U.S.C. § 331.........................................................................................12

28 U.S.C. § 1391(e).............................................................................14, 20

Community Reinvestment Act, 12 U.S.C. § 2901 *et seq.* .....................2, 4

**Other Authorities**

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
COMMUNITY REINVESTMENT ACT, https://perma.cc/AYB5-HCSW
(last visited July 24, 2024).......................................................................3

Brennan Center, End 'Judge Shopping' (Mar. 20, 2024),
https://perma.cc/LQ87-79V9. .................................................................12

Chief Justice Roberts, 2021 Year-End Report on the Federal Judiciary
(Dec. 31, 2021), https://perma.cc/ZT43-M4LJ.....................................11

Code of Conduct for Justices of the Supreme Court of the United
States (Nov. 13, 2023), https://perma.cc/2LBR-YQQF. .....................23

Comment Letter from NFHA et al. regarding CRA Regulations
(Aug. 5, 2022), https://perma.cc/PM88-LYFY. ....................................3

Dalhia Lithwick & Mark Joseph Stern, *John Roberts Just Dropped the
Hammer on Rogue, Lawless Trump Judges*, SLATE
(Mar. 15, 2024), https://perma.cc/96YC-GF2V ...................................12

Elie Mystal, *A Texas Court Has Decided to Let the Scariest Judge in Texas Keep Being Scary*, THE NATION (Apr. 3, 2024), https://perma.cc/9NGJ-UXUD ....................................................................12

Federal Financial Institutions Examination Council, National Information Center, Large Holding Companies (Dec. 31, 2023), https://www.ffiec.gov/npw/Institution/TopHoldings. ........................................21

Federal Reserve Vice Chair on the Community Reinvestment Act (Nov. 3, 2023), https://www.c-span.org/video/?531610-2/federal-reserve-vice-chair-community-reinvestment-act ............................................3

Guidance by the Judicial Conference Committee on Court Administration and Case Management (Mar. 15, 2024), https://perma.cc/Y5UW-ZMAK ..........................................................................13

Laurie Goodman et al., *An Assessment of Lending to LMI and Minority Neighborhoods and Borrowers: Performance of Independent Mortgage Banks in the Context of CRA Reform*, URBAN INSTITUTE (Apr. 2023), https://perma.cc/FCM6-SL2K. ..........................4

Letter from Chief Judge David C. Godbey to Senator Charles E. Schumer (Mar. 29, 2024), https://perma.cc/Q85Q-C6CV ................................17

Letter from Senators Patrick Leahy and Thom Tillis to Chief Justice John Roberts (Nov. 2, 2021), https://perma.cc/9X6W-X56D ...........................12

Motion to Transfer Venue, *Utah v. Walsh*, No. 2:23-cv-00016-Z (N.D. Tex. Feb. 7, 2023), Doc. 15 ....................................................................12, 22

Nicholas Bagley, *A Single Judge Shouldn't Have This Kind of National Power*, THE ATLANTIC (Apr. 14, 2023), https://perma.cc/Z9WJ-5RH6 .........................................................................12

Stephen Popick, *Did Minority Applicants Experience Worse Lending Outcomes in the Mortgage Market? A Study Using 2020 Expanded HMDA Data*, FDIC (June 2022), https://perma.cc/4FBL-2R2T ........................4

Steve Vladeck (@steve_vladeck), X (Jan. 26, 2023, 5:45 PM), https://perma.cc/5Q88-8DDL ..........................................................................17

Transcript of Supreme Court Argument, *United States v. Texas*,
No. 22-58 (Nov. 29, 2022) (Kagan, J.),
https://perma.cc/AZQ6-58C7 ...........................................................11

U.S. CENSUS, 2020 POPULATION DATA, https://perma.cc/Z3SG-7NA7 .................21

U.S. COURTS, ABOUT THE JUDICIAL CONFERENCE,
https://perma.cc/3DVV-TH87 ...........................................................12

U.S. Courts, Conference Acts to Promote Random Case Assignment
(Mar. 12, 2024), https://perma.cc/X9SQ-ZUK6..................................12

U.S. District Court for the Eastern District of Texas, General Order
Assigning Civil and Criminal Actions (Jan. 6, 2023),
https://perma.cc/PJ7C-MZZ3 ............................................................11

U.S. District Court for the Northern District of New York, General
Assignment #12, Case Assignment Plan (Oct. 8, 2020),
https://perma.cc/2CLJ-KKHA .............................................................9

U.S. District Court for the Northern District of Texas, Amarillo
Division, Special Order No. 3-344 (Sept. 14, 2022),
https://perma.cc/82BS-ZDP3...............................................................15

U.S. District Court for the Southern District of Mississippi, Internal
Rule 1 (Mar. 1, 2024) https://perma.cc/D2D7-728P ..........................10

U.S. District Court for the Southern District of Texas, Amended
Division of Work Order (Apr. 22, 2024),
https://perma.cc/TR4G-TK8C ............................................................11

U.S. District Court for the Western District of Louisiana, Standing
Order 1.61 (Jan. 12, 2024), https://perma.cc/J2AQ-VYCH.................9

U.S. District Court for the Western District of Missouri, Local Rule
83.9(a), https://perma.cc/2U3M-UQ82..................................................9

