No. 24-10367

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Texas Bankers Association; Amarillo Chamber of Commerce; American Bankers Association; Chamber of Commerce for the United States of America; Longview Chamber of Commerce; Independent Community Bankers of America; Independent Bankers Association of Texas,
*Plaintiffs-Appellees*

‒ v. ‒

Board of Governors of the Federal Reserve System; Jerome Powell, Chairman; Federal Deposit Insurance Corporation; Martin Gruenberg, Chairman; Office of the Comptroller of the Currency; Michael J. Hsu, Acting Comptroller,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
Civil Action No. 2:24-cv-00025

**BRIEF OF THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND THE NATIONAL COMMUNITY REINVESTMENT COALITION AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

KATHRYN J. YOUKER
THOMAS SILVERSTEIN
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600
kyouker@lawyerscommittee.org

1

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that *amici curiae* are unaware of any persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and amicus briefs filed in this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

***Amici***: Lawyers' Committee for Civil Rights Under Law, National Community Reinvestment Coalition.

***Counsel for Amici***: Kathryn Youker and Thomas Silverstein, both of the Lawyers' Committee for Civil Rights Under Law.

*Amici curiae* the Lawyers' Committee for Civil Rights Under Law and the National Community Reinvestment Coalition certify that they have no outstanding shares or debt securities in the hands of the public, they have no parent companies, and no publicly held company has a 10% or greater ownership interest in any of the *amici curiae*.

Dated: June 25, 2024                              /s/ Kathryn J. Youker
                                                             Kathryn J. Youker
                                                             Counsel for Amici Curiae

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................. iii

**INTEREST OF AMICI** ...................................................................... 1

**SUMMARY OF ARGUMENT** ............................................................. 2

**ARGUMENT** ...................................................................................... 5

   **I.**   **Deeply Entrenched Racial and Socioeconomic Disparities in Access to Credit Persist, Signaling a Need to Redefine CRA Assessment Standards.** .. 5

      a.   Racial and Socioeconomic Disparities in Access to Credit Persist. ........... 6

      b.   As Financial Institutions Shift to Online Banking Options, Updating Regulations for CRA Assessments in Order to Combat Continued Disparities Is Sound Policy and Consistent with the Statutory Text. ................................. 11

   **II.**  **The District Court Erred in Concluding that the Major Questions Doctrine Weighed in Favor of Ruling for Plaintiffs.** ...................................... 14

      a.   The Economic Impact of the CRA Rule Pales in Comparison to That of Agency Actions of Vast Political and Economic Significance. ...................... 15

      b.   Agency Actions That Impose Process-Oriented Rather Than Substantive Requirements Are Unlikely to Raise Major Questions. ................................... 17

      c.   Relying upon the Major Questions Doctrine to Invalidate the CRA Rule Would Raise Significant Separation of Powers Concerns. .............................. 19

**CONCLUSION** ................................................................................... 21

**CERTIFICATE OF COMPLIANCE** ................................................. 22

**CERTIFICATE OF SERVICE** ........................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Human Svcs.*, 594 U.S. 758 (2021) ................................................................................16, 17

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ..............................16, 17, 20

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604 (5th Cir. 2021) ..................................................................................18

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ................................................................................19

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .....................20, 21

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) ................................18

*Mistretta v. U.S.*, 488 U.S. 361 (1989) ................................................20

*Tesla, Inc. v. Nat'l Labor Rels. Bd.*, 86 F.4th 640 (5th Cir. 2023) ........................18

*Texas Bankers Ass'n v. Off. of the Comptroller of the Currency*, No. 2:24-cv-00025 (N.D. Tex. Mar. 29, 2024) ....................................14, 16, 17

*Texas v. Nuclear Reg. Comm'n*, 78 F.4th 827 (5th Cir. 2023) ..............................18

*Texas v. U.S.*, 50 F.4th 498 (5th Cir. 2022) ........................................18

*United States v. American Bank of Oklahoma*, No. 23-cv-00371-CDL (N.D. Okla. Oct. 3, 2023) ..................................................................... 9

*United States v. Ameris Bank*, No. 3:23-cv-01232 MMH-LLL, 2023 U.S. Dist. LEXIS 200013 (M.D. Fla. Nov. 7, 2023) ......................................... 9

*United States v. First Nat'l Bank of Pennsylvania.*, No. 1:24-CV-88 (M.D. N.C. Feb. 13, 2024) ...........................................................9, 10

*United States v. Washington Trust Co.*, No. 23-cv-00399 (D. R.I. Oct. 21, 2023) . 9, 10

