No. 24-10367

# In the United States Court of Appeals for the Fifth Circuit

TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS,

*Plaintiffs-Appellees,*

*v.*

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; JEROME POWELL, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; FEDERAL DEPOSIT INSURANCE CORPORATION; MARTIN GRUENBERG, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE FEDERAL DEPOSIT INSURANCE CORPORATION; OFFICE OF THE COMPTROLLER OF THE CURRENCY; AND MICHAEL J. HSU, IN HIS OFFICIAL CAPACITY AS ACTING COMPTROLLER OF THE CURRENCY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

**BRIEF FOR THE STATES OF TEXAS, ALABAMA, ARKANSAS, GEORGIA, IDAHO, IOWA, KENTUCKY, LOUISIANA, MISSISSIPPI, MONTANA, NEBRASKA, NORTH DAKOTA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, AND WEST VIRGINIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

ERIC ABELS
Assistant Attorney General

Counsel for State Amici

# Certificate of Interested Persons

No. 24-10367

Texas Bankers Association; Amarillo Chamber of Commerce; American Bankers Association; Chamber of Commerce of the United States of America; Longview Chamber of Commerce; Independent Community Bankers of America; Independent Bankers Association of Texas,

*Plaintiffs-Appellees,*

*v.*

Board of Governors of the Federal Reserve System; Jerome Powell, in his Official Capacity as Chairman of the Board of Governors of the Federal Reserve System; Federal Deposit Insurance Corporation; Martin Gruenberg, in his Official Capacity as Chairman of the Federal Deposit Insurance Corporation; Office of the Comptroller of the Currency; and Michael J. Hsu, in his Official Capacity as Acting Comptroller of the Currency,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, amici curiae, as governmental entities, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit

Lanora Pettit

*Counsel of Record for Amici Curiae*

i

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................ i

Table of Authorities ................................................................................... ii

Interest of Amici Curiae .............................................................................. 1

Introduction ................................................................................................. 3

Argument ...................................................................................................... 5

    I.    Only Congress Can Expand the *Community* Reinvestment Act to Include Considerations Other Than a Bank's Actual Community. ............ 5

        A.    The FBAs assert a power to redefine the very terms on which Americans access the economy. ........................................................ 7

        B.    Congress did not authorize—let alone clearly authorize—the FBAs to redefine the defining feature of the CRA. ........................... 13

        C.    This Court should not rely on policy arguments to provide the FBAs power that Congress chose not to grant. ........................... 16

    II.    The FBAs Have No Authority to Assess Bank Deposit Products. ............. 17

Conclusion .................................................................................................. 21

Certificate of Service ................................................................................. 23

Certificate of Compliance .......................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    594 U.S. 758 (2021) ...................................................... 7, 8, 9, 16

*Allen v. Milligan*,
    599 U.S. 1 (2023) .................................................................... 10

*Atascadero State Hosp. v. Scanlon*,
    473 U.S. 234 (1985) ............................................................. 3, 12

*Biden v. Nebraska*,
    600 U.S. 482 (2023) ............................... 5, 6, 7, 10, 11, 12, 16, 17

*Bilski v. Kappos*,
    561 U.S. 593 (2010) .................................................................... 14

*Bush v. Vera*,
    517 U.S. 952 (1996) .................................................................... 15

*Chamber of Com. of U.S. of Am. v. U.S. Dep't of Lab.*,
    885 F.3d 360 (5th Cir. 2018) ....................................................... 5

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    98 F.4th 646 (5th Cir. 2024) (Ho, J., dissenting) ......................... 5

*Dep't of Transp. v. Ass'n of Am. R.R.s.*,
    575 U.S. 43 (2015) (Thomas, J., concurring) ........................... 5, 19

*Easom v. US Well Servs., Inc.*,
    37 F.4th 238 (5th Cir.) ............................................................... 18

*ETSI Pipeline Project v. Missouri*,
    484 U.S. 495 (1988) .................................................................... 16

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................ 4, 5, 7, 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ...................................................................... 5

*Gonzalez v. Oregon*,
    546 U.S. 243 (2006) .................................................................... 10

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ...................................................................... 3

*INS v. Chadha*,
    462 U.S. 919 (1983) .................................................................... 19

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117
    (2024) .......................................................................................... 3

*King v. Burwell*,
    576 U.S. 473 (2015) ................................................................ 13, 19

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) .................................................................... 17

*Loper Bright Enters. v. Raimondo*,
    144 S.Ct. 2244 (2024) ......................................................... 15, 16, 19

*Loving v. United States*,
    517 U.S. 748 (1996) .................................................................... 20

*NFIB v. OSHA,*
 595 U. S. 109 (2022) (Gorsuch, J., concurring) ..........................................10, 17

*NRA v. Vullo,*
 49 F.4th 700 (2d Cir. 2022), *vacated* 602 U.S. 175 (2024) ................................. 4

*Smith v. United States,*
 508 U.S. 223 (1993)................................................................................. 13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
 600 U.S. 181 (2023) ................................................................................ 10

*Texas v. EPA,*
 829 F.3d 405 (5th Cir. 2016) ..................................................................... 2

*Theriot v. Parish of Jefferson,*
 185 F.3d 477 (5th Cir. 1999) .................................................................... 15