U.S. District Court for the Western District of Texas, Amended Order
Assigning the Business of the Court (May 31, 2024),
https://perma.cc/A9AW-AYRJ.............................................................11

Y. Li et al., *Racial/Ethnic and Income Disparities in Neighborhood-level Broadband Access in 905 US Cities, 2017–2021*, PUBLIC HEALTH (Mar. 12, 2023), https://perma.cc/H48B-YB6Y ........................5

Zach Fox et al., *Bank Branch Closures Take Greatest Toll on Majority-Black Areas*, STANDARD & POOR GLOBAL (July 25, 2019), https://perma.cc/A3NL-TW29 ..................................................................4

## INTERESTS OF *AMICI CURIAE*

The National Fair Housing Alliance ("NFHA"), the National Urban League ("NUL"), the National Coalition on Black Civic Participation ("NCBCP"), UnidosUS, and the Raza Development Fund ("RDF") respectfully submit this brief as *amici curiae* in support of Defendants-Appellants.[1]

NFHA is a national organization dedicated to ending discrimination and ensuring equal opportunity in housing for all people. NFHA is a consortium of 167 private, non-profit fair-housing organizations, state and local civil rights agencies, and individuals. NFHA strives to eliminate housing discrimination and ensure equal housing opportunities through leadership, homeownership, credit access, responsible artificial intelligence, education, member services, public policy, community development, and enforcement initiatives.

NUL is a national organization dedicated to economic empowerment, equality, and social justice. NUL collaborates at the national and local levels with community leaders, policymakers, and corporate partners to elevate standards of living for Black Americans and other historically underserved groups. NUL has 90 affiliates serving 300 communities in 37 states and the District of Columbia.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all Parties have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), *amici* certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person other than *amici* and their counsel contributed money intended to fund the preparation or submission of the brief.

NCBCP is a non-profit, non-partisan organization dedicated to increasing civic engagement and voter participation in Black and underserved communities. NCBCP strives to create an enlightened community by engaging people in all aspects of public life through service/volunteerism, advocacy, leadership development, and voting.

UnidosUS, previously National Council of La Raza, is the nation's largest Hispanic civil rights and advocacy organization. Through a combination of expert research, advocacy programs, and a network of over 300 affiliates across the United States and Puerto Rico, UnidosUS simultaneously challenges the social, economic, and political barriers that affect Latinos at the national and local levels.

RDF is a community development financial institution that invests in Latino and other underserved communities across the country, with the goal of advancing economic opportunity, social mobility, and racial justice. RDF has directly invested over $1 billion in 38 states, leveraging over $6 billion in education, affordable housing, healthcare, and social services.

At issue in this case are regulations promulgated by Defendants-Appellants pursuant to the Community Reinvestment Act, 12 U.S.C. § 2901 *et seq.* ("CRA"). The CRA was enacted in 1977 "to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and

moderate-income (LMI) neighborhoods."[2] The CRA is "one of the foundational pieces of legislation that Congress passed to deal with redlining and discrimination in housing markets."[3] It is an essential tool in helping *amici* combat discrimination and ensure economic empowerment for consumers because it requires financial institutions to invest in the communities that *amici* serve.

*Amici* have decades of experience in supporting and/or implementing the CRA including compelling financial institutions to comply with the CRA, developing or supporting programs and policies to support compliance with the CRA, and challenging discriminatory conduct that inhibits the purpose of the CRA. *Amici* have also supported, developed, and/or implemented programs that expand access to quality, affordable credit for LMI consumers and advance the purpose of the CRA.

Each *amici* provided comments about the proposed CRA regulation revisions. For example, in August 2022, *amici* NFHA and NUL submitted a comment letter to Defendants-Appellants regarding the proposed versions of the regulations at issue in this case.[4] The letter stressed the need for the regulations to be updated—it has been

---

[2] BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, COMMUNITY REINVESTMENT ACT (CRA), https://perma.cc/AYB5-HCSW (last visited July 24, 2024).
[3] Federal Reserve Vice Chair on the Community Reinvestment Act at 2:54 (Nov. 3, 2023), https://www.c-span.org/video/?531610-2/federal-reserve-vice-chair-community-reinvestment-act.
[4] Comment Letter from NFHA et al. regarding CRA Regulations (Aug. 5, 2022), https://perma.cc/PM88-LYFY.

nearly three decades since the prior update—and suggested updates that would allow the CRA and *amici* to achieve their shared nondiscrimination goals. *Amici* explained the importance of the CRA to their members and communities and the ways in which updating the CRA regulations would better serve them.

Though the financial services landscape has changed significantly since the CRA rule was last updated in 1995, credit access challenges for rural, LMI, and other underserved communities remain. For example, a recent government study found persistent disparities in both underwriting and pricing outcomes between borrowers of color and white borrowers in the mortgage market.[5] While LMI communities remain underserved when it comes to credit access by all lenders, depository institutions covered by the CRA[6] perform the worst.[7] Depository institutions are closing branches—disturbingly, the industry closes more branches in high-income Black communities than in low-income non-Black communities[8]—and providing more services online, even though many underserved areas lack sufficient infrastructure for internet access thereby exacerbating the hurdles these communities

[5] Stephen Popick, *Did Minority Applicants Experience Worse Lending Outcomes in the Mortgage Market? A Study Using 2020 Expanded HMDA Data*, FDIC (June 2022), https://perma.cc/4FBL-2R2T.