*West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) ......passim

**Statutes**

12 U.S.C. § 1813(c)(2) .................................................................... 6

12 U.S.C. § 2901(a) ...........................................................2, 5, 6, 12

12 U.S.C. § 2902(2) .......................................................................... 6

12 U.S.C. § 2905..............................................................................20

364 U.S. 339, 341 (1960) ................................................................10

**Other Authorities**

Aleksandrs Malins, *The Rise of Digital Banking: A Paradigm Shift in Fintech*,
  Forbes (May 1, 2024),
  https://www.forbes.com/sites/forbestechcouncil/2024/05/01/the-rise-of-digital-
  banking-a-paradigm-shift-in-fintech/ ................................................11

Aniket Mehrotra et al., *Evidence of Disparities in Access to Mortgage Credit*, Urb.
  Inst. (Mar. 2024), https://www.urban.org/sites/default/files/2024-
  03/Evidence_of_Disparities_in_Access_to_Mortgage_Credit.pdf ...................6, 7

Chris Arnold, *How Some Online Lenders Dodge States Laws to Charge Triple
  Digit Interest Rates*, NPR (Nov. 12, 2019),
  https://www.npr.org/2019/11/12/778632599/how-some-online-lenders-dodge-
  state-laws-to-charge-triple-digit-interest-rates.....................................13

Clea Benson & Alexis Leondis, *Lending to Minorities Declines to a 14-Year Low
  in U.S.*, Bloomberg (Sept. 24, 2014),
  https://www.bloomberg.com/news/articles/2014-09-24/lending-to-minorities-
  declines-to-a-14-year-low-in-u-s- ................................................... 9

DAVID M. P. FREUND, *Colored Property: State Policy and White Racial Politics in
  Suburban America* (2007) ............................................................ 8

Jesse Van Tol, *NCRC Comment Letter On Figure Bank's Charter Application*
  (Feb. 4, 2022), https://ncrc.org/ncrc-comment-letter-on-figure-banks-charter-
  application/ ..........................................................................13

Jesse Van Tol, *NCRC Comment On SoFi's Charter Application* (Aug. 12, 2020),
  https://www.ncrc.org/ncrc-comment-on-sofis-charter-application/ ....................13

Jesse Van Tol, *NCRC's Full Public Comment Letter On Community Reinvestment Act Interagency Rulemaking* (Aug. 4, 2022), https://ncrc.org/ncrcs-full-public-comment-letter-on-community-reinvestment-act-interagency-rulemaking/........13

Kim Vu Dinh, *Black Livelihoods Matter: Access to Credit as a Civil Right and Striving for a More Perfect Capitalism Through Inclusive Economics*, 22 Hous. Bus. & Tax L. J. 1 (2021) ................................................................................. 7

Kristen Broady et al., *An analysis of financial institutions in Black-majority communities: Black borrowers and depositors face considerable challenges in accessing banking services*, Brookings (Nov. 2, 2021), https://www.brookings.edu/articles/an-analysis-of-financial-institutions-in-black-majority-communities-black-borrowers-and-depositors-face-considerable-challenges-in-accessing-banking-services/......................................................... 8

Laurie Goodman et al., *Community Reinvestment Act Modernization*, Urb. Inst. 3-4 (Aug. 3, 2022), https://www.urban.org/sites/default/files/2022-08/Community%20Reinvestment%20Act%20Modernization_0.pdf................... 6

Lindsay Sain Jones & Goldburn P. Maynard, Jr., *Rebooting the Community Reinvestment Act*, 61 Am. Bus. L. J. (forthcoming 2024) (on file with authors) . 5, 6, 8

Marcia Johnson, JaPaula Kemp & Anh Nguyen, *The Community Reinvestment Act: Expanding Access*, 12 Kan. J. L. & Pub. Pol'y 89 (2002) ....................................11

Miho Kubota, *Encouraging Community Development in Cyberspace: Applying the Community Reinvestment Act to Internet Banks*, 5 Bos. Univ. J. Sci. & Tech. L. 8 (1999) ..............................................................................................................11

Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era*, 143 J. Fin. Econ. 30 (2021) .......................................................................................12

Thomas W. Beetham, *The Community Reinvestment Act and Internet Banks: Redefining the Community*, 39 Bos. Coll. L. Rev. 911 (1998)............................12

## Regulations

89 Fed. Reg. at 7,096 ................................................................................4, 15, 16

**INTEREST OF AMICI**

The Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a nonprofit civil rights organization founded in 1963 to secure equal justice for all through the rule of law, targeting, in particular, the inequities confronting Black Americans and other people of color. The Lawyers' Committee uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have voice, opportunity, and power to make the promises of our democracy real. The Lawyers' Committee has for decades sought to ensure that homebuyers, small business, and other consumers have access to credit on fair terms, including in partnership with both federal financial regulators and with banks and other financial institutions, and to redress the legacy of redlining. Implementation of the Community Reinvestment Act in ways that match the realities of the twenty-first century is critical to the fulfilment of these important goals.