*U.S. Bank v. Phila. Nat'l Bank,*
 374 U.S. 321 (1963) ................................................................................ 11

*U.S. Well Servs., Inc. v. Easom,*
 143 S. Ct. 427 (2022) .............................................................................. 18

*United States v. Aguilar-Alonzo,*
 944 F.3d 544 (5th Cir. 2019) .................................................................... 13

*Utility Air Regul. Grp. v. EPA,*
 573 U.S. 302 (2014)............................................................................13, 19

*Wayman v. Southard,*
 23 U.S. (10 Wheat.) 1 (1825) ..................................................................... 6

*West Virginia v. EPA,*
 597 U.S. 697 (2022) ..............................................2, 5, 6, 7, 9, 10, 12, 13, 19, 21

*Wis. Cent. Ltd. v. United States,*
 585 U.S. 274 (2018) ............................................................................... 16

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. art. I, § 1 ..............................................................................5, 7

12 U.S.C.:

 § 301 ...................................................................................................... 4

 § 321 ...................................................................................................... 2

 § 330 ...................................................................................................... 2

 § 481 .................................................................................................... 11

 § 1818(a)(i) ............................................................................................. 4

 § 2901(a)(2) ........................................................................................... 18

§ 2901(a)(3) ..................................................................................3

§ 2901(b)................................................................................ 1, 12, 15

§ 2902(4) ................................................................................... 14

§ 2903(a)(1) ...............................................................13, 14, 17, 18

§ 2906(b)(2)...................................................................................3

16 U.S.C. § 583b ............................................................................ 15

34 U.S.C. § 10389 .......................................................................... 15

42 U.S.C. § 9805............................................................................. 14

50 U.S.C. § 3003(4) ....................................................................... 15

**Other Authorities:**

Ballentine's Law Dictionary 231 (3d ed. 1969) .............................13, 14

Black's Law Dictionary 254 (5th ed. 1979) ............................... 13, 14, 15

Black's Law Dictionary 350 (Rev. 4th ed. 1968) ...........................13, 14

Board of Governors of the Federal Reserve System, *Community Reinvestment Act (CRA)*, https://perma.cc/4DRF-DTPS ............................... 2

Board of Governors of the Federal Reserve System, *CRA and the Applications Process*,https://perma.cc/DTJ8-A3KV .......................................... 4

Cal. Dep't of Fin. Prot. & Innovation, *The Dual Chartering System and the Benefits of the State Charter*, https://perma.cc/746L-YJGC ...................... 20, 21

Center for Microeconomic Data, *Household Debt and Credit Report*, Federal Reserve Bank of NY (Q2 2024), https://www.newyorkfed.org/microeconomics/hhdc ...................................18

Community Reinvestment Act Interagency Questions and Answers, 57 Fed. Reg. 10899 (Mar. 31, 1992)...................................................... 11

Community Reinvestment Act of 1977; Implementation, 43 Fed. Reg. 47144 (Oct. 12, 1978) ...................................................................... 11

Community Reinvestment Act, 89 Fed. Reg. 6574 (Feb. 1, 2024) .......... 1, 12, 19, 20

Conference of State Bank Supervisors, *State Financial Regulation 101* (July 1, 2023), https://perma.cc/H2NN-FA34 ............................................... 2

Diego Zuluaga, *Too Small to Succeed?*, Cato Institute (2020), https://www.cato.org/regulation/winter-2019-2020/too-small-succeed .......................................................................................... 6

Drew Desilver, *Most U.S. bank failures have come in a few big waves*, Pew Research Center (Apr. 11, 2023), https://perma.cc/X3GS-RF5B ........... 11

Eugene A. Ludwig et al., *The Community Reinvestment Act: Past Successes and future Opportunities, Revisiting the CRA: Perspectives on the Future of the Community Reinvestment Act* at 85, Fed. Reserve Banks of Boston and S.F. (2009), https://tinyurl.com/5t48wawc ............................................. 6

Fed. Reserve Bank of St. Louis, *Deposits, All Commercial Banks*, FRED Economic Data, https://fred.stlouisfed.org/series/ DPSACBW027SBOG ................................................................................18

Frank Holmes, *How Bank Closures Could Be Giving Rise to Digital Currencies*, Forbes (Jan. 6, 2021), https://perma.cc/3MXR-GRZD ................ 6

H.R. 1289, 110th Cong. § 103 (2007)....................................................................10

H.R. 1479, 111th Cong. § 103 (2009) ...................................................................10

H.R. 4893, 106th Cong. § 102 (2000)...................................................................10

H.R. 865, 107th Cong. § 102 (2001) .....................................................................10

*NCRC Forecast: Weakening the Community Reinvestment Act Would Reduce Lending by Hundreds of Billions of Dollars*, Nat'l Cmty. Reinvestment Coal. (Sept. 2018), https://tinyurl.com/k6fvc76y ........................................... 9

*The Federalist* No. 45, (James Madison) (Clinton Rossiter ed., 1961)......................3

Zach Fox & Usman Pirzada, *US Bank branch closures reach another high in 2018*, S&P Global (Jan. 18, 2010), https://perma.cc/NY6K-977Q .................. 6