[6] *See* 12 U.S.C. § 2902(2); *id.* § 1813(c)(2).

[7] Laurie Goodman et al., *An Assessment of Lending to LMI and Minority Neighborhoods and Borrowers: Performance of Independent Mortgage Banks in the Context of CRA Reform*, URBAN INSTITUTE (Apr. 2023), https://perma.cc/FCM6-SL2K.

[8] Zach Fox et al., *Bank Branch Closures Take Greatest Toll on Majority-Black Areas*, STANDARD & POOR GLOBAL (July 25, 2019), https://perma.cc/A3NL-TW29.

face when trying to access quality credit.[9] The CRA regulations at issue were designed to address some of these persistent disparities.

The regulations at issue, had they gone into effect, would have had sweeping and positive effects for *amici's* members and communities. Instead, *amici* have been harmed by the District Court's preliminary injunction. Furthermore, the means by which the injunction was obtained—transparent judge-shopping—have undermined *amici* and the public's confidence in the fairness of our system of justice.

*Amici* support the merits arguments advanced by Defendants-Appellants as to why the preliminary injunction should not be affirmed. They submit this brief to address the additional concerns raised by Plaintiffs-Appellees' judge-shopping.

---

[9] *See* Y. Li et al., *Racial/Ethnic and Income Disparities in Neighborhood-level Broadband Access in 905 US Cities, 2017–2021*, PUBLIC HEALTH (Mar. 12, 2023), https://perma.cc/H48B-YB6Y.

## SUMMARY OF ARGUMENT

Judge-shopping is the disfavored practice of filing a lawsuit in a single-judge division to which the case has little-to-no connection in order to guarantee that the case is assigned to a favorable judge. Judge-shopping is only possible in a few judicial divisions where all cases are assigned to one judge; most judicial districts and divisions randomly assign judges to cases, for important reasons. But these single-judge divisions have, in recent years, issued more than their fair share of nationwide injunctions. As such, Supreme Court Justices, courts at every level, the United States Department of Justice, Senators from both parties, and legal commentators have all recently expressed concern about the effects of judge-shopping on public confidence in the courts.

In response, Chief Justice John Roberts and the Judicial Conference of the United States recently issued guidance recommending that District Courts assign cases randomly among all judges in a judicial district, particularly where the matter has nationwide implications. The Judicial Conference emphasized the importance of random assignment of cases to maintaining public confidence in the courts and allowing the judiciary to manage its workload. The Conference warned against the potential for judge-shopping to impugn the credibility of the courts.

Notwithstanding the Judicial Conference's guidance, the Northern District of Texas's Amarillo Division has remained a haven for judge-shoppers. All civil cases

filed in that Division are assigned to Judge Matthew Kacsmaryk, who in five years on the bench has enjoined countless government programs benefitting the poor, migrants, women, Black people, and other marginalized groups. Again and again, judge-shopping industry groups have exploited a loophole in the federal venue statute to get their cases placed in his courtroom. And he has delivered.

Plaintiffs-Appellees are nationwide trade groups headquartered in Washington, D.C., challenging rulemaking that took place in Washington, D.C., by Defendants-Appellants, federal agencies that reside in Washington, D.C. But instead of filing in D.C., Plaintiffs-Appellees followed a now well-worn judge-shopping playbook. By cherry-picking a handful of local organizations, including the Amarillo Chamber of Commerce, to serve as co-plaintiffs, they ensured their case would be heard by Judge Kacsmaryk. The plan worked, and they quickly won a preliminary injunction. On the same day that the District Court entered the injunction, the Northern District of Texas informed the United States Senate that it would be ignoring the Judicial Conference's Guidance.

A court may not enter a preliminary injunction unless such an injunction would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Preliminary injunctions obtained via judge-shopping are not in the public interest because they undermine public confidence in the impartiality of the judiciary. The appearance of impropriety can be as harmful as impropriety itself.

7

The judge-shopping that occurred here raises questions of fairness for *amici* and other interested members of the public whom the new CRA regulations affect. Regardless of outcome, it creates an appearance of bias that tarnishes the integrity of the federal courts and interferes with the orderly administration of its workload. Under these circumstances, permitting the injunction to stand does tangible harm to the public interest in an impartial judicial process.

For these reasons, *amici* urge this Court to vacate and remand with instructions to the District Court to transfer this case to a more appropriate jurisdiction, or at minimum, to randomly reassign this case among all judges in the Northern District of Texas.

# ARGUMENT

## I.     Judge-Shopping Is the Disfavored Practice of Strategically Filing a Lawsuit in a Single-Judge Division to Guarantee a Desired Judge

As a general matter, parties in federal court have "no right to a 'judge of their choice.'" *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1262 (5th Cir. 1983). Cases are typically randomly assigned to one of several judges sitting in the district where the case is filed. There are 94 federal judicial districts, some of which are sub-divided into divisions. *See* 28 U.S.C. §§ 81–131. All but six of the 94 districts have at least three judgeships. *See* 28 U.S.C. § 133. Thus, in almost all districts, litigants have no more than a 33.33% chance of drawing a particular judge.