The National Community Reinvestment Coalition ("NCRC") is a network of more than 700 organizations and individuals dedicated to creating a nation that builds wealth all Americans.  NCRC works with community leaders, policymakers and institutions to advance solutions to solve America's persistent racial and socio-economic wealth, income and opportunity divides.  Formed in 1990 by national, regional and local organizations to increase the flow of private capital into

traditionally underserved communities, NCRC members include nonprofit community development and finance organizations; community organizing and civil rights groups; minority and women-owned business associations; national, state and local housing, economic development, education, media, arts, healthcare and investment organizations; state and local government agencies; faith-based institutions; and committed, hopeful individuals from across the nation.

## SUMMARY OF ARGUMENT

In 1977, Congress responded to the pleas of community members and grassroots organizations across the United States and enacted the Community Reinvestment Act ("CRA") with the purpose of ensuring that insured depository institutions were meeting the needs of the communities in which they were chartered for both credit and deposit services. 12 U.S.C. § 2901(a). Up to that point, it was decidedly not the case that regulated entities, primarily banks, were meeting those needs. Often with the collusion and coordination of the federal government, many banks engaged in redlining practices whereby they refused to extend credit to predominantly Black communities and other communities of color, integrated communities, and mostly white communities deemed to be at "risk" of becoming more diverse. At the same time, it was common for banks to offer some services, such as savings and checking accounts, to residents of communities of color while not offering others, such as home mortgage loans. The money of

residents of communities of color was deemed good enough for one purpose but not for another. Congress tackled this problem by passing the CRA and also other statutes like the Fair Housing Act, the Equal Credit Opportunity Act, and the Home Mortgage Disclosure Act. In the CRA, Congress advanced the solution of requiring insured depository institutions to go through an evaluation process whereby their regulators, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Federal Reserve Board (collectively, "Defendants"), would assess the extent to which they were meeting community needs for credit and deposit services.

Over the nearly half century since, the CRA has meaningfully contributed to efforts to redress the legacy of redlining and to promote access to credit and deposit services on fair terms. That progress, in contrast to the picture painted in the District Court's decision below, has been counterbalanced by setbacks that have left the United States far from achieving Congress's purpose in enacting the CRA and related statutes. As the country discovered during the Great Recession, new products and new ways of delivering those products to individuals and businesses can cause backsliding just as easily as they can bring about positive change. In more recent years, the increasingly digital marketplace for financial services is a source of both promise and peril. In order for CRA evaluations of insured depository institutions to remain a vital tool in efforts to remedy redlining

and increase access to financial services, the implementation of the CRA's requirements must be in dialogue with current market realities, particularly those relating to the use of technology. The broad text of the CRA provisions describing the "convenience and needs of communities" and the concept of "community" itself anticipate the need for regulation to adapt to changing times. In this context, Defendants promulgated a new regulation that attempts to meet the needs of a changing marketplace in a manner consistent with the statutory text. *Community Reinvestment Act*, 89 Fed. Reg. 6,574 (Feb. 1, 2024) ("CRA Rule"). On March 29, 2024, the District Court preliminarily enjoined this new regulation from taking effect.

The contested provisions of the CRA Rule would alter the geographic scope of the analysis performed in assessments and evaluations pursuant to the CRA and require the consideration of access to deposit products with fair terms in addition to credit products. They would not, on their own, impose new obligations to provide services in practice. The imposition of procedural requirements on regulated entities, building off of a substantial, preexisting body of procedural requirements, is perfectly in keeping with both statutory text and purpose. Furthermore, procedural requirements, as distinct from substantive obligations, are unlikely to implicate questions of vast economic and political significance. This is critical because the District Court relied in part upon the Supreme Court's Major

Questions Doctrine in concluding that the trade associations acting as Plaintiffs in this lawsuit were likely to succeed on the merits of their Administrative Procedure Act ("APA") challenge to the CRA Rule. The Major Questions Doctrine imposes a clear statement requirement for agency actions that do reflect decisions concerning questions of vast economic and political significance. This part of the District Court's holding was in error, and that error provides a basis for reversal.

## ARGUMENT

### I. Deeply Entrenched Racial and Socioeconomic Disparities in Access to Credit Persist, Signaling a Need to Redefine CRA Assessment Standards.