## Interest of Amici Curiae

The Community Reinvestment Act of 1977 ("CRA") serves a single (albeit vital) purpose: to require the big three federal banking agencies—the Federal Reserve, Federal Deposit Insurance Corporation, and the Comptroller of the Currency (collectively, the "FBAs") "to use [their] authority" to encourage financial "institutions to help meet the credit needs of the local communities in which they are chartered," and thereby help to put an end to the pernicious practice of redlining. 12 U.S.C. § 2901(b). Today, those FBAs assert that same statute authorizes them to "modernize the CRA framework," Community Reinvestment Act, 89 Fed. Reg. 6574, 6584 (Feb. 1, 2024), by (among other things) expanding the definition of "community" to consider not just "the geographic areas where [a] bank maintains deposit-taking facilities" but also "other geographic areas where [a] bank conducts retail lending" and beyond—a potentially limitless notion in the modern, digital age. ROA.495.

The States of Texas, Alabama, Arkansas, Georgia, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and West Virginia do not doubt that the FBAs and their amici sincerely believe that this expansion of the CRA will help minority communities as well as others who may be underserved by the financial industry. Nevertheless, Amici States submit this brief because the expansion has the potential to devastate rather than empower local communities. As the Texas Bankers Association, "America's oldest and largest state banking organization" explained, banks across Texas have already incurred nonrecoverable costs from seeking to

comply with these new requirements. ROA.280-84. Simple economics suggest that these costs will be passed onto the banks' customers, and their effect is likely to be felt most heavily by those least able to afford them. Even worse, some members of the Association have "already begun making plans to scale back lending in certain areas to avoid incurring new assessment areas, costing them valuable business opportunities," ROA.283, and exacerbating the phenomenon of "banking deserts" that these rules were designed to address, *see, e.g.*, Cal.Br.6-10. It is precisely because regulations like this carry such "basic and consequential tradeoffs" that the Framers placed them in the hands of a single entity: Congress. *West Virginia v. EPA*, 597 U.S. 697, 730 (2022).

Three out of every four of the nation's banks—including many that will be subject to the challenged rule—are state chartered.[1] State regulators work tirelessly not only to "ensure [such] financial institutions are operating in a safe and sound manner" but also "to support the economic health of their local commun[ity]."[2] By interfering with that relationship, the challenged actions "inver[t]" the "federalism principles enshrined" in our Constitution. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016).

---

[1] State-chartered banks may apply to become members of the federal reserve system. 12 U.S.C. § 321. This can provide state-chartered banks many benefits, but it also subjects them to numerous federal laws, including the CRA. *See* 12 U.S.C. § 330; Board of Governors of the Federal Reserve System, *Community Reinvestment Act (CRA)*, https://perma.cc/4DRF-DTPS (last visited Sept. 16, 2024).

[2] *See* Conference of State Bank Supervisors, *State Financial Regulation 101* (July 1, 2023), https://perma.cc/H2NN-FA34.

## Introduction

For more than 200 years, our Constitution has "ensure[d] the protection of 'our fundamental liberties,'" by dividing power not only between the state and federal governments but also among the branches of the federal government. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). Knowing that a national government could grow distant from the People (from whom sovereignty in a democratic republic is derived), the Framers provided that "[t]he powers delegated by the [federal] Constitution to the federal government are few and defined." *The Federalist* No. 45, at 289 (James Madison) (Clinton Rossiter ed., 1961). By contrast, "[t]hose which . . . remain in the State governments," which are far more in tune with and accountable to local communities, "are numerous and indefinite." *Id.* "The legislative power is the greatest of the[] powers" granted to the federal government, "and, of course, it was given to Congress." *Jarkesy v. SEC*, 34 F.4th 446, 459 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024).

In 1977, Congress used that power to "address 'redlining,'" the practice of private banks "refusing credit in neighborhoods 'deemed too risky'"— neighborhoods that were "predominately minority and inner city." ROA.586. Finding that "regulated financial institutions have continuing and affirmative obligation[s] to help meet the credit needs of the local communities in which they are chartered," 12 U.S.C. § 2901(a)(3), Congress required the FBAs to evaluate whether banks under their purview are fulfilling that duty, *id.* § 2906(b)(2). These evaluations allow financial institutions to be held publicly accountable and are

considered when a bank applies to the FBA for "mergers, acquisitions, and branches."[3] But they can also lead to sanctions if a bank is found to be making "undue use of bank credit," 12 U.S.C. § 301; or engaging in "unsafe or unsound practices," *id.* § 1818(a)(i)—broad concepts that have shown themselves ripe for abuse, *cf., e.g.*, *NRA v. Vullo*, 49 F.4th 700, 708–09 (2d Cir. 2022), *vacated* 602 U.S. 175 (2024).

As the district court noted, "[b]y most measures, the CRA achieved its goals: '[f]or more than 45 years, banks have extended trillions of dollars of credit to … low- and moderate-income individuals in their communities,'" ROA.587 (quoting ROA.254), and 98% of banks have achieved laudable scores on their assessments, ROA.606. Congress has signaled its satisfaction with this result by refusing to enact the Community Reinvestment Modernization Act "four times in nine years." ROA.600-01.