Each district decides for itself how precisely to assign cases. *See* 28 U.S.C. § 137(a). Some districts randomly assign cases among all judges in the district.[10] Others assign cases randomly within the division where they are filed, or, if a case is filed in a division with only one judge, randomly assign a percentage of cases filed in that single-judge division to judges outside that division.[11]

---

[10] *See, e.g.*, U.S. District Court for the Northern District of New York, General Assignment #12, Case Assignment Plan, sec. D.2 (Oct. 8, 2020), https://perma.cc/2CLJ-KKHA (randomly assigning newly filed cases across all judges in the district); U.S. District Court for the Western District of Missouri, Local Rule 83.9(a), https://perma.cc/2U3M-UQ82 (same).

[11] For example, only one District Judge sits in the Lake Charles Division of the Western District of Louisiana, but ten percent of the civil cases filed in that Division are randomly assigned to a judge in the Lafayette Division. *See* U.S. District Court for the Western District of Louisiana, Standing Order 1.61 (Jan. 12, 2024), https://perma.cc/J2AQ-VYCH. Similarly, only one District Judge sits in in the Southern District of Mississippi's Western Division, but twenty percent of the civil cases filed in that Division are randomly assigned to a judge in a different division. *See* U.S.

Random assignment of judges to cases is "essential to maintaining public confidence in the impartiality of judicial proceedings." *Ahmed v. Miller*, 452 F. Supp. 3d 721, 727 (E.D. Mich. 2020) (citation omitted). *See also Dakota Rural Action v. United States Dep't of Agric.*, No. CV 18-2852, 2019 WL 1440134, at *1 (D.D.C. Apr. 1, 2019) (same). It "guarantees fair and equal distribution of cases to all judges, avoids public perception or appearance of favoritism in assignments, and reduces opportunities for judge-shopping." *Tripp v. Exec. Off. Of President*, 196 F.R.D. 201, 202 (D.D.C. 2000). *See also United States v. Phillips*, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) ("[R]andom assignment protects the integrity of the judicial system by leaving the pairing of cases and judges to chance."). Random assignment strengthens public trust by refuting "criticism that business is being assigned to particular judges in accordance with any particular agenda." *Grutter v. Bollinger*, 16 F. Supp. 2d 797, 802 (E.D. Mich. 1998).

While random assignment is the best practice and the norm, a handful of the 94 federal judicial districts with single-judge divisions instead assign all cases filed

---

District Court for the Southern District of Mississippi, Internal Rule 1, sec I.D (Mar. 1, 2024) https://perma.cc/D2D7-728P.

in those divisions to that one judge.[12] Litigants can guarantee that they will appear in front of a particular judge simply by filing in such a single-judge division.[13]

This practice is known as judge-shopping,[14] and it is heavily disfavored. It "contravene[s] the very purpose of random assignment, which is to prevent judge-shopping by any party, thereby enhancing public confidence in the assignment process." *Coates v. SAIA Motor Freight Line, LLC*, No. 3:20-CV-25, 2020 WL 1812020, at *2 (N.D. Miss. Apr. 8, 2020) (quoting *Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 341 F. Supp. 2d 69, 72–73 (D.P.R. 2004)). Over the past few years, this concern—that judge-shopping will undermine public confidence in the judicial system—has been expressed by Supreme Court Justices,[15] numerous District

---

[12] For example, each of the Lufkin Division of the Eastern District of Texas, the Galveston Division of the Southern District of Texas, and the Midland-Odessa and Pecos Divisions of the Western District of Texas is a single-judge division where all civil cases are assigned to that one judge. *See* U.S. District Court for the Eastern District of Texas, General Order Assigning Civil and Criminal Actions (Jan. 6, 2023), https://perma.cc/PJ7C-MZZ3; U.S. District Court for the Southern District of Texas, Amended Division of Work Order (Apr. 22, 2024), https://perma.cc/TR4G-TK8C; U.S. District Court for the Western District of Texas, Amended Order Assigning the Business of the Court (May 31, 2024), https://perma.cc/A9AW-AYRJ.

[13] Notably, not all single-judge divisions permit this tactic; some randomly assign a percentage of cases filed in the division to a judge outside it, in order to preserve some amount of randomization. *See supra* n.11. This makes single-judge divisions that do not practice randomization even more of an aberration.

[14] As this Court explained in *McCuin*, judge-shopping and forum-shopping are different practices. "Forum-shopping is sanctioned by our judicial system." 714 F.2d at 1261. Litigants often, validly, choose between federal and state court, among the courts of several states, and within the various venues in a single district. *Id.* Judge-shopping, on the other hand, has never been condoned. *Id.*

[15] *See* Transcript of Supreme Court Argument, *United States v. Texas*, No. 22-58 (Nov. 29, 2022) (Kagan, J.), https://perma.cc/AZQ6-58C7 (noting that single-judge divisions allow litigants to "pick [their] trial court judge"); Chief Justice Roberts, 2021 Year-End Report on the Federal Judiciary (Dec. 31, 2021), https://perma.cc/ZT43-M4LJ (noting that "the Judicial Conference has long supported the random assignment of cases" and appointing subcommittee to ensure random assignment continues).