Congress enacted the CRA in order to address disparities in access to credit resulting from redlining and disinvestment, including through discrimination against loan applicants in predominantly Black neighborhoods. Lindsay Sain Jones & Goldburn P. Maynard, Jr., *Rebooting the Community Reinvestment Act*, 61 Am. Bus. L. J. (forthcoming 2024) (manuscript at 6-10) (on file with authors) The CRA requires Defendants, as supervisory agencies, to evaluate whether a financial institution meets "the needs of its entire community, including low- and moderate-income neighborhoods." 12 U.S.C. § 2906(a)(1). Since its passage, the CRA has contributed to some progress in efforts to address the legacy of redlining, including by spurring regulated entities to increase lending in low- and moderate income communities, Jones, *supra* at 22-23. However, communities of color still face

disparate barriers in obtaining access to credit. Aniket Mehrotra et al., *Evidence of Disparities in Access to Mortgage Credit*, Urb. Inst. 6 (Mar. 2024), https://www.urban.org/sites/default/files/2024-03/Evidence_of_Disparities_in_Access_to_Mortgage_Credit.pdf.

    a.  Racial and Socioeconomic Disparities in Access to Credit Persist.

Through the CRA, Congress adopted a race-neutral framework for redressing the harms of intentional racially discriminatory redlining. The CRA's assessment requirement does not explicitly address race but uses economic status instead. Jones, *supra* 3. The CRA requires regulated financial institutions to meet the needs of low- and moderate-income neighborhoods that encompass their entire community. 12 U.S.C. § 2906(a)(1). Regulated financial institutions include insured depository institutions, which are banks or savings associations whose deposits are insured by the FDIC. 12 U.S.C. § 2902(2); 12 U.S.C. § 1813(c)(2). In a majority of low-income neighborhoods, people of color comprise the majority of the population, but the majority of low-income borrowers are white. Laurie Goodman et al., *Community Reinvestment Act Modernization: Comments on the May 2022 Notice of Proposed Rulemaking*, Urb. Inst. 3-4 (Aug. 3, 2022), https://www.urban.org/sites/default/files/2022-08/Community%20Reinvestment%20Act%20Modernization_0.pdf. Thus, the

CRA has the potential to facilitate the delivery of benefits to a broader swath of underserved applicants than just those harmed by redlining.

Whether looking just at race or at socioeconomic status, as well, it is clear that the work of fulfilling Congress's intent in enacting the CRA is far from complete. In a research report published by the Urban Institute in March 2024, data shows that disparities in credit access among different racial and ethnic groups continues to persist. Mehrotra et al., *supra* 1-10. The homeownership gap between white and Black households in 1970 was 24 percent, however, as of 2021, the gap has widened to 29 percent. *Id.* at 2. Black and Latino borrowers have historically been the victims of financial discrimination, whether it be predatory lending practices, such as banks requiring higher rates for subprime loans despite having similar credit profiles to their white counterparts, or limited access to credit, where those in predominantly Black neighborhoods receive fewer offers for credit compared to those similarly situated in predominantly white neighborhoods. Kim Vu Dinh, *Black Livelihoods Matter: Access to Credit as a Civil Right and Striving for a More Perfect Capitalism Through Inclusive Economics*, 22 Hous. Bus. & Tax L. J. 1, 15, 18-19 (2021).

Limited access to financial services based on race extends to deposit products in addition to loans. In 2019, 3 percent of Black adults were underbanked, and 14 percent were unbanked. Kristen Broady et al., *An analysis of financial*

*institutions in Black-majority communities: Black borrowers and depositors face considerable challenges in accessing banking services*, Brookings (Nov. 2, 2021), https://www.brookings.edu/articles/an-analysis-of-financial-institutions-in-black-majority-communities-black-borrowers-and-depositors-face-considerable-challenges-in-accessing-banking-services/. In 2020, people of color reported paying higher banking fees compared to their white counterparts. *Id.* This suggests that the deposit and checking products offered to them by financial institutions had less fair terms than those offered to white individuals. Despite the goals of the CRA, neighborhoods that are a majority Black and Latino tend to have fewer banking options than white majority neighborhoods. *Id.*