Undeterred by the lack of a problem to solve, the FBAs now claim the authority to define a bank's "community" beyond "a bank's physical, deposit-taking footprint" to account for (among other things) amorphous notions of the "statistical area[s]" in which a bank has made "CRA-relevant loans." ROA.588. And they have expanded an assessment of a bank's *credit* practices to include consideration of a bank's *deposit* products and loosely associated practices. But the CRA says nothing to suggest that Congress "intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown &*

---

[3] Board of Governors of the Federal Reserve System, *CRA and the Applications Process*, https://perma.cc/DTJ8-A3KV (last visited Sept. 16, 2024).

*Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). "Restoring our democracy requires regaining control of the bureaucracy." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 98 F.4th 646, 650 (5th Cir. 2024) (Ho, J., dissenting) (per curiam). And here that requires affirming the preliminary injunction as to both the FBAs' redefinition of the term "community," and its inclusion of deposit products in CRA assessments.

## ARGUMENT

### I.  Only Congress Can Expand the *Community* Reinvestment Act to Include Considerations Other Than a Bank's Actual Community.

The Constitution delegates the "power to fashion legally binding rules" that will govern private conduct, *Dep't of Transp. v. Ass'n of Am. R.R.s.*, 575 U.S. 43, 77 (2015) (Thomas, J., concurring) (*Amtrak II*), to one entity: Congress, U.S. Const. art. I, § 1. Although it is now accepted that Congress has the "power to create a vast and varied federal bureaucracy," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010), respect for the separation of powers demands that courts remain "skeptical of federal regulations crafted from long-extant statutes that exert novel and extensive power over the American economy." *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Lab.*, 885 F.3d 360, 387 (5th Cir. 2018); *see also, e.g.*, *Biden v. Nebraska*, 600 U.S. 482, 503 (2023). In this instance, the district court properly employed that critical approach to enjoin as unlawful the FBAs' decision to redefine a law of great "economic and political significance," which arose out of a painful time in our Nation's history. *West Virginia*, 597 U.S. at 721.

The FBAs and their supporters—including many of Amici's sister States—evidently find such skepticism inconvenient because it impedes the FBAs' ability to address the perceived "modern realities" of a "banking landscape no longer tethered to physical branches." Cal.Br.12. But it is precisely this skepticism that ensures that questions involving "basic and consequential tradeoffs" between competing societal goals, *Nebraska*, 600 U.S. at 506, are "entirely regulated by the legislature itself," *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)). It might very well be true that "[i]f the CRA is to continue to be effective, it must be modernized by expanding its . . . service area focus."[4] But it is also true that compliance costs associated with innumerable banking regulations are frequently cited for bank closures.[5] The Constitution empowers Congress to make choices among such competing priorities—not the FBAs, not individual States, and not this Court.

---

[4] Cal.Br.9 n.20 (quoting Eugene A. Ludwig et al., *The Community Reinvestment Act: Past Successes and future Opportunities, Revisiting the CRA: Perspectives on the Future of the Community Reinvestment Act* at 85, Fed. Reserve Banks of Boston and S.F. (2009), https://tinyurl.com/5t48wawc).

[5] *See, e.g.*, Frank Holmes, *How Bank Closures Could Be Giving Rise to Digital Currencies*, Forbes (Jan. 6, 2021), https://perma.cc/3MXR-GRZD (citing Zach Fox & Usman Pirzada, *US Bank branch closures reach another high in 2018*, S&P Global (Jan. 18, 2010), https://perma.cc/NY6K-977Q); Diego Zuluaga, *Too Small to Succeed?*, Cato Institute (2020), https://www.cato.org/regulation/winter-2019-2020/too-small-succeed.

## A. The FBAs assert a power to redefine the very terms on which Americans access the economy.

Although the Constitution does not define the "legislative Power[]," U.S. Const. art. I, § 1, the Supreme Court's major-questions jurisprudence identifies four factors that suggest a question is presumptively reserved for Congress: (1) "economic" significance; (2) "political" significance; (3) "histor[ical]" precedent; and (4) "the breadth of the authority that [the agency] has asserted." *West Virginia*, 597 U.S. at 721. The Court has also cautioned that lower courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision . . . to an administrative agency." *Brown & Williamson*, 529 U.S. at 133. And "[c]ommon sense tells us that as more indicators from [the Supreme Court's] previous major questions cases are present, the less likely it is that Congress would have delegated the power to the agency without saying so more clearly." *Nebraska*, 600 U.S. at 521 (Barrett, J., concurring). Here, that inquiry is easy because whether and how to address "racial inequalities in access to digital infrastructure" (and particularly to electronic banking) presents every one of those factors. Cal.Br.11.

*First*, the economic significance of the FBAs' assertion of authority alone "provide[s] a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159–60). True, the pre-enforcement compliance burden of the rule—an estimated $91.8 million, ROA.601—is relatively modest compared to those in other, recent major-questions cases. *See Nebraska*, 600 U.S. at 488 ($430 billion); *Ala.*

*Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) ($50 billion). Leaving aside any longer-term compliance costs (which are considerably higher), in this instance, such out-of-pocket cost are not "a reasonable proxy of the [rule's] economic impact," *Ala. Ass'n of Realtors*, 594 U.S. at 764. "In 2022 alone, banks provided more than $227 billion in capital to low- and-moderate income individuals and businesses" impacted by the CRA. ROA.587 (quotation marks omitted). The *point* of the FBAs' actions is to fundamentally shift how they go about doing so.