Judges,[16] the Department of Justice,[17] Senators from both parties,[18] and several concerned legal commentators.[19]

In response, earlier this year, the Judicial Conference of the United States issued guidance designed to "strengthen[] the policy governing random case assignment and limit[] the ability of litigants to effectively choose judges in certain cases by where they file a lawsuit."[20] The Judicial Conference is "the national policymaking body for the courts."[21] Chief Justice John Roberts is the presiding officer; membership is comprised of the Chief Judge of every Court of Appeals and the Court of International Trade, plus a district judge from every circuit. *See* 28

---

[16] *See, e.g.*, *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 261 F. Supp. 3d 1056, 1060 (N.D. Cal. 2017) ("Even the appearance of judge-shopping would 'doubtless disrupt[] the proper functioning of the judicial system,' and could 'impair[] public confidence in the impartiality of judges.'" (quoting *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995))); *United States v. Phillips*, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (noting that "attempts to manipulate the random case assignment process are subject to universal condemnation" and collecting cases).

[17] *See, e.g.*, Mot. to Transfer Venue, *Utah v. Walsh*, No. 2:23-cv-00016-Z (N.D. Tex. Feb. 7, 2023), Doc. 15, at 1 (seeking transfer out of the single-judge Amarillo Division and noting that the plaintiffs' judge-shopping "undermines public confidence in the administration of justice").

[18] *See* Letter from Senators Patrick Leahy and Thom Tillis to Chief Justice John Roberts (Nov. 2, 2021), https://perma.cc/9X6W-X56D.

[19] *See, e.g.*, Dalhia Lithwick & Mark Joseph Stern, *John Roberts Just Dropped the Hammer on Rogue, Lawless Trump Judges*, Slate (Mar. 15, 2024), https://perma.cc/96YC-GF2V; Elie Mystal, *A Texas Court Has Decided to Let the Scariest Judge in Texas Keep Being Scary*, The Nation (Apr. 3, 2024), https://perma.cc/9NGJ-UXUD; Nicholas Bagley, *A Single Judge Shouldn't Have This Kind of National Power*, The Atlantic (Apr. 14, 2023), https://perma.cc/Z9WJ-5RH6; Brennan Center, End 'Judge Shopping' (Mar. 20, 2024), https://perma.cc/LQ87-79V9.

[20] U.S. Courts, Conference Acts to Promote Random Case Assignment (Mar. 12, 2024), https://perma.cc/X9SQ-ZUK6 (hereinafter "Judicial Conference Press Release"),

[21] U.S. Courts, About the Judicial Conference, https://perma.cc/3DVV-TH87.

U.S.C. § 331. The guidance regarding randomized case assignment was issued following more than two years of study by a Conference subcommittee.[22]

The substance of the guidance takes the form of a recommendation to District Courts advising that they apply district-wide assignment to, *inter alia*, "civil actions seeking to bar or mandate nationwide enforcement of a federal law, including a rule, regulation, policy, or order of . . . a federal agency."[23] The Conference urged District Courts to "[e]mploy case assignment practices that successfully avoid the likelihood that a case will be assigned to a particular judge," such as "[s]hared case assignments between the judge in a single-judge division with a judge or judges in another division or divisions."[24]

In its memorandum recommending the guidance, the Conference stated that "the most crucial tool" in achieving "the Judicial Conference's longstanding policies supporting the random assignment of cases and ensuring that district judges remain generalists" "is the case assignment practices or methods employed in dividing the business of the court. Case assignment practices or methods that do not reflect the longstanding Judicial Conference policy of random case assignment tend to

---

[22] *See* Judicial Conference Press Release, *supra* n.20.
[23] Guidance by the Judicial Conference Committee on Court Administration and Case Management (Mar. 15, 2024), https://perma.cc/Y5UW-ZMAK (hereinafter "Judicial Conference Guidance"), at 1.
[24] *Id.*, Attachment at 3.

undermine the independence of the branch and the trust of the public in the judiciary."[25]

## II.     The Northern District of Texas is a Haven for Judge-Shopping Industry Groups

Notwithstanding this consensus about the harms of judge-shopping, the Northern District of Texas has continued to permit and even welcome the practice.[26] Judge-shopping is especially popular among nationwide industry groups who seek to challenge actions by the federal government in judicial districts, such as the Northern District of Texas, that have single-judge divisions which have historically been friendly to the groups' interests. These groups have exploited a loophole in the federal venue statute, which allows cases against the United States and its agents, unlike other civil cases, to be filed in *any* judicial district where a plaintiff resides. *See* 28 U.S.C. § 1391(e).

Their judge-shopping follows a now-familiar path. A trade organization based in Washington, D.C., like the American Bankers Association, identifies a member organization located in a far-flung, single-judge division—Amarillo, Texas, for example—where all cases are assigned to a judge who has historically been friendly to the group's interests. The trade organization recruits this member to serve as a

---

[25] *Id.* at 2.

[26] The Northern District of Texas is able to do this because, notwithstanding the Judicial Conference's guidance, each Chief District Judge retains the authority to ultimately determine how case assignments will be made in their district. *See* 28 U.S.C. § 137(a).

"local plaintiff" alongside the national organization. The chosen member will typically have, at best, an attenuated connection to the federal policy being challenged. It has no closer a connection to the issues being litigated than any of the group's hundreds or thousands (or hundreds of thousands) of other members. Rather, including the chosen member as a plaintiff allows the national group to exploit the member's residency to assert venue in that district, and thus to select a judge who is likely to rule in their favor.