Continuing disparities in financial services do not emerge out of the ether; they have ascertainable causes. Redlining persists where a bank limits or prohibits services in certain neighborhoods due to its racial demographics. Jones, *supra* 6. Although redlining does not have the official state sanction that it did when the federal Home Owners' Loan Corporation was publishing official redlining maps, DAVID M. P. FREUND, *Colored Property: State Policy and White Racial Politics in Suburban America* 111-18 (2007), too many financial institutions continue to engage in activity that meets the definition of redlining. Clea Benson & Alexis Leondis, *Lending to Minorities Declines to a 14-Year Low in U.S.*, Bloomberg (Sept. 24, 2014), https://www.bloomberg.com/news/articles/2014-09-24/lending-

to-minorities-declines-to-a-14-year-low-in-u-s-. Just within the past year, the

Department of Justice ("DOJ") has settled a number of cases against banks

violating the Federal Housing Act and the Equal Credit Opportunity Act by

engaging in illegal redlining, specifically targeting majority-Black and Latino

neighborhoods. *See, e.g.*, Consent Order, *United States v. First Nat'l Bank of*

*Pennsylvania.*, No. 1:24-CV-88 (M.D. N.C. Feb. 13, 2024); Consent Order, *United*

*States v. Washington Trust Co.*, No. 23-cv-00399 (D. R.I. Oct. 21, 2023); Consent

Order, *United States v. American Bank of Oklahoma*, No. 23-cv-00371-CDL (N.D.

Okla. Oct. 3, 2023).

Illustrative examples show how the CRA is part and parcel of attempts to

remedy this unlawful discrimination as well as the limits of an approach to CRA

compliance that defines assessment areas too narrowly. In *United States v. Ameris*

*Bank*, where the defendant bank allegedly engaged in unlawful redlining by,

"avoiding providing home loans and other mortgage services in majority-Black

and Hispanic census tracts in the Bank's self-designated assessment area," the

parties entered into a consent agreement that required, among other relief, that the

defendant maintain compliance with the CRA's assessment requirements. *United*

*States v. Ameris Bank*, No. 3:23-cv-01232 MMH-LLL, 2023 U.S. Dist. LEXIS

200013, at *1-2, *7-8 (M.D. Fla. Nov. 7, 2023). In *United States v. First National*

*Bank of Pennsylvania*, another case in which evidence from a bank's CRA

evaluation was referenced in a complaint, the government alleged that the

defendant violated the Equal Credit Opportunity Act and the Fair Housing Act, in

part, by not locating its branches and mortgage loan officers in majority-Black and

Latino neighborhoods in Charlotte, North Carolina and Winston-Salem, North

Carolina. Complaint at 7-11, No. 24-CV-88 (Feb. 5, 2024). *United States v.*

*Washington Trust Co.* illustrates how this type of conduct can manifest in ways

that call to mind extreme discrimination fact patterns like that of *Gomillion v.*

*Lightfoot*, 364 U.S. 339, 341 (1960) (holding that facially neutral boundary

changes in redistricting that can only be explained by race can support an inference

of unlawful discrimination in violation of the Equal Protection Clause). In that

case, the government alleged that the defendant had never had a branch in a

majority-Black and Latino census tract "despite the fact that nearly 16 percent of

all residential census tracts in the State of Rhode Island" were majority-Black and

Latino and despite aggressive efforts to open new branches. Complaint at 7-9,

*United States v. Washington Trust Co.*, No. 1:23-cv-00399 (Sep. 27, 2023). The

State of Rhode Island as a whole comprised the defendant's CRA assessment area,

and the government marshaled evidence using that geographic frame in its

complaint. *Id.* at 6. Cases like these illustrate the persistence of lending

discrimination, the connection between lending discrimination and the locations in

which banks choose to operate, and the role that the CRA can play in remedying

lending discrimination.

      b. As Financial Institutions Shift to Online Banking Options, Updating
Regulations for CRA Assessments in Order to Combat Continued
Disparities Is Sound Policy and Consistent with the Statutory Text.

Many regulated depository institutions have expanded their online banking

services in order to compete for customers and to lower costs. Aleksandrs Malins,

*The Rise of Digital Banking: A Paradigm Shift in Fintech*, Forbes (May 1, 2024),

https://www.forbes.com/sites/forbestechcouncil/2024/05/01/the-rise-of-digital-

banking-a-paradigm-shift-in-fintech/. This shift to online banking services

demonstrates a need to redefine the assessment requirements of CRA regulations in

a manner consistent with the statutory text. Marcia Johnson, JaPaula Kemp & Anh

Nguyen, *The Community Reinvestment Act: Expanding Access*, 12 Kan. J.