The potential market impact of expanding the scope of the CRA—and thereby the cost of compliance that has led to so many bank closures, *supra* n.5—is amply demonstrated in the plaintiffs' evidence. For example, the 388 member banks in the Texas Bankers Association collectively hold over $1 trillion in combined assets. ROA.280. Of those 388 banks, fifty-six banks would be considered "large" under the FBAs' new rules, and twenty of these large banks hold assets of at least $10 billion. ROA.281. Some of these banks "have already begun making plans to scale back lending in certain areas in avoid incurring new assessment areas." ROA.283. Banks in the Independent Community Bankers of America, an association consisting of "more than one half of the total depository institutions in the United States," ROA.315, also voiced similar concerns. When asked whether the modernization of the CRA would cause them to reduce lending to avoid generating an RLAA, "28.2% of survey respondents replied they will reduce lending." ROA.317, 606. Given the economic significance of the banking industry, it is extremely unlikely that Congress could have intended to authorize the FBAs to disregard such effects.

Far from denying this conclusion, the FBAs and their amici *rely* on the economic significance of the rule in explaining why that the district court's ruling was improper. For example, California and its coalition of States assert an interest in this case precisely because they "have collectively seen hundreds of billions of dollars in investments and lending flow into their communities," which they insist is "[d]ue to the obligations the CRA imposed on banks." Cal.Br.2. And they assert that "research consistently shows that low-and moderate-income communities subject to CRA evaluations receive increased investments and loans worth billions of dollars." *Id.* at 15 (citing *NCRC Forecast: Weakening the Community Reinvestment Act Would Reduce Lending by Hundreds of Billions of Dollars*, at 4–6, Nat'l Cmty. Reinvestment Coal. (Sept. 2018), https://tinyurl.com/k6fvc76y). Assuming this assessment to be true (this brief takes no position on that issue), it puts the FBAs actions squarely in major-questions territory. *Ala. Ass'n of Realtors*, 594 U.S. at 764.

*Second*, the political significance of the FBAs' efforts to expand the CRA is also difficult to overstate. As the FBAs and their amici freely admit, the current rule seeks to address "existing racial and wealth disparities" that they insist are the direct descendants of the Jim Crow era redlining that led to the CRA's passage in the first place. Cal.Br.25; *see also, e.g.*, FBA.Br.51-52. There can be little doubt, however, that whether, when, and how policymakers may use their remedial authority in the present to counteract the perceived effect of racial discrimination in the past is "the subject of an earnest and profound debate across the country." *West Virginia*, 597 U.S. at 732. Indeed, it might fairly be characterized one of the most hotly contested

legal issues of our time,[6] making the "oblique form of the claimed delegation all the more suspect." *Gonzalez v. Oregon*, 546 U.S. 243, 267 (2006).

The Court should exercise even greater caution in accepting the FBAs' position since Congress "considered and rejected," *West Virginia*, 597 U.S. at 731, the very policy that the FBAs seek to adopt by administrative fiat four times in nine years, ROA.600-01. As the district court noted, the Community Reinvestment Modernization Act would have modernized the CRA to account for changes in the way that minority and low-income communities access the financial markets in the exact way the FBAs did so in the rule. ROA.600-01. Congress rejected the suggestion in 2000, 2001, 2007, and 2009.[7] Congress' denial of the precise authority at issue is a sure "sign that an agency is attempting to 'work around' the legislative process to resolve for itself a question of great political significance." *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring) (quoting *NFIB v. OSHA*, 595 U. S. 109, 122 (2022) (Gorsuch, J., concurring) (per curiam)).

*Third*, as the district court also noted, "[n]ever before have the FBAs claimed authority to assess banks *wherever* they conduct retail lending." ROA.600. "Granted, . . . this is not a case where the agenc[ies] [are] operating entirely outside [their] usual domain." *See Nebraska*, 600 U.S. at 521 (Barrett, J., concurring). That is, the FBAs were created to regulate banks, and they continue to regulate banks. But the same could have been said in *Nebraska*: Although the Secretary of Education has

---

[6] *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 45 (2023); *see generally Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).

[7] H.R. 4893, 106th Cong. § 102 (2000); H.R. 865, 107th Cong. § 102 (2001); H.R. 1289, 110th Cong. § 103 (2007); H.R. 1479, 111th Cong. § 103 (2009).

long been empowered to set rules regarding student loans, the Court concluded that did *not* give him leave to "release 43 million borrowers from their obligations to repay $430 billion in student loans," in part because the Secretary had "never previously claimed powers of this magnitude" before. *Id.* at 501. So too here: Although there have been periods of significant bank closures before now, *see* Drew Desilver, *Most U.S. bank failures have come in a few big waves*, Pew Research Center (Apr. 11, 2023), https://perma.cc/X3GS-RF5B, the FBAs "have—since 1978—limited themselves to areas surrounding deposit-taking facilities." ROA.600 (citing Community Reinvestment Act of 1977; Implementation, 43 Fed. Reg. 47144, 47144 (Oct. 12, 1978); Community Reinvestment Act Interagency Questions and Answers, 57 Fed. Reg. 10899, 10899 (Mar. 31, 1992)).