Perhaps the most infamous such judge is Matthew Kacsmaryk. Every civil case filed in the single-judge Amarillo Division of the Northern District of Texas is assigned to Judge Kacsmaryk.[27] Judge Kacsmaryk was appointed by former President Donald Trump in 2019. In just five years, he has issued nationwide injunctions suspending the regulatory approval of mifepristone,[28] restricting access to birth control[29] and gender-affirming healthcare,[30] nullifying a COVID vaccine mandate for healthcare workers,[31] and stymying administrative efforts to protect

---

[27] *See* U.S. District Court for the Northern District of Texas, Amarillo Division, Special Order No. 3-344 (Sept. 14, 2022), https://perma.cc/82BS-ZDP3.

[28] *See All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 668 F. Supp. 3d 507 (N.D. Tex. 2023). The Fifth Circuit reversed Judge Kacsmaryk in part, 78 F.4th 210 (5th Cir. 2023), and the Supreme Court reversed the remaining part, 602 U.S. 367 (2024).

[29] *See Deanda v. Becerra*, 645 F. Supp. 3d 600 (N.D. Tex. 2022), *judgment entered*, No. 2:20-CV-092-Z, 2022 WL 17843038 (N.D. Tex. Dec. 20, 2022). The Fifth Circuit reversed Judge Kacsmaryk in part. 96 F.4th 750 (5th Cir. 2024).

[30] *See Texas v. Equal Emp. Opportunity Comm'n*, 633 F. Supp. 3d 824 (N.D. Tex. 2022).

[31] *See Texas v. Becerra*, 575 F. Supp. 3d 701 (N.D. Tex. 2021).

migrants[32] and remedy current and historical discrimination.[33] The preliminary injunction that Judge Kacsmaryk issued in the present case is just the latest in a long line of pro-corporate, anti-administrative, anti-civil rights injunctions. Several of these injunctions have been subsequently overturned by this Court and/or the Supreme Court,[34] illustrating the idiosyncrasies of Judge Kacsmaryk's jurisprudence, but by the time that they are vacated—substantial damage has been done to already marginalized communities.

Judge Kacsmaryk has gone out of his way to accommodate judge-shoppers in Amarillo. In one opinion denying a motion for an intra-district transfer to the Northern District's Dallas Division, he reasoned that Amarillo was a more convenient forum for litigants because, *inter alia*, "72-ounce steak dinners are *free*" at a local restaurant. *Barton v. C. R. Bard, Inc.*, No. 2:19-CV-181-Z, 2020 WL 1809702, at *4 (N.D. Tex. Apr. 9, 2020) (emphasis in original). He has repeatedly refused efforts to transfer cases to more appropriate venues. *See, e.g.*, *Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 2663256 (N.D. Tex. Mar. 28, 2023) (denying motion to transfer case challenging Department of Labor regulation to D.D.C.); Order, *United States v. Planned Parenthood Federation of America, Inc.*, No. 2:21-cv-22

---

[32] *See Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021). While the Fifth Circuit affirmed Judge Kacsmaryk, 20 F.4th 928 (5th Cir. 2021), the Supreme Court subsequently reversed and remanded, 597 U.S. 785 (2022).
[33] *See Strickland v. U.S. Dep't of Agriculture*, No. 2:24-CV-60-Z, 2024 WL 2886574 (N.D. Tex. June 7, 2024).
[34] *See supra* nn. 28, 29, 32.

(N.D. Tex. Sept. 20, 2022), Doc. 183 (denying motion to transfer case to the Austin Division, where defendant had substantial presence, from the Amarillo Division, where defendant had no presence and none of the acts at issue occurred).

The Judicial Conference's guidance has dissuaded neither Judge Kacsmaryk nor the Northern District of Texas. The guidance was issued on March 15, 2024.[35] Two weeks later, the Chief Judge of the Northern District informed inquiring Senators that "[t]he district judges of the Northern District of Texas met on March 27, 2024, and discussed case assignment. The consensus was not to make any change to our case assignment process at this time."[36] That same day, March 29, Judge Kacsmaryk issued the preliminary injunction in the present case. *See* ROA.608.

In Amarillo, Judge Kacsmaryk hears all cases; in three of the Northern District's six other divisions, one judge hears two-thirds of all cases.[37] As such, the majority of divisions in the Northern District of Texas give litigants a greater than 50% chance of picking the judge of their choice. The District continues to welcome

---

[35] *See* Judicial Conference Press Release, *supra* n.20.

[36] Letter from Chief Judge David C. Godbey to Senator Charles E. Schumer (Mar. 29, 2024), https://perma.cc/Q85Q-C6CV. The supposed "consensus" was apparently not unanimous. In the last few months, Judge Mark Pittman, who was appointed by former President Donald Trump and is one of two active District Judges in the Northern District's Fort Worth division, has twice tried to transfer a case challenging federal regulations to the District of Columbia. This Court has twice—the second time without explanation—wrestled the case back to Fort Worth. *See Chamber of Com. of the U.S.A. v. CFPB*, No. 4:24-CV-00213-P, 2024 WL 1329959 (N.D. Tex. Mar. 28, 2024), *mandamus granted, order vacated sub nom. In re Fort Worth Chamber of Com.*, 100 F.4th 528 (5th Cir. 2024); *Chamber of Com. of the U.S.A. v. CFPB*, No. 4:24-CV-00213-P, 2024 WL 2724181 (N.D. Tex. May 28, 2024), *mandamus granted, order vacated sub nom. In re Chamber of Com. of United States of Am.*, 105 F.4th 297 (5th Cir. 2024).