L. & Pub. Pol'y 89, 101-02 (2002). Prior to the promulgation of the CRA Rule,

Defendants' regulations defined "communities," or assessment areas, as the

geographic locations where a bank originates loans and operates its main office,

branch locations, and ATM machines. Miho Kubota, *Encouraging Community*

*Development in Cyberspace: Applying the Community Reinvestment Act to Internet*

*Banks*, 5 Bos. Univ. J. Sci. & Tech. L. 8, 16 (1999). This framing raises questions

about how to define a "community" of a bank that exists solely online but is still

subject to CRA regulations. *Id.* at 17-20. If banks are required to meet the needs of

the "entire community" of which they serve, including low- and moderate-income individuals, but due to online banking options, are able to provide services beyond the reach of their physical branch locations, the definition of "community" within the meaning of the CRA must be reevaluated in order to ensure that meaning is given to all provisions of the statute, including Congress's broad express purpose. Thomas W. Beetham, *The Community Reinvestment Act and Internet Banks: Redefining the Community*, 39 Bos. Coll. L. Rev. 911, 912 (1998); 12 U.S.C. § 2901(a). The challenged CRA Rule takes an important step towards meeting this challenge through its Retail Lending Test.

The online financial services ecosystem can be rife with attempts to skirt civil rights and consumer protection laws, thereby making it critical that accurate CRA evaluations can serve as a prophylactic against abuse. Mortgage lending discrimination that manifests in the form of higher interest rates for Black and Latino borrowers is similarly pervasive among online lenders as it is among those that primarily operate face-to-face. Robert Bartlett et al., *Consumer-Lending Discrimination in the FinTech Era*, 143 J. Fin. Econ. 30, 55 (2021) (concluding that mortgage lending data for 2018-2019 "is consistent with FinTech lenders using pricing strategies and data analytics that produce discriminatory pricing"). Some abusive online practices specifically manipulate the ability to evade consumer protection laws by basing operations in states with weak laws while

providing services to individuals, families, and small businesses in other states.

Chris Arnold, *How Some Online Lenders Dodge States Laws to Charge Triple Digit Interest Rates*, NPR (Nov. 12, 2019),

https://www.npr.org/2019/11/12/778632599/how-some-online-lenders-dodge-state-laws-to-charge-triple-digit-interest-rates. In other instances, fintech applications for bank charters proposed designating only headquarter location as an assessment area, although the online lender made substantial numbers of loans across the country. Jesse Van Tol, *NCRC Comment Letter On Figure Bank's Charter Application* (Feb. 4, 2022), https://ncrc.org/ncrc-comment-letter-on-figure-banks-charter-application/; Jesse Van Tol, *NCRC Comment On SoFi's Charter Application* (Aug. 12, 2020), https://www.ncrc.org/ncrc-comment-on-sofis-charter-application/; Jesse Van Tol, *NCRC's Full Public Comment Letter On Community Reinvestment Act Interagency Rulemaking* (Aug. 4, 2022), https://ncrc.org/ncrcs-full-public-comment-letter-on-community-reinvestment-act-interagency-rulemaking/. The CRA Rule's responsiveness to these types of threats was thoroughly vetted at the Notice of Proposed Rulemaking stage by the National Community Reinvestment Coalition and civil rights commenters that stress the importance of capturing online lending and deposit taking activity. *Id.* There is a strong basis for concluding that Defendants must do more, not less, to confront persistent lending disparities within the scope of their statutory authority, contrary

to the implication of the District Court that the goals of the CRA have already been

accomplished.

## II.    The District Court Erred in Concluding that the Major Questions Doctrine Weighed in Favor of Ruling for Plaintiffs.

In arriving at the conclusion that Plaintiffs were likely to succeed on the

merits of their APA claim, the District Court relied in part on the Major Questions

Doctrine. *Texas Bankers Ass'n v. Off. of the Comptroller of the Currency*, No.

2:24-cv-00025, slip op. at 15-16 (N.D. Tex. Mar. 29, 2024). The Supreme Court

held in *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 721-23

(2022) that Congress is expected to speak clearly when delegating to agencies the

power to make decisions with vast political and economic significance. However,

the CRA Rule clearly does not implicate the Major Questions Doctrine, and

extending the contours of the Major Questions Doctrine to reach regulations like

that at issue in this case would raise significant separation of powers concerns. In

addition to the reasons stated by Appellants for why the Major Questions Doctrine

is inapposite, Brief for Appellant at 37-40, Texas Bankers Ass'n v. Office of the

Comptroller of the Currency, No. 24-10367 (July 18, 2024) (noting that the

rulemaking is within Defendants' areas of expertise and that the rulemaking does

not rely on ancillary statutory provision), the CRA Rule is unlike regulations that

courts have set aside on Major Questions Doctrine grounds insofar as that it

primarily imposes process-oriented as opposed to substantive obligations and

therefore does not touch upon decisions of vast political and economic significance. Additionally, the District Court did not state a cognizable factual basis for concluding that the CRA Rule touched upon decisions of vast political and economic significance.

     a.  The Economic Impact of the CRA Rule Pales in Comparison to That of Agency Actions of Vast Political and Economic Significance.