And, *fourth*, as in *Nebraska*, accepting the FBAs' interpretation of their own authority would give them "virtually unlimited power to rewrite the[ir original Act." *Nebraska*, 600 U.S. at 502. The Supreme Court has recognized that "the broad visitorial power of federal bank examiners" is "perhaps the most effective weapon of federal regulation" because "[w]henever the agencies deem it necessary, they may order 'a thorough examination of all affairs of the bank.'" *U.S. Bank v. Phila. Nat'l Bank*, 374 U.S. 321, 329 (1963) (quoting 12 U.S.C. § 481). And if they find anything "undue" about the banks' use of credit, or "unsafe" about their practices, the regulators can employ a "panoply of sanctions," including "suspend[ing] the bank from the use of the credit facilities" of the Federal Reserve to "terminat[ing] the bank's insured status" under the FDIC. *Id.* at 329–30 (collecting statutes).

11

As discussed below, the FBAs have used 649 triple-column pages to redefine "community" from one that is tied to a physical neighborhood to something that involves the FBAs' subjective assessment of the relevant "statistical area," or CRA-relevant loans. 89 Fed. Reg. at 6577. Perhaps more troubling, they have expressly provided for the creation of an assessment based on "'the nationwide area outside' a bank's Facility Based Assessment Areas," ROA.588 (citing ROA.256). Consistent with longstanding statutory law, however, many of these banks are chartered *by States*, *supra* p.2. If FBAs can define "local communities," 12 U.S.C. § 2901(b), to mean "nationwide area[s]," ROA.565-66 (quoting 89 Fed. Reg. at 6619, 6763, 7115), and then assess state-chartered banks' performance against their own notions on how those banks *should* perform in that nationwide area not just in the credit markets but in the deposit-product markets, *see infra* Part II, it is difficult to see what the FBAs think they *cannot* do.

Such a limitless assertion of power is a primary hallmark of a major question reserved to Congress. *See Nebraska*, 600 U.S. at 502–03. But even long before the Supreme Court formally recognized "major questions doctrine 'label'" in 2022, *West Virginia*, 597 U.S. at 724, it held that "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute," 501 U.S. at 460 (quoting *Atascadero State Hosp.*, 473 U.S. at 242) (cleaned up).

**B. Congress did not authorize—let alone clearly authorize—the FBAs to redefine the defining feature of the CRA.**

The FBAs can point to no such "'clear congressional authorization' for the power [they] claim[]." *West Virginia*, 597 U.S. at 723 (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). To the contrary, Section 2903(a)(1) authorizes the FBAs to "assess the institution's record of meeting the credit needs of its entire community." 12 U.S.C. § 2903(a)(1). Because the CRA does not define the term "entire community," courts "normally construe it in accord with its ordinary or natural meaning," considering its context and other times Congress has used similar terms. *United States v. Aguilar-Alonzo*, 944 F.3d 544, 550 (5th Cir. 2019) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)); *see also, e.g.*, *King v. Burwell*, 576 U.S. 473, 486 (2015). Here, the district court properly found that Congress intended a bank's community to mean the neighborhood around its physical location—not its collection of potential customers wherever they might reside.

To start, as the district court noted, the term "community" itself "necessarily involves a limited geographic area." ROA.593. At the time the CRA was passed, the term "community" was defined as "vicinity, synonymous with locality. People who reside in a locality in more or less proximity." *Community*, Black's Law Dictionary 350 (Rev. 4th ed. 1968); *see also, e.g.*, *Community*, Black's Law Dictionary 254 (5th ed. 1979) (same); *Community*, Ballentine's Law Dictionary 231 (3d ed. 1969) ("A town; municipality; a district"). This is confirmed by the fact that the very same statutory provision describes that community as "including low- and moderate-income *neighborhoods*, consistent with the safe and sound operation of such

13

institution." 12 U.S.C. § 2903(a)(1) (emphasis added). At the time of the CRA's passage, neighborhood—like community—was understood to mean "[a] place near; an adjoining or surrounding district; a more immediate vicinity; vicinage." Black's (4th ed.), *supra* at 1188; *see also, e.g.*, Black's (5th ed.), *supra* at 934 (same); *Ballentine's*, *supra* at 842 ("A region, area or territory of local significance characterized by people living in it as neighbors"); *id.* (equating it with the area from which a jury might be drawn).

This conclusion is underscored by Section 2903's broader statutory context. For example, under Section 2902(4), a bank that serves military members "who are not located within a defined geographic area may define its 'entire community' to include its entire deposit customer base without regard to geographic proximity." 12 U.S.C. § 2902(4). In specifying that banks serving *military* members can act "without regard to geographic proximity," Congress impliedly did not provide such flexibility to *other* banks. *See Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010) ("This would violate the canon against interpreting any statutory provision in a manner that would render another provision superfluous.").