[37] Steve Vladeck (@steve_vladeck), X (Jan. 26, 2023, 5:45 PM), https://perma.cc/5Q88-8DDL.

judge-shoppers with open arms. And industry groups looking for a friendly home for their anti-administrative, anti-civil rights agendas, like Plaintiffs-Appellees here, have accepted that invitation.

### III.   There Is No Credible Reason for Plaintiffs-Appellees to Have Filed in the Amarillo Division Except to Shop for Their Preferred Judge

Plaintiffs-Appellees the American Bankers Association ("ABA"), Chamber of Commerce of the United States ("U.S. Chamber"), and Independent Community Bankers of America ("ICBA") are all based in the District of Columbia. *See* Complaint, *Texas Bankers Ass'n v. Office of the Comptroller*, No. 2:24-CV-025-Z (Feb. 5, 2024), Doc. 4, at 1–2 (hereinafter, "Compl."). The ABA is comprised of "small, regional, and large banks" "in each of the fifty States and the District of Columbia." *Id.* ¶ 9. The U.S. Chamber has approximately 300,000 members "from every region of the country." *Id.* ¶ 11. "ICBA's membership consists of thousands of community banks," "located in each of the fifty States and the District of Columbia." *Id.* ¶ 13.

Out of hundreds of thousands of member organizations, these three national industry groups cherry-picked the Amarillo Chamber of Commerce, Longview Chamber of Commerce, Texas Bankers Association, and Independent Community Bankers of Texas (collectively, the "local plaintiffs") to serve as plaintiffs alongside them. *Id.* ¶¶ 7, 8, 12, 14. The local plaintiffs have no closer a connection to the CRA or to the regulations at issue than any of the ABA, U.S. Chamber, or ICBA's other

18

members. But by including them, the industry groups "based in Washington D.C.," and eighty percent of whose lawyers "work in Washington, D.C.,"[38] were able to challenge rules "promulgated in Washington, D.C., by government agencies stationed in Washington, D.C., and by employees who work in Washington D.C." in Amarillo, Texas. *Chamber of Com. of the U.S.A. v. CFPB*, No. 4:24-CV-00213, 2024 WL 2724181, at *6 (N.D. Tex. May 28, 2024) (granting motion to transfer venue from N.D. Tex. to D.D.C.), *mandamus granted, order vacated sub nom. In re Chamber of Com. of United States of Am.*, 105 F.4th 297 (5th Cir. 2024).

Plaintiffs-Appellees had every incentive to judge shop, for at least two reasons. First, District Courts in Texas have recently granted numerous injunctions to judge-shopping financial services trade groups seeking to stymie federal regulators, including Plaintiffs-Appellees themselves. *See, e.g.*, *Chamber of Com. of the U.S.A. v. CFPB*, No. 4:24-CV-00213-P, 2024 WL 2310515, at *6 (N.D. Tex. May 10, 2024); *Texas Bankers Ass'n v. CFPB*, 685 F. Supp. 3d 445 (S.D. Tex. 2023). Each of the regulations at issue in those cases applied nationwide and had no special connection to Texas, but by bringing their challenges in the Fifth Circuit—where District Courts were bound by this Court's ruling that the Consumer Financial Protection Bureau was categorically powerless, *see Cmty. Fin. Servs. Ass'n of Am.,*

---

[38] Of the 12 Plaintiffs' counsel listed on the Complaint, 10 are Washington, D.C.-based. *See* Compl. at 56–57.

*Ltd. v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022), *rev'd and remanded*, 601 U.S. 416 (2024)—the groups were able to get the regulations quickly enjoined. This recent success surely emboldened Plaintiffs-Appellees.

Second, Plaintiffs-Appellees wanted immediate relief. They allege that the first-year cost of compliance with the new CRA regulations to Plaintiffs-Appellees' members will be somewhere between $90 million and $600 million. *See* Compl. ¶¶ 86–87. They assert that they cannot afford to wait for the judicial process to play out.[39] So they went directly to Judge Kacsmaryk, who has a track record of issuing quick anti-administrative, anti-civil rights relief. And he delivered.

Plaintiffs-Appellees could have filed this case anywhere where any party resides or where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(1). The most obvious venue, then, would have been the District Court for the District of Columbia. Plaintiffs-Appellees the ABA, U.S. Chamber, and ICBA are all based in the District of Columbia. *See* Compl. at 1–2. So are 80 percent of their lawyers. *Id.* at 56–57. Appellants-Defendants are all federal agencies that reside in the District of Columbia. *Id.* at 2. They engaged in the

---

[39] Notwithstanding this complaint, as Defendants-Appellants' brief explains in detail, these amounts represent an insignificant percentage of Plaintiffs-Appellees' member organizations' expenses. *See* Brief of Defendants-Appellants, Doc. 49, sec. III.A. And the member organizations will not necessarily be required to incur compliance costs immediately. *Id.* sec. III.B.

rulemaking being challenged from the District of Columbia. Yet Plaintiffs-Appellees did not file in the District of Columbia.