The uncontradicted record in this case shows that the financial impact of the CRA Rule is much smaller than that of agency actions that the Supreme Court has struck down when relying on the Major Questions Doctrine. For example, the OCC estimated the cost of compliance with the Rule for small entities that it regulates (of which there are 617) at a mere $18,304 per bank. 89 Fed. Reg. at 7,096. Disclosure requirements emanating from the Rule are likewise modest. With respect to the FDIC, the estimated number of hours required for compliance with such requirements at 234,974, a large number but an increase of just 3,392 from prior requirements which Plaintiffs are not challenging. *Id.* at 7,106. The increases for entities regulated by the OCC and the Federal Reserve Board would be marginally higher. *Id.* By contrast, in *West Virginia*, the Supreme Court concluded that a challenged Environmental Protection Agency regulation would "substantially restructure the American energy market." *West Virginia*, 597 U.S., at 724. The Court based its decision on a finding that "there is no control a coal plant operator can deploy to attain the emissions limits established by the Clean Power

Plan." *Id.* at 726. In the Court's view, effectively prohibiting a category of power plant was a decision of vast political and economic significance. *Id.* at 735. In *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023), the Court grounded its striking down of a student debt relief plan on findings that the cost of providing such relief would be between $469 billion and $519 billion. Lastly, in *Alabama Ass'n of Realtors v. Dep't of Health & Human Svcs.*, 594 U.S. 758, 764 (2021), the Court concluded that $50 billion appropriated by Congress for emergency rental assistance was a "reasonable proxy" for the economic impact of an eviction moratorium.

The District Court only mentioned one ground in concluding that the CRA Rule implicated a major question: that Defendants had not previously interpreted the CRA to require the evaluation of regulated entities' activities "*wherever* they conduct retail lending." *Texas Bankers Ass'n*, slip op. at 15. But Defendants have long required extensive evaluations that place nearly as significant reporting and compliance obligations on regulated entities as would the CRA Rule. 89 Fed. Reg. at 7,106. For some regulated entities, the CRA Rule will actually lessen their reporting and compliance obligations. Brief for Appellant at 40, Texas Bankers Ass'n v. Office of the Comptroller of the Currency, No. 24-10367 (July 18, 2024). Thus, there is continuity rather than change with respect to the approximate level of cost imposed on regulated entities by the CRA Rule.

The District Court also made no findings relating to whether regulated entities would have to restructure or even close their businesses, the cost of the regulation (whether to the government or to regulated entities), or the number of regulated entities affected by the rule. *Texas Bankers Ass'n*, slip op. at 15-16. In other words, the District Court made no findings to establish a factual basis for its conclusion that the CRA Rule reflected a decision of vast political and economic significance.

      b.  Agency Actions That Impose Process-Oriented Rather Than Substantive Requirements Are Unlikely to Raise Major Questions.

Significantly, none of the Supreme Court's decisions striking down agency actions on the basis of the Major Questions Doctrine have involved rules that impose process-oriented rather than substantive requirements. This is unsurprising. Requirements that entities undergo an evaluative process are unlikely to spark the kinds of "sharp debates" that often accompany decisions of vast political significance, *Biden*, 143 S. Ct. at 2374, and the costs associated with them are not likely to mount up to tens or hundreds of billions of dollars. *Id.*; *Alabama Ass'n of Realtors*, 594 U.S. at 764. Process requirements are also unlikely to intrude upon areas that are "the particular domain of state law." *Alabama Ass'n of Realtors*, 594 U.S. at 764.

This Court's precedents confirm the insight that rules that impose process requirements are fundamentally different from substantive requirements or

17

prohibitions for purposes of the Major Questions Doctrine. None of the cases in which this Court has held that agency actions are in excess of statutory authority in light of the Major Questions Doctrine principally involved process requirements. *See, e.g.*, *Tesla, Inc. v. Nat'l Labor Rels. Bd.*, 86 F.4th 640, 651 (5th Cir. 2023) (holding that prohibition on employers requiring employees to wear uniforms barring special circumstances was a "major decision" that Congress would not have intended to permit "without clearer statutory indication"); *Texas v. Nuclear Reg. Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023) (holding that the issuance of a license for away-from-reactor storage facility for nuclear waste presents a major question); *Louisiana v. Biden*, 55 F.4th 1017, 1028-30 (5th Cir. 2022) (holding that the mandate of vaccination against the COVID-19 virus for federal contractors presents a major question); *Texas v. U.S.*, 50 F.4th 498, 526-27 (5th Cir. 2022) (holding that deferring deportation proceedings against certain undocumented immigrants and enabling such individuals to receive certain benefits is a decision of "enormous political and economic significance"); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 617-18 (5th Cir. 2021) (holding that a mandate of vaccination against the COVID-19 virus for employees of employers with 100 or more workers presents a major question).[1] Each of these