And it is consistent with other uses of "community" in case- and code-book. For example, in creating other programs to assist underprivileged "communities," Congress sometimes specifies that communities are "defined without regard to political or other subdivisions or boundaries," but it consistently speaks in terms of geographic proximity. 42 U.S.C. § 9805 (discussing community economic

development programs).[8] As have the courts when, for example, defining what constitutes a "community of interest" in the context of voting rights. *E.g.*, *Bush v. Vera*, 517 U.S. 952, 964 (1996) (considering such factors as "shared broad-cast and print media, public transport infrastructure, and institutions such as schools and churches"); *Theriot v. Parish of Jefferson*, 185 F.3d 477, 486 (5th Cir. 1999) ("The record indicates that the neighborhoods and subdivisions that now make up District 3" are a community of interest based on socio-economic similarities).

As the district court noted, the word "entire" does not change what a community is. ROA.594. Rather, it modifies "community" and thereby clarifies that banks need to serve their "whole" community, "without division, separation, or diminution." *Black's* (5th ed.), *supra* at 477; *see* ROA.594. And, tellingly, "entire" is not the only term that Congress used to describe the relevant community. For example, the statute's congressional findings speak in terms of serving "local" communities. 12 U.S.C. § 2901(b). That term has also long been understood to mean "belonging or confined to a particular place." Black's (5th ed.), *supra* at 845.

Nor does this clear geographic focus change merely because modern life is becoming increasingly digital. *See Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244,

---

[8] *See also, e.g.*, 16 U.S.C. § 583b (allowing the Department of Agriculture to set forest-management policy that allow the "maintenance of a stable community or communities [that are] primarily dependent upon the sale of timber"); 34 U.S.C. § 10389 (discussing the deployment of school-resources officers in "community-oriented policing" in conjunction with "community-based organizations"). Where Congress has *not* intended a geographical meaning, that is abundantly clear from specific definition or linguistic context. *E.g.*, 50 U.S.C. § 3003(4) (defining the "intelligence community").

2266 (2024). Indeed, "that is the whole point of having written statutes; 'every statute's meaning is fixed at the time of enactment.'" *Id.* (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)).

**C.  This Court should not rely on policy arguments to provide the FBAs power that Congress chose not to grant.**

"In a final bid to elide the statutory text," *Nebraska*, 600 U.S. at 500, various amici states aligned with the Defendant-Appellants appeal to the purpose of the CRA. Per California and its co-amici, the new rule helps ensure that vulnerable individuals (those living in low to moderate income communities and people of color) receive "full and equal access to loans in neighborhoods lacking a physical branch." Cal.Br.5. According to these States, the new assessments "will be critical to help vulnerable communities gain access in a modern banking landscape increasingly detached from physical branches." *Id.* at 5-6. Leaving aside that such arguments *support* the district court's assessment that this case presents a question of economic and political importance, *supra* p.7–10, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 594 U.S. at 766. "[R]egardless of how serious the problem" the FBAs seek to address, they "may not exercise [their] authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Brown & Williamson*, 529 U.S. at 125 (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)).

And as in other major questions cases, the "question here is not whether something should be done; it is who has the authority to do it." *Nebraska*, 600 U.S.

at 501. It is a fundamental principle of administrative law that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Because Congress has not chosen to redefine what constitutes a "community" for the purposes of the CRA, it is not the role of the courts "to weigh such tradeoffs" as discussed by the states supporting the FBAs. *NFIB*, 595 U.S. at 120. Rather, "[i]n our system of government, that is the responsibility of those chosen by the people through democratic processes." *Id.* Should Congress deem the policy concerns of the FBAs to be of the utmost importance, it will modernize the CRA to account for them.

## II.  The FBAs Have No Authority to Assess Bank Deposit Products.

Just as the CRA does not authorize the FBAs to divorce bank geographical assessment areas from deposit taking facilities, it does not authorize the FBAs to assess banks on deposit products and services. Although the district court did not rest its analysis of this aspect of the rule on the major questions doctrine, ROA.597-600, many of the same principles suggest that the text of the CRA offers no support for the FBAs' interpretation.

Deposit products possess the same hallmarks of a major question as their credit-product cousins. Indeed, because the FBAs rely on the same provision of the CRA to claim this authority, ROA.516-17 (relying on 12 U.S.C. § 2903(a)(1)), the historical and political factors are identical. They have similar economic implications as well because the size of the markets are similar: deposits in commercial banks totaled approximately $17.6 trillion on June 12, 2024. Fed. Reserve Bank of St. Louis, *Deposits, All Commercial Banks*, FRED Economic Data, https://fred.stlouisfed.org/

series/DPSACBW027SBOG (last visited September 17, 2024); with household debt reaching $17.8 trillion in the second quarter of 2024, Center for Microeconomic Data, *Household Debt and Credit Report*, Federal Reserve Bank of NY (Q2 2024), https://www.newyorkfed.org/microeconomics/hhdc. Indeed, as the FBAs' own amici demonstrate, the economic implications are, to a degree, intertwined because there is a "correlation between a community's access to deposit products and its ability to access credit." Cal.Br.16.