Plaintiffs-Appellees complain that their members have "already begun spending substantial time and resources" to comply with the CRA regulations at issue. Compl. ¶ 20. Their biggest members, with the most money at stake, are presumably the country's biggest banks. More of the country's large banks are headquartered in New York than anywhere else.[40] Yet Plaintiffs-Appellees did not file in the Southern District of New York.

If Plaintiffs-Appellees had full faith in the validity of their arguments, they would have filed their complaint without manipulating the case-assignment process. Instead, they traveled to the Amarillo Division, reasoning merely that "Plaintiff Amarillo Chamber of Commerce resides in this District, and members of the TBA, ABA, U.S. Chamber, IBAT, and ICBA are all headquartered in and do business in this District." Compl. ¶ 19. Notably, Plaintiffs-Appellees do not allege any special connection to the Amarillo *Division*. Amarillo is a curious venue for this case: it has a population of just 200,000 and is not a financial center.[41] Plaintiffs-Appellees do not explain what interest the Amarillo Chamber of Commerce has in the regulations at issue above and beyond the interests of their hundreds of thousands of other

---

[40] *See* Federal Financial Institutions Examination Council, National Information Center, Large Holding Companies (Dec. 31, 2023), https://www.ffiec.gov/npw/Institution/TopHoldings.
[41] *See* U.S. CENSUS, 2020 POPULATION DATA, https://perma.cc/Z3SG-7NA7.

member organizations. "There is no apparent reason—other than judge shopping—that explains why Plaintiffs elected to file in the Amarillo Division . . . " U.S. Dep't of Justice Mot. to Transfer Venue, *Utah v. Walsh*, No. 2:23-cv-00016-Z (N.D. Tex. Feb. 7, 2023), Doc. 15, at 15.

### IV.  Because Preliminary Injunctions Obtained Via Judge-Shopping Are Not in the Public Interest, this Court Should Reverse and Remand with Instructions to Transfer the Case

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (citation omitted). *See also Winter*, 555 U.S. at 20 (holding that "[a] plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest"). "[W]here an injunction is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus v. United States*, 321 U.S. 414, 440 (1944).

Judge-shopping adversely affects the public's interests by creating the appearance of unfairness in the eyes of interested parties, such as *amici* here. "Ultimately, the power of the federal judiciary . . . rests upon nothing more substantial than the ethereal virtue of persuasion, and, the public's perception of

principled decision-making." *Jenkins v. Bellsouth Corp.*, No. CIV.A.CV-02-1057, 2002 WL 32818728, at *6 (N.D. Ala. Sept. 13, 2002). Whatever the substantive outcome of the litigation, the public, including *amici*, will be left with the impression that that outcome is the product not of reasoned legal analysis but of jurisdictional opportunism. That is, preliminary injunctions obtained via judge-shopping, such as the one issued by the District Court here, harm the public by impugning the integrity of the courts. *See also* Judicial Conference Guidance at 2 ("Case assignment practices or methods that do not reflect the longstanding Judicial Conference policy of random case assignment tend to undermine the independence of the branch and the trust of the public in the judiciary."). Judge-shopping also interferes with the public interest in the orderly administration of justice by encroaching on the courts' ability to manage their workload. *Id.*, Attachment at 2. In fact, judge-shopping subordinates the public's interest in the impartial resolution of matters of public importance to the litigants' interest in getting the outcome of their choice.

As the Supreme Court's recently promulgated Code of Conduct warns, the "appearance of impropriety" can be just as harmful as "impropriety" itself.[42] This case has been tainted by the "perception that [the Amarillo] division [i]s a 'fiefdom' of sorts, in which the idiosyncrasies and preferences of one judge come to dominate

---

[42] Code of Conduct for Justices of the Supreme Court of the United States (Nov. 13, 2023), https://perma.cc/2LBR-YQQF.

the local litigation practice." *In re Gibson*, 423 F. App'x 385, 388 (5th Cir. 2011) (unpublished). To remedy this harm, *amici* urge this Court to vacate and remand with instructions to the District Court to transfer this case to a more appropriate jurisdiction,[43] or at the very least, to randomly reassign this case among all judges in the Northern District of Texas.

## CONCLUSION

There is no credible reason for Plaintiffs-Appellees to have filed in the Amarillo Division *except* to shop for their preferred judge. To affirm would be to undermine the important public interests that motivated the Judicial Conference to issue its guidance supporting random assignment of cases: the integrity of the courts, the public's confidence in the judicial system, and the orderly administration of the federal case docket. *Amici* urge this Court not to let that happen.

---

[43] For example, Washington, D.C., where the three largest Plaintiffs-Appellees and 80% of their counsel reside, where all of Defendants-Appellants and their counsel are located, where the rulemaking at issue in this case took place, and where the bench is familiar with Administrative Procedure Act challenges and capable of fairly resolving this matter.

Dated: July 25, 2024                          Respectfully submitted,

                                              /s/ Ellora Thadaney Israni
                                              Ellora Thadaney Israni
                                              Kenneth Scott
                                              John Relman
                                              RELMAN COLFAX PLLC
                                              1225 19th St. NW, Suite 600
                                              Washington, D.C. 20036
                                              (202) 969-4727
                                              eisrani@relmanlaw.com

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 5905 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

/s/ Ellora Thadaney Israni
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2024 a true and correct copy of the foregoing Brief was served via the court's CM/ECF system.

/s/ Ellora Thadaney Israni
Counsel for *Amici Curiae*