---

[1] A panel of this Court has also rejected a Major Questions Doctrine challenge to a procedural requirement to disclose certain demographic information regarding the board composition of publicly-traded companies. *Alliance for Fair Bd. Recruitment v. Securities & Exchange Comm'n*,

cases involved an agency action that assigned substantive benefits or burdens to individuals or entities covered by the action, unlike the CRA Rule. In a counterfactual, the CRA Rule might come closer to raising the types of concerns that motivated this Court in those decisions if it, for example, purported to require regulated entities to actually originate a certain volume of loans or certain types of loans in low-income census tracts and relied upon ancillary statutory provisions or regulated outside of the area of agency expertise in doing so. Imposing new substantive requirements where Congress did not explicitly do so, depending on their nature and scope, can implicate the Major Questions Doctrine. What Defendants have done through the CRA Rule cannot.

    c.   Relying upon the Major Questions Doctrine to Invalidate the CRA Rule Would Raise Significant Separation of Powers Concerns.

In articulating the Major Questions Doctrine, the Supreme Court noted that the doctrine applies in "extraordinary" cases, in contrast to the mine run of cases where courts can readily conclude that Congress intended to confer authority on agencies. *West Virginia*, 597 U.S. at 721 (*quoting Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)). This limitation of the

---

85 F.4th 226, 256-57 (5th Cir. 2023). The *en banc* Fifth Circuit has vacated that decision pending review by the full court, but the reasoning of the panel decision remains persuasive. The panel rejected many arguments in support of its potential bases for relief in denying a petition for review of a Securities and Exchange Commission order, so it may be that the case that the panel's conclusions with respect to the Major Questions Doctrine are not at risk of being unsettled.

Major Questions Doctrine to "extraordinary" cases is integral to ensuring that the doctrine is applied in ways that are consistent with its underlying impetus of protecting the separation of powers. *See West Virginia*, 597 U.S. at 723. In its Major Questions Doctrine cases, the Supreme Court has posited that the doctrine is necessary to ensure that the Executive Branch does not usurp powers that are rightfully those of Congress. *Id.*; *Biden*, 143 S. Ct. at 2375. At the same time, it is well established that Congress, within the scope of its enumerated powers and subject to the requirement that it articulate an intelligible principle to guide agencies, has the power to delegate aspects of the implementation of statutes to those agencies. *Mistretta v. U.S.*, 488 U.S. 361, 372-73 (1989). Indeed, the Supreme Court reinforced the importance of respecting such delegations in its decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (holding that, "[w]hen the best reading of a statute is that it delegated discretionary authority to an agency," the court fulfills its role, in part, "by recognizing constitutional delegations").

Though the District Court omitted to mention this key point, the CRA does just that through its directive to Defendants that they promulgate "[r]egulations to carry out the purposes" of the Act. 12 U.S.C. § 2905. Congress has articulated intelligible principles to guide the content of Defendants' rulemaking regarding evaluations of regulated entities through the substantive provisions of 12 U.S.C. §§

2903, 2906 and has expressly delegated to Defendants the authority to elucidate the detailed specifications of those examinations through 12 U.S.C. § 2905. The CRA Rule, therefore, is just the sort of agency action regarding which the role of the courts must be limited to gauging whether agencies have engaged in reasoned decision-making, *Loper Bright Enterprises*, 144 S. Ct. at 2263, rather than to narrowing the ambit of agency rulemaking out of concern that a decision is too significant. The Major Questions Doctrine plays a role in reconciling the roles of the three branches, but, if stretched to reach decisions that do not rise to the level of implicating questions of vast political and economic significance, like the CRA Rule, it risks becoming the very type of problem that it seeks to solve: an encroachment on the rightful powers of co-equal branches of government.

## CONCLUSION

For these reasons, the Court should vacate the Preliminary Injunction below.

Respectfully submitted,

Dated: July 25, 2024

/s/ Kathryn J. Youker
KATHRYN J. YOUKER
THOMAS SILVERSTEIN
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW, Suite 900
Washington, D.C.  20005
(202) 662-8600
kyouker@lawyerscommittee.org

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4,744 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

/s/ Kathryn J. Youker
Kathryn J. Youker
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2024, a true and correct copy of the foregoing Brief was served via the court's CM/ECF system.

/s/ Kathryn J. Youker
Kathryn J. Youker
Counsel for *Amici Curiae*