The biggest difference is that the FBAs have not even a fig leaf of statutory authority for their consideration of deposit products. Congress clearly knew the difference between credit services and deposit services in 1977 as it expressly found that "the convenience and needs of communities include the need for credit services *as well as* deposit services." *See* 12 U.S.C. § 2901(a)(2) (emphasis added). Yet in the operative language of the CRA, Congress gave the agencies sole power to "assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." *Id.* § 2903(a)(1). This direct omission by Congress is clear and unambiguous: FBAs assess credit services, not deposit services. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir.), *cert. denied sub nom. U.S. Well Servs., Inc. v. Easom*, 143 S. Ct. 427 (2022) (By 1977, "Congress knew how to, and could have, included terms like" deposit services).

The FBAs seek to fill this gap by claiming "that there is a sufficient nexus between deposit products and the provision of credit such that" evaluating whether banks are meeting the credit needs of low- and moderate-income individuals requires

looking at deposit products as well. 89 Fed. Reg. 6943. But an agency has never had "power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air*, 573 U.S. at 325. And because whether to subject banks to a CRA assessment based on their treatment of deposit products is one of "deep and economic and political significance,'" any ambiguity has long been resolved against the agency's assertion of authority. *Loper Bright*, 144 S.Ct. at 2269 (noting that "*Chevron* d[id] not apply" to such questions) (quoting, *inter alia*, *King*, 576 U.S. at 486).

The arguments put forth by the States supporting the FBAs do not help the cause. To the contrary, their assertion that "evaluations of deposit products will incentivize banks to provide communities with full and equal access," Cal.Br.16, is a naked plea for this Court to make the type of "basic and consequential tradeoffs" that the Constitution (and, by extension, the major-questions doctrine) reserves to Congress, *West Virginia*, 597 U.S. at 730; *see also* ROA.599. True, Congress may not move as quickly as the FBAs or their supporters might prefer. "[B]ut it is crystal clear from the records of the Convention, contemporaneous writings and debates, that the Framers ranked other values higher than efficiency." *INS v. Chadha*, 462 U.S. 919, 958-59 (1983). Instead, "[o]ur Constitution, by careful design, prescribes a process for making law," with "many accountability checkpoints." *Amtrak II*, 575 U.S. at 61 (Alito, J., concurring) (citing *Chadha*, 462 U.S. at 959). However slow they may seem to bankers or economists, "Article I's precise rules of representation, member qualifications, bicameralism, and voting procedure [still] make Congress

the branch most capable of responsive and deliberative lawmaking." *Loving v. United States*, 517 U.S. 748, 757–58 (1996).

This case proves the wisdom of that design. Just as California and nineteen other states view the evaluation of deposit products as a positive improvement, many commenters disagreed with the choice of the FBAs. For example, as the final rule notes, some commenters "opposed the inclusion of a bank's deposit products in the evaluation of the test altogether," commenting that "there is no statutory basis in the CRA for evaluating the features of bank deposit products." 89 Fed. Reg. at 6943. Likewise, other "commenters warned the agencies against regulating costs and fees." *Id.* at 6945. Still, other commenters "noted that the analysis of low-cost features could force banks to offer certain products at particular prices and fees and urged the agencies to implement safeguards to prevent the evaluation from causing such a result." *Id.* By opting to include deposit products in the evaluations of "credit needs," the FBAs ignored each of these concerns and assumed congressional power to weigh policy choices.

Nor does this leave those favoring greater bank regulation—particularly the District of Columbia and the eighteen States who joined California in its brief to this Court—without recourse. As one of California's own financial regulator notes, "[a]s of June 30, 2023, there were 3,632 state banks with total assets of $8.0 trillion, versus 756 national banks with total assets of $14.9 trillion." Cal. Dep't of Fin. Prot. & Innovation, *The Dual Chartering System and the Benefits of the State Charter*, https://perma.cc/746L-YJGC (last visited Sept. 17, 2024). This has "prompted individual states to be responsive to the needs of their constituent bankers and

citizens" and resulted in common-place financial innovations such as "branching, deposit insurance, trust services, variable rate mortgages, home equity loans, interest-bearing transaction accounts, and checking accounts." *Id.* One of the primary benefits of our federal system is that if allowing banks such flexibility has also led to discrimination or predatory practices in individual States, it can be removed as easily as it was given. Presumptively the States that support the FBAs don't want to do that because it might lead capital to flee to other jurisdictions. But the need to make such "tradeoffs" merely demonstrates why the district court was right to hold that only Congress is constitutionally empowered to modernize the CRA. *West Virginia*, 597 U.S. at 730.

## CONCLUSION

The Court should affirm the district court's order.

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

TIM GRIFFIN
Attorney General of Arkansas

BRENT WEBSTER
First Assistant Attorney General

CHRIS CARR
Attorney General of Georgia

AARON L. NIELSON
Solicitor General

RAÚL LABRADOR
Attorney General of Idaho

/s/ Lanora C. Pettit
LANORA C. PETTIT
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

BRENNA BIRD
Attorney General of Iowa

21

RUSSELL COLEMAN
Attorney General of Kentucky

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Attorney General of Mississippi

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

DREW WRIGLEY
Attorney General of North Dakota

DAVE YOST
Attorney General of Ohio

GENTNER DRUMMOND
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

SEAN REYES
Attorney General of Utah

PATRICK MORRISEY
Attorney General of West Virginia

ERIC ABELS
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for State Amici

## CERTIFICATE OF SERVICE

On September 25, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,556 